# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

IN RE:      ENGLE CASES

                                      Case No.:     3:09-cv-10000-J-WGY-JBT

_____/

## <u>OPINION AND ORDER</u>

# Table of Contents

Introduction…………………………………………………………… **5**

**Part I: Background and Facts……………………………………….** **9**

Part I.A: The Engle Class Action – 1994 to 2006…………….. 9

Part I.B: Potential Plaintiffs………………………………….. 10

Part I.C: Individual Suits Filed – 2008……………………….. 12

Part I.D: The Stay– 2008 to 2010…………………………….. 14

Part I.E: Case Management Efforts…………………………... 15

Part I.E.1: Responses to the December 2010 Order…... 17

Part I.E.2: The April 2011 Order……………………… 19

Part I.E.3: The June 2011 Hearing…………………….. 21

Part I.E.4: The Court Questionnaires…………………. 25

Part I.F: Motions to Dismiss…………………………………. 27

Part I.F.1: The Wilner Declaration……………………. 28

Part I.F.2: The June 2012 Hearing…………………….. 30

Part I.G: The Denton Juror…………………………………… 34

Part I.H: Case Dismissals in 2012 and 2013 and Appointment
of Special Master…………………………………… 36

Part I.I: The 2016 Report and Recommendation…………….. 40

Part I.J: The December 2016 Hearing………………………... 41

**Part II: Procedural Due Process…………………………………** **41**

Part II.A: Constitutional Requirements………………………. 42

Part II.B: Rule 11 Procedural Requirements…………………. 52

**Part III: Rule 11…………………………………………………** **54**

Part III.A: Rule 11 in General………………………………… 54

Part III.B: An Objective Bad Faith Standard Applies to Court-
Initiated Rule 11 Sanctions………………………... 57

Part III.C: Application of Rule 11 to Dead Plaintiffs' Personal
Injury Actions…………………………………………    63

Part III.C.1: Facts……………………………………    63

Part III.C.2: The 588 Actions Were Objectively Frivolous…    63

Part III.C.3: Counsel "Later Advocated" the 588 Complaints
In this Court…………………………………    64

Part III.C.4: Counsel Advocated Personal Injury Claims in
Objective Bad Faith……………………………    68

Part III.C.5: Counsel's Objections…………………………...    74

Part III.D: Rule 11's Application to Other Cases……………………    79

**Part IV: 28 U.S.C. § 1927……………………………………………..    80**

Part IV.A.: § 1927……………………………………………    80

Part IV.B:  Application……………………………………………    84

Part IV.B.1: The 588 Actions…………………………………    85

Part IV.B.2: Previously Adjudicated Cases…………………..    85

Part IV.B.3: Cases Dually Filed in State and Federal Court….    88

Part IV.B.4: The Larramore Case, 3:09-cv-13139……………    88

Part IV.B.5: The Olds Cases, Case Nos. 3:09-cv-12059 and
3:09-cv-12060…………………………………..    90

Part IV.B.6: The Eugene Johnson Case, 3:09-cv-12989…...    94

Part IV.B.7: Cases Where Plaintiffs Did Not Wish to Pursue a
Claim…………………………………………..    95

Part IV.B.8: Non-Smoker Plaintiffs………………………    100

Part IV.B.9: Non-Florida Resident Plaintiffs………………    104

Part IV.B.10: Cases Where the Plaintiff Did Not Suffer From
An <u>Engle</u> Disease…………………………… 109

Part IV.B.11: Cases Barred by the Statute of Limitations… 109

Part IV.B.12: Cases Involuntarily Dismissed for Lack of a
Federal <u>Engle</u> Questionnaire……………….. 110

**Part V: Inherent Authority…………………………………… 114**

Part V.A: The Court's Inherent Authority to Sanction…………… 114

Part V.B: Applicability of Inherent Authority Sanctions to Cases
Discussed in Parts III and IV………………………….. 116

Part V.C: Material Misrepresentations…………………………… 119

Part V.C.1: Misrepresentations During the June 6, 2011 Hearing… 120

Part V.C.2: April 6, 2012 Declaration (Doc. 589-1)………………. 125

**Part VI: Sanctions……………………………………………… 129**

Part VI.A: Monetary Sanctions…………………………………. 129

Part VI.B: Apportionment of Fault………………………………... 143

Part VI.C: Non-Monetary Sanctions……………………………… 145

**Conclusion……………………………………………………… 146**

WILLIAM G. YOUNG, TIMOTHY J. CORRIGAN, MARCIA MORALES HOWARD, and ROY B. DALTON, JR., DISTRICT JUDGES[1]:

> **[A]ttorneys are the filter upon which courts rely to maintain the integrity of, and trust in, our judicial process.**

Peer v. Lewis, 606 F.3d 1306, 1316 (11th Cir. 2010). On the rare occasion when attorneys undermine that integrity and trust, there must be consequences. This is one of those rare occasions.

Of the thousands of "Engle-progeny"[2] product liability actions over which this Court has presided ("**Federal Engle Actions**"), the majority had to be resolved through a painstakingly piecemeal culling process. While the judicial books are closed for the litigants in the Federal Engle Actions, this matter cannot be concluded until The Wilner Firm, P.A. and Farah & Farah, P.A. (collectively, "**Counsel**") and their principals, Norwood Wilner ("**Wilner**") and Charlie Farah ("**Farah**"),[3] are held to account for the immense waste of judicial resources and contempt shown for the judicial process occasioned by maintaining over a thousand non-viable claims. Counsel evinced a conscious disregard of their

---

[1] Because of the large size of the federal Engle docket, the then three active district judges of the Jacksonville Division of the United States District Court for the Middle District of Florida jointly managed these cases. We were later joined by the Honorable William G. Young of the United States District Court for the District of Massachusetts, sitting by designation. All four of the undersigned judges have participated in the consideration of the sanctions issue and all four join this opinion.

[2] See Engle v. Liggett Group, Inc. (Engle III), 945 So. 2d 1246 (Fla. 2006).

[3] Throughout this opinion the Court uses the terms "Wilner" and "Farah" to mean Norwood Wilner and Charlie Farah. While Wilner's and Farah's law firms, collectively called "Counsel" in this opinion, are responsible for the monetary sanctions imposed under this Order, it is primarily the conduct of Wilner and Farah, and not the other lawyers in the respective firms, that has caused the Court to impose sanctions.

professional obligation to properly investigate such claims, obtain authorizations to file from clients, and—most importantly—communicate honestly with this Court. With the litany of litigation abuses recited here, the Court could never, in good conscience, sanction another lawyer in the future for failing to investigate a single claim if Counsel's failure here to investigate hundreds of actions were to be passed over, thereby implying that Counsel's indifference toward their professional obligations was acceptable because there were "just too many" potential claimants to do the job properly. The Court will not shrink from the formidable and unpleasant task of scrutinizing these filings individually and invoking the full authority of the judiciary, so as to renew the clarion call to the Bar that professionalism matters.

In January 2008, Wilner and Farah filed approximately 3,700 Engle-progeny complaints in the Florida state and federal courts. The complaints alleged personal injury, wrongful death, and loss-of-consortium claims related to cigarette smoking. As it turns out, many of the plaintiffs never authorized Wilner and Farah to file a suit. Some had barely heard of them. Dozens did not meet the basic requirements for maintaining an Engle-progeny claim (some of the "personal injury" plaintiffs never even smoked, for example). Over 500 "personal injury" plaintiffs were actually people who had died well before Counsel filed the complaints. Indeed, one of the "personal injury plaintiffs" had died 29 years earlier.

The Court discovered these defects in 2012 only after it sent questionnaires directly to the named plaintiffs – over Counsel's objections. Before the questionnaire process, Wilner and Farah had insisted the Court need not inquire into the status of the plaintiffs; that

a questionnaire process would not yield useful information; that there was no sizeable group of cases appropriate for dismissal; and that they could certify in accordance with Rule 11 of the Federal Rules of Civil Procedure that the complaints were viable. It was this obstructive, deceptive, and recalcitrant behavior that, in combination with the hundreds of frivolous complaints, compelled the Court to initiate sanctions proceedings.

As judges, we are properly cautioned against using 20/20 hindsight in evaluating the actions of lawyers in the context of unprofessional conduct. We are insulated from the hurly-burly of the practice of law, the press of client demands, the call of time sheets to log, and the occasional dictatorial demands of the Court. So it is, with that caution in mind, that a full explanation of the factors that motivate us to impose sanctions upon Wilner and Farah against the unique backdrop of these "tobacco cases" is warranted. The Court's findings here are drawn from a seven-month investigation by the Court's Special Master (the U.S. Attorney for the Middle District of Florida), careful consideration of the Special Master's Report and Recommendation (Doc. 2147 ("**2016 R&R**")), Counsel's objections to the 2016 R&R (Doc. 2165 ("**Objections**")), and the Special Master's Response to the Objections (Doc. 2170 ("**Response**")), comprising almost 600 pages of briefing and thousands of pages of exhibits.[4]

---

[4] Unless otherwise noted, the citation "Doc. __" refers to docket entries on the <u>Engle</u> Master Docket, Case No. 3:09-cv-10000-J-WGY-JBT ("**Master Docket**"). Additionally, page citations refer to the page number printed at the bottom of a document, not the page number designated by CM/ECF.

The Court also has the benefit of a 2014 Eleventh Circuit opinion affirming the dismissal of over 500 Engle personal injury actions that Wilner and Farah had filed on behalf of dead people, which noted that:

> [T]he root of the problem in all these [Engle] cases is simple. Back in 2008, when these cases were originally filed, the law firm that brought them [Wilner and Farah] didn't have the time or resources required to fully investigate all the complaints (the firm in question filed claims on behalf of over 4,000 individuals). As a result, problem after problem cropped up once the District Court started going through the inventory of cases: there were personal injury claims filed on behalf of deceased smokers, wrongful death claims filed by "survivors" of smokers who were still living, cases filed as a result of "clerical errors," multiple cases filed for the same person, cases filed for people the law firm had no contact with, claims that had already been adjudicated by another court, cases filed for people who didn't want to pursue a lawsuit, and claims filed long after the relevant limitations period had run. Over and over, plaintiffs' counsel explained that these problems were the result of the unique logistical difficulties involved in managing so many individual lawsuits. And over and over the District Court reminded counsel that a lawyer's responsibilities to the court are not diluted even by an ocean of claims.

In re Engle Cases, 767 F.3d 1082, 1087 (11th Cir. 2014). The Eleventh Circuit also observed:

> [T]he lawyers in these cases have established a pattern of acting on behalf of "clients" they have dubious authority to represent. As will become evident from the history of this mass action, plaintiffs' counsel have mostly managed their inventory of cases as they see fit, with scant contact with or input from the individuals they purport to represent.

Id. at 1088 n.4.

Given the importance of the matters at hand and the volume of pertinent materials, the Court has organized this unavoidably lengthy Order into six parts. Part I reviews in chronological order the factual and procedural background. Part II addresses Counsel's procedural due process concerns. Parts III, IV, and V discuss and apply the legal standards

governing the imposition of sanctions under Rule 11, 28 U.S.C. § 1927, and the Court's inherent authority, respectively. Finally, Part VI sets forth the type and amount of sanctions the Court will impose.[5]

**PART I**

**A. The Engle Class Action—1994 to 2006**

From 1994 to 2006, a class action lawsuit between Florida cigarette smokers (or their survivors) and several major tobacco companies wound its way through the Florida state courts. The smokers alleged, among other things, that the tobacco companies negligently manufactured and marketed their cigarettes, that they had manufactured cigarettes that were defective and unreasonably dangerous, and that they had conspired to conceal the dangers of cigarettes. The "Engle class" consisted of "[a]ll Florida citizens and residents" "and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." See R.J. Reynolds Tobacco Co. v. Engle (Engle I), 672 So. 2d 39, 40, 42 (Fla. 3d DCA 1996) (alteration and quotation marks omitted). The class was estimated to number 700,000 people.

In 1999, a jury in Dade County, Florida found generally that smoking causes certain diseases, such as lung cancer and coronary heart disease; that cigarettes containing nicotine are addictive; that the defendant-tobacco companies negligently manufactured and marketed their cigarettes; and that the tobacco companies manufactured cigarettes that were defective. See Engle III, 945 So. 2d at 1256-57 & n.4. Years later, in December 2006,

---

[5] A Table of Contents is provided at the beginning of this Opinion and Order.

because "individualized issues, such as legal causation, comparative fault, and damages predominate[d]," the Florida Supreme Court decertified the class, and required class members to file individual lawsuits. Id. at 1268. However, the Florida Supreme Court held that the original jury's findings should have preclusive effect in any action filed by an Engle class member, meaning each plaintiff would not have to re-establish that the defendants were negligent, that their cigarettes were defective, or that cigarettes cause certain diseases. See id. at 1269-70; Philip Morris USA, Inc. v. Douglas, 110 So. 3d 419, 424-25 (Fla. 2013). Instead, an individual plaintiff would have to prove only (1) that he is a member of the Engle class, and if so, (2) that his addiction to cigarettes caused his particular injuries, and (3) the amount of his damages. See Douglas, 110 So. 3d at 430. The Florida Supreme Court gave class members one year from the issuance of its mandate, or until January 11, 2008, to file individual complaints. See Engle III, 945 So. 2d at 1277.

**B.      Potential Plaintiffs**

While the Engle class action wended its way through the state courts, Wilner says around 6,000 people contacted him about suing cigarette manufacturers ("**Potential Plaintiffs**"). (See 2016 R&R at 74–75). Assuming that the Potential Plaintiffs likely were members of the Engle class, Wilner advised them that (1) Wilner could not represent them in individual actions given the time and expense required; and (2) the Potential Plaintiffs' best chance for recovery was through the Engle class action. (See 2016 R&R, Ex. 10 at 2-3). Thus, between 1995 and 2008, Wilner collected names, but he did not "make formal or

special inquiry into the status" of the Potential Plaintiffs.[6] (2016 R&R at 75-76; Doc. 822 at 4-5).

After <u>Engle III</u>, Wilner scrambled to get in touch with the Potential Plaintiffs. Nonetheless, by the January 2008 deadline, Wilner had not been in contact with many of the Potential Plaintiffs in 10 to 14 years. (2016 R&R at 76). According to Wilner, in the year between <u>Engle III</u> and the January 2008 deadline:

> [W]e went manually through the 7,000 [contacts] as best we could. We attempted to call people, but we were overwhelmed.
>
> We do not have the – the ability to contact 7,000 people in a year. They don't sit by the phone. And so we said, the best thing we can do is . . . unless there's an indication that this is not a class member, preserve this case.
>
> At that point, after preservation, Well, we can deal with—if they turn out not to be what we think they are, if there's some bad data, we will get to it. And we did get to it.
>
> \*   \*   \*
>
> So, okay, I have a class member who's called me, many times come in – and . . . I don't want to embellish this, but come in in a bad circumstance, dragging their oxygen sometimes, wanted us to represent them, wanted us to right their wrongs.
>
> And we said, Okay. We're going to watch this class. We'll do what we can. And then all of a sudden I've got 7,000 things that I can't do.

---

[6] Wilner's files contain little record of client communications, investigation, or attorney-client agreements during the 1995–2007 timeframe. For example, Wilner's internal data indicated that: (1) only 45 clients "entered into contracts in the 1990s" (2016 R&R at 183); and (2) only 289 individuals completed an internal tobacco information questionnaire between 1995 and 2007 (<u>id.</u> at 80). Wilner "produced medical records, medical authorizations, and/or correspondence requesting records for approximately 232 individuals," but he obtained the medical records for only 94 of those individuals before the complaints were filed. (<u>See</u> <u>id.</u> at 81). Thus, Wilner evidently investigated only a tiny fraction of the Potential Plaintiffs' claims before filing thousands of complaints against <u>Engle</u> Defendants in January 2008.

So, yes, the answer is, I am going to try and preserve that, and then we're going to find out if there's a problem with it, and we did with—there were 500-or-so that had previously died.

(Doc. 2174 at 98–100).

As the Eleventh Circuit put it:

As we now know, in the years it took <u>Engle</u> to wind its way through state court, Mr. Wilner lost contact with many of his clients. When the Florida Supreme Court decided <u>Engle III</u> in 2006, he attempted to track them down, but he had trouble locating all of them. As the one-year period came to a close, he was still unable to contact some (undisclosed) portion. Nevertheless, he decided to file suit on behalf of all his "clients," whether he was able to reestablish contact or not.

<u>In re Engle Cases</u>, 767 F.3d at 1089.

## C. Individual Suits Filed—2008

In January 2008, Counsel filed around 3,700 <u>Engle</u>-progeny complaints in state and federal courts located in Florida, including: (a) the Circuit Court for Duval County, Florida, where Counsel filed 17 multi-plaintiff complaints, which each named about 220 plaintiffs ("**Duval Cases**"); (b) this Court, where Counsel filed 27 multi-plaintiff complaints, which encompassed the claims of 660 people ("**Initial Federal Complaints**"); and (c) duplicate state-court actions for each of these 660 individuals named in the Initial Federal Complaints ("**Duplicate State Actions**").[7] The complaints were signed by Wilner and Farah.

The Defendants removed the Duval Cases to this Court. <u>In re Engle Cases</u>, 767 F.3d at 1090. Following removal, this Court had approximately 3,700 complaints before it that

---

[7] As the Special Master observed, simultaneously filing an action in both federal and state court is not necessarily improper. (2016 R&R at 171-74); <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817 (1976) ("Generally, as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.") (internal quotation mark and citation omitted).

encompassed the claims of 4,432 plaintiffs—the Federal Engle Actions.[8] Id. In a case management proposal filed in this Court on March 21, 2008, Wilner represented that all of the 4,000-plus plaintiffs "come with[in] the Engle class definition specified by the Florida Supreme Court and thus share the Engle I verdict." (See Nestor Amoros, et al. v. R.J. Reynolds Tobacco Co., Case No. 3:07-cv-760-J-25HTS, Doc. 35-2 at 1, 17). As it turned out, Counsel never should have filed many of the Federal Engle Actions—which alleged personal injury, wrongful death, and loss-of-consortium claims related to cigarette smoking—because: (a) many of the plaintiffs never authorized Counsel to file a lawsuit; (b) certain plaintiffs plainly did not meet the basic requirements for maintaining an Engle-progeny claim because they never even smoked or lived in Florida; and (c) over 500 "personal injury" plaintiffs were actually people who had died well before Counsel filed the complaints ("**Pre-Deceased Plaintiffs**"). Indeed, when the Court pressed Wilner at the December 13, 2016 hearing about whether he had authorization to file the complaints, he repeatedly referred to agreements authorizing him to make a claim on the Engle Trust Fund, which is not an authorization to initiate litigation. (See Doc. 2174 at 126-35). Ultimately, when asked whether he had signed authorizations to initiate a lawsuit for each of the plaintiffs, Wilner admitted: "Probably not." (Id. at 135).[9]

---

[8] Counsel filed complaints on behalf of 4,432 named plaintiffs. Some of the complaints alleged a relative's loss-of-consortium claim along with a wrongful death or personal injury claim, which is why the number of plaintiffs exceeds the number of complaints. The Court later severed the loss-of-consortium claims from the associated smokers' claims.

[9] This accords with the Special Master's report that he could locate only 45 attorney-client agreements, authorizing litigation, with respect to the timeframe before the filing of the complaints. (2016 R&R at 183).

**D.    The Stay—2008 to 2010**

The Federal <u>Engle</u> Actions became the basis of the federal <u>Engle</u> docket ("**Engle Docket**"). To aid the administration of these actions, the Court stayed further proceedings on October 29, 2008 ("**Stay**"). <u>In re Engle Cases</u>, 767 F.3d at 1090. During the Stay, the Court created individual dockets for each of the 4,432 plaintiffs, with each action given a separate case number. <u>Id.</u> at 1091. The Court also created the Master Docket to deal with case-management issues and other matters common to all of the Federal <u>Engle</u> Actions. <u>Id.</u> The three active district judges of the Jacksonville Division assumed joint management of these actions, later joined by the Honorable William G. Young of the U.S. District Court for the District of Massachusetts.

The Stay remained in effect from October 2008 to October 2010, while the parties appealed this Court's decision in <u>Brown v. R.J. Reynolds Tobacco Co.</u>, 576 F. Supp. 2d 1328 (M.D. Fla. 2008), <u>rev'd</u>, 611 F.3d 1324 (11th Cir. 2010). During that time, Counsel undertook a belated investigation into the status of the plaintiffs and their respective claims. Beginning in July 2009 and continuing through 2010, Wilner mailed so-called "**July 2009 Letters**" to 2,756 plaintiffs ("**Letter Recipients**"). (2016 R&R at 179–80). The July 2009 Letters informed the Letter Recipients that, as a "client" of Counsel "since the early 1990's tobacco litigation," Wilner had filed a lawsuit on their behalf.

The July 2009 Letters also requested—a year and a half after Wilner filed the complaints—that the Letter Recipients return a questionnaire about the plaintiff's smoking history and medical diagnoses ("**Counsel Questionnaire**"), a "Tobacco Litigation Authority to Represent," and an authorization for the release of medical records. Such

requests suggest that Wilner did not obtain any of these things <u>before</u> he filed the complaints. Even though Wilner had already filed suit on behalf of all 2,756 Letter Recipients, only 1,807 responded to Wilner. (<u>Id.</u> at 180). Whatever information Wilner learned from those 1,807 responses, however, it did not prompt him to correct any complaints or dismiss any actions for lack of viability.

## E. Case Management Efforts

In 2010, the Eleventh Circuit decided <u>Brown</u>, 611 F.3d 1324, and activity resumed on the Federal <u>Engle</u> Docket. On October 20, 2010, Counsel notified the Court that they were voluntarily dismissing 499 cases where a Duplicate State Action was pending. (Doc. 11). The Court asked Wilner why he was dismissing only 499 of the 660 cases that were filed in both courts, and Wilner replied:

> Some of them are not—are not viable. And some of them are—were previously litigated. And we—if we were to dismiss them out of this [C]ourt, we'd be subject to the—to the two dismissal rules. So we had to be aware of that. So that's the only reason.

> But, yes, the—at the time we filed these in 2008, it was totally unclear. We knew that there was—this was a big block of litigation. And we're just trying to get a trial date. We're trying to move the case.

(Doc. 31 at 74). As to the remaining cases, Wilner filed a case management brief "on behalf of approximately 3800 claimants," in which he urged the Court to try groups of 100 to 500 cases at a time. (Doc. 25 at 1, 13). <u>Wilner ridiculed the Defendants' proposal to process cases individually, and in doing so – ironically – accused the Defendants of "ignor[ing] the limited resources of the court system, and at worst consciously exploit[ing] them.</u>" (Id. at 9) (emphasis added).

In an Order dated December 22, 2010 ("**December 2010 Order**"), the Court dismissed the 499 cases and the number of Federal <u>Engle</u> Actions dropped to approximately 3,800. (Doc. 42 at 4). Concerned about case management issues created by such a large number of actions, the Court ordered the parties to:

> carefully and individually review each of the roughly 3800 remaining cases and to determine which of those cases is presently due to be dismissed (whether because a case has already been tried in state court, because a plaintiff has died leaving no heirs, or otherwise). No later than March 17, 2011, the parties shall each file a notice in the [M]aster [D]ocket which includes (1) a list of cases for which dismissal is sought, (2) a certification that the party has reviewed each individual case, and (3) a certification of compliance with Local Rule 3.01(g). By the same deadline, the parties shall file appropriate dismissal motions in the affected cases, specifically referencing whether the opposing side consents or objects.

(<u>Id.</u> at 7, ¶ 8). Importantly, the Court reminded the parties "of their continuing obligation throughout this litigation to inform each other and the Court when any of the remaining cases is due to be dismissed for any reason." (<u>Id.</u> at 8).

In January 2011, the Defendants recommended that Counsel gather basic information by interviewing each plaintiff. (Docs. 48, 48-1). Wilner responded that any information gleaned from individual interviews "would not be worth much to anyone." (Doc. 61 at 3). Wilner:

> balked at the suggestion that his law firm contact its clients to gather this information—citing the time and resources required and the likelihood that the information would quickly become outdated as more plaintiffs died over time. Thus, he stated the firm's intention to comply with the [C]ourt's [O]rder by just reviewing the information the firm already had in its files.

<u>In re Engle Cases</u>, 767 F.3d at 1092 (citing Doc. 61 at 3). Wilner also insisted that Counsel had:

> individual files for each plaintiff we represent, and we will make a good faith effort to screen each case for information contained within the file that suggests the case is not a viable one for reasons such as those described in the Court's order. We have already started this process and at this time expect, on the basis of some initial runs, to identify something like ten percent of the filed cases as appropriate for dismissal.

(Doc. 61 at 3). Given the dearth of information obtained before filing the Federal Engle Actions (see supra note 6), and the fact that more than 900 people failed or declined to reply to the July 2009 Letters, Wilner's claim that Counsel had "individual files for each plaintiff" was dubious. The Special Master's Report confirmed that Wilner's record-keeping was far less complete than he represented.

### 1. Responses to the December 2010 Order

In his March 17, 2011 response to the December 2010 Order ("**Counsel's 2011 Response**"), Wilner: (1) recommended dismissing another 136 Duplicate State Actions; (2) requested closure of 118 cases that resulted from a clerical error; (3) sought consolidation of 500 loss-of-consortium cases with their associated smokers' cases ("**Consolidation Request**"); and (4) moved for leave to withdraw from—but not to dismiss—332 cases ("**Withdrawal Request**") because "these claims involve for the most part clients who have not been in contact with the undersigned or have claims that the undersigned cannot prosecute" ("**Lost Plaintiffs**"). (Doc. 114 at 2); (Docs. 114-1, 114-2, 114-3, 114-4). Wilner also certified by signature "that counsel has reviewed each individual case in counsel's files for those that can be dismissed for the reasons listed above. Plaintiffs' counsel will continue to work with and review the cases within its files and file additional notices of dismissal as appropriate." (Doc. 114 at 3). Counsel's 2011 Response inexplicably

omitted mention of the myriad cases involving, for example, non-smoking plaintiffs, Pre-Deceased Plaintiffs asserting personal injury claims, and those whose claims were previously adjudicated ("**Previously Adjudicated Cases**").

In their March 17, 2011 Response to the December 2010 Order ("**Defendants' 2011 Response**"), the Defendant tobacco companies provided a list of cases to dismiss, including: (a) 30 Previously Adjudicated Cases—including several cases Wilner himself had handled; (b) close to 250 cases that had Duplicate State Actions; (c) 125 actions that were duplicates of another federal court case; and (d) 25 actions where the plaintiff opted-out of the <u>Engle</u> Class Action. (Docs. 113, 113-1, 113-2). Notably, the Defendants advised that Wilner did not represent the plaintiffs in several of the Duplicate State Actions—including two set for trial. (Doc. 113 at 2). This troubling information indicated that the plaintiffs who were represented in state court by <u>other</u> <u>attorneys</u> likely did not authorize Wilner to represent them and were unaware that Wilner had filed Federal <u>Engle</u> Actions on their behalf.

On March 24, 2011, the Defendants filed a supplemental brief pointing out the differences between Defendants' 2011 Response and Counsel's 2011 Response (Doc. 128 at 11, 14), and noting that "the lists developed by Defendants contain some plaintiffs with cases that the Wilner Firm should certainly have known had been previously adjudicated" (<u>id.</u> at 11). For example:

> Ms. Joan Karbiwnyk, whose case has been filed in this Court under Docket No. 3:09-CV-13026-J-34HTS, is the same Joan Karbiwnyk whose claim was not only filed, but was in fact tried to a defense verdict—14 years ago <u>by Mr. Wilner himself</u>.

(Id.) (emphasis added). Another troubling example was Case No. 3:09-cv-10564, which Wilner brought in this Court on behalf of Diane Nelson. On February 16, 2011, the Defendants notified Wilner that Ms. Nelson's personal representative—Linda Patton—was deposed the year before in a different lawsuit. During the deposition, Ms. Patton testified that as the personal representative of Ms. Nelson she had long ago decided to drop the case, and in fact thought it had already been dismissed:

> Q.    Is it your understanding that you've dismissed the one that you filed on behalf of your late sister?
>
> A.    Yes.
>
> Q.    Have you seen any documentation reflecting such a dismissal?
>
> A.    It was a long time ago. I don't remember.
>
> Q.    Okay. Is it your intention not to pursue any case on behalf of your late sister's estate?
>
> A.    Yes, that's correct.

(Id. at 14–15).

### 2.    The April 2011 Order

In an Order dated April 15, 2011 ("**April 2011 Order**"), the Court: (a) determined that Counsel and Defendants apparently agreed to dismiss 118 clerical-error actions and 119 cases with Duplicate State Actions; (b) granted the Consolidation Request; and (c) reserved

ruling on the Withdrawal Request pending a hearing.[10] (See Doc. 145 at 2–4). After the April 2011 Order, roughly 2,900 Federal Engle Actions remained pending.

Having become concerned about Counsel's lack of case management, the Court appointed the late Michael J. Dewberry, Esq., as a Temporary Special Master to assist the Court in managing the cases. (Doc. 65). In a report dated April 22, 2011, the Temporary Special Master observed "that neither side has any real grasp of the composition of the universe of cases, regardless of the actual number. . . . Counsel know next to nothing about more than 90% of this action—the cases that remain stayed …." (Doc. 147 at 38). The Temporary Special Master wrote that "[t]he absence of basic information" created "uncertainty as to the viability of the [stayed] cases," and that "it is apparent that additional winnowing opportunities are both available and appropriate." (Id.). Thus, the Temporary Special Master recommended sending questionnaires to each plaintiff to gather essential information. (Doc. 146 at 22–28).

Contending that they had been in contact with all of their clients, Counsel objected to the questionnaire. (Doc. 158). Counsel asserted that their own "data" obviated the need to send questionnaires to the plaintiffs in the remaining 2,900 Federal Engle Actions:

> This data is the product of ongoing and routine communications by telephone, mail, in person meetings, and electronic communications, between plaintiffs' counsel and the plaintiffs. This data, however, will not result in "a substantial reduction in the number of cases" as the [Temporary Special Master] suggested might occur. . . . Such winnowing has already occurred. On April 15, based upon the agreement of the parties, this Court dismissed 273[11] cases.

---

[10] The Defendants urged the Court to dismiss the Lost Plaintiffs' actions, and Wilner opposed dismissal.

[11] The correct number is 237 cases, not 273.

In another 332 cases, [P]laintiffs' counsel has asked to withdraw due to lack of contact. Additional cases have been dismissed for other reasons including because the plaintiffs opted out of the <u>Engle</u> litigation. These efforts have resulted in the reduction of the federal <u>Engle</u> progeny cases from 4432 cases to a current total of roughly 2900 cases, a reduction of 35 percent. There may be additional cases that become untriable as this litigation proceeds because circumstances can always change, but <u>there is no longer any sizeable group of cases ripe for dismissal.</u>

(<u>Id.</u> at 14–15) (emphasis added) (footnotes omitted). Counsel assured the Court that "[t]here is no need for the tremendous expense of energy and resources for a third party to poll the remaining plaintiffs because counsel already possess the vast majority of this data, and are working diligently to fill in all gaps." (<u>Id.</u> at 15) (footnote omitted). Counsel reiterated that they "are engaged in a constant and ongoing process of updating information and will continue to take appropriate steps if additional clients become unable or unwilling to pursue their claims." (<u>Id.</u> at 17). As the Court later learned, these assertions obscured the fact that hundreds of cases were fatally defective.

### 3. The June 2011 Hearing

The Court held a hearing on June 6, 2011 ("**June 2011 Hearing**") to address discrepancies between Counsel's 2011 Response and Defendant's 2011 Response, the 332 Lost Plaintiffs' actions, the Withdrawal Request, and other concerns. (Doc. 171). Judge Corrigan directly asked Wilner about the Lost Plaintiffs' cases—"What was the basis upon which the claims were brought in the first place? Were you in contact with them at the time the suit was filed on their behalf?" (<u>Id</u>. at 6). Wilner responded:

Many but not all. As we talked about earlier, we did have some claims that when the [<u>Engle</u> filing deadline] approached, we had them—we were historically in contact with them, and we had to file their claim because it must be preserved.

Most of them we were in contact shortly after, but we lose contact because people die, and so we don't always have contact at any given time. We have contact with the greater, by far, number, but there are always some that either die or go to a nursing home or something and we lose touch.

(<u>Id.</u> at 7).

Judge Corrigan then asked Wilner how the Lost Plaintiffs' cases were "distinct" from the cases that had been dismissed, and he asked whether Wilner was telling the Court that he was "in direct contact with all of the remaining plaintiffs that [were] still pending in these cases?" (<u>Id.</u>). Wilner responded:

Yes, your Honor, within the possibilities of being able to express that because you can't talk to everybody at once. So, yes, your Honor, as far as within statistical possibility, we are in <u>contact</u> with the remainder, but that changes every day. If somebody doesn't answer long enough, then they are put on the warning list; and if they still don't answer, they may come up eventually that we have lost them.

(<u>Id.</u> at 7-8) (emphasis added). Judge Howard then asked what Wilner meant by "contact"— "When you say you're in contact with them, as of how recently have you actually had [contact?] . . . I'm saying, if you've heard from them three years ago, that doesn't really count to me." (<u>Id.</u> at 8). Wilner agreed that three years would not count:

No, that doesn't. It's not nothing, but that's not what I mean in contact. I mean within the past group of months, depending on how wide of a net we are talking about and how quickly we can go through it. We can't contact everybody at once; but we are in touch with them in recent history, meaning X number of months; and they indicated to us, through writings or personal interviews or telephone calls, they were <u>alive, present, willing, and all that.</u>

(<u>Id.</u>) (emphasis added). To clarify, Judge Howard asked whether "within the last six months, all but the 332 [Lost Plaintiffs] . . . have expressed that they are willing and able to proceed with these claims? Is that your representation to the Court?" (<u>Id.</u> at 8-9). Wilner responded

affirmatively—"Yes, absolutely. The defense has gotten the idea that they are not. I don't know, but we are in constant contact with them . . . ." (Id. at 9) (emphasis added). Although the Court accepted such affirmations at the time, they later proved to be false.[12]

During the June 2011 Hearing, Wilner again assured the Court that he had authority to file the complaints on behalf of the Lost Plaintiffs:

> JUDGE HOWARD: Let me ask you this: You're suggesting you would be— you filed these lawsuits, and it's not at all clear to me whether these 332 [Lost Plaintiffs] were even consulted at the time the lawsuits were filed, but you filed them on their behalf.
>
> MR. WILNER: Yes.

(Id. at 10). The Court, dubious, continued:

> JUDGE CORRIGAN: . . . [U]ntil we ordered you to do it, you hadn't done the work that we have now done, and I would have thought you would have. I would have thought. . . . I can even understand that as of January of '08 you had to meet a deadline and so you just met the deadline. I can understand that.
>
> What I'm having trouble understanding that as it got into '09 and 2010, while things were on appeal, while we were in our processes—we had two or three hearings with multi-judge panel hearings—until we actually ordered you to actually look at all these and to do the work that we have now done, it didn't appear to us you were doing it yourself, and I would have thought that you would have.
>
> MR. WILNER: Well, we were doing it along the line; but as I say, when more than a year has gone by with any one case, it's now a suspicion whether there is somebody still there. So these things do time out from time to time, and in another year there may be another 7 or 8 percent that have died, that are no longer with us.

---

[12] At best, Wilner's own records indicate that 2,231 out of roughly 2,900 remaining plaintiffs were contacted in the six months before the June 2011 Hearing. (2016 R&R at 191). At worst, the Special Master determined that Wilner's records confirm contact with only 1,320 plaintiffs during that time. (See id. at 191–94).

So I admit that as years go by, there are people that are not here, but we keep— we have kept in contact with them, and in fact taken—

JUDGE DALTON: Mr. Wilner, can I interrupt you for a second? I apologize for the interruption, but this is the question I have, whether it's 6 or 60 or 600 or 6000, can you represent to the Court that you have authority to proceed on behalf of those individuals who are remaining in the plaintiff pool and that you are prepared to prosecute those claims, to diligently prosecute those claims toward resolution?

\* \* \*

MR. WILNER: The answer is, are all 2800 ready and able? Well, as far as we know today, they are. I hasten to say—

(Id. at 16-18) (emphasis added). Wilner continued:

MR. WILNER: We already cut [the unviable claims] out. After those, all of them -- and I say, all of them—are subject to—you are always going to find one mistake, but all of them we have been in touch with either by telephone or something within the past—and I say, eight, nine, that range.

I didn't run the specific field that says when we last talked to them, but in recent history; and the 300-and-so were the ones that we couldn't find, that we just kind of just did that, but I don't mind doing it again.

We did do that. We did go through and eliminate those that were not viable. So we –

. . .

JUDGE CORRIGAN: Let me ask it this way, and I don't care if Mr. Wilner answers it or you answer it.

If you had to sign a Rule 11 complaint today, under Rule 11, because we know we haven't really talked about Rule 11, but if you had to sign a Rule 11 complaint today on behalf of each one of these smokers who has a case that you can certify under Rule 11, how many people would that be?

MR. WILNER: Twenty-eight hundred and whatever the last two digits are. That's our data.

(Id. at 28–29) (emphasis added).

24

Finally, the Court addressed Counsel's opposition to sending out questionnaires given the urgent need for accurate information:

> JUDGE DALTON: [W]e need to figure out what's the total constellation of lawsuits that we have? How can we divide them up in terms of do we have cases that have living people, we have death cases with survivors, we have death cases with no survivors? All of those, as you know, have—I mean, the elements of damage are going to be different with respect to each, and we are trying to figure out a way that we can triage these things and marshal them so that we can deal with them; and, frankly, we need some help, and we don't feel like we are getting it. That's the point.

(Id. at 17). Although Counsel told the Court that they were gathering information on their "clients," the Court essentially told Wilner, "though not in so many words, that it no longer trusted him." In re Engle Cases, 767 F.3d at 1095. The Court asked Counsel how long they would need to distribute and collect questionnaires. Counsel responded that three months would be enough time "since they were in contact with all their clients and in the process of gathering the information sought by the [Temporary] Special Master." Id. The Court denied the Withdrawal Request and dismissed the 332 Lost Plaintiffs' actions. (Doc. 174). As such, approximately 2,600 Federal Engle Actions remained pending.

### 4.     The Court Questionnaires

In August 2011, the Court ordered Wilner to send questionnaires to each of the remaining 2,600 plaintiffs ("**Court Questionnaires**"),[13] setting a November 2011 deadline for their return. Although Counsel mailed the Court Questionnaires "to 2,661 unique

---

[13] The three-page, 14-question Court Questionnaires were designed to elicit basic information about the alleged smokers, including whether the named plaintiff wished to participate in the Engle litigation. (See Doc. 218-1).

addresses," Counsel returned only 1,724 completed questionnaires to the Temporary Special Master by the deadline. In re Engle Cases, 767 F.3d at 1096. In moving for an extension to submit outstanding questionnaires, Counsel represented that they had not received questionnaires from 753 plaintiffs, but that they had been in contact with approximately 500 of those plaintiffs in the previous year. (Doc. 359 at 3-4). Counsel thus virtually admitted that they had not been in contact with another 200-or-so plaintiffs during the previous year. Such representations were at odds with Wilner's assertions at the June 2011 Hearing that he had been in contact with 2,600 of the remaining plaintiffs within the previous six months.

In response to Counsel's motion for an extension, Defendants asserted that Wilner's filing of so many complaints in 2008 was problematic. As the result of "discovery produced in one of the state cases in Duval County," Defendants learned that

> the Wilner Firm had, in fact, in many instances simply taken names from old files and listed them on those group complaints without determining whether the named individuals were legally authorized to pursue such a lawsuit or even wished to do so. As stated in the form letter to some of those people produced by the Wilner Firm, in 'the early 1990s'—15 or more years before the instant complaints were filed—the [Wilner] firm had collected the names of an unknown number of individuals apparently interested in the then-recently filed Engle Class Action. But obviously, the fact that an individual might have been interested in participating as a passive class member in a case that might potentially be resolved on a classwide basis did not mean that he or she was legally authorized or willing to file an individual contested lawsuit.

(Doc. 360 at 2; see also Doc. 465 at 3). The Court denied the motion for an extension, but it advised that—upon a showing of good cause—the Court might allow Counsel to submit additional Court Questionnaires.[14] (Doc. 379).

---

[14] Later, the Court would allow the submission of 72 additional questionnaires for good cause. (Doc. 604).

The Temporary Special Master detected problems almost as soon as he began analyzing the 1,724 Court Questionnaires. (See Doc. 503). According to a report issued by the Temporary Special Master in January 2012 ("**2012 Temporary Special Master's Report**"):

> (1)    521 plaintiffs were already deceased (some for more than 20 years) when Counsel filed personal injury actions on their behalf;
>
> (2)    66 plaintiffs were living when Counsel filed wrongful death actions on their behalf;
>
> (3)    64 deceased plaintiffs had no survivors when Counsel filed wrongful death cases on their behalf; and
>
> (4)    Counsel filed 39 wrongful death cases that were barred by the statute of limitations [("**SOL**")].[15]

(Id. at 6-14). All of these defects led the Temporary Special Master to conclude that "the current universe of 1,700 cases [in which questionnaires were returned] is still inflated to an unknown extent" by non-viable claims and by plaintiffs who were unwilling or unable to proceed with the claims Counsel brought on their behalf. (Id. at 4).

## F.    Motions to Dismiss

Without explanation, Counsel moved to voluntarily dismiss 189 cases in January 2012 ("**Plaintiffs' 2012 MVD**").[16] (Doc. 452). Two months later, Defendants moved to dismiss 39 time-barred wrongful death actions and 521 personal injury actions that Counsel had filed on behalf of Pre-Deceased Plaintiffs ("**Defendants' 2012 MTD**"). (Docs. 581,

---

[15] Florida law imposes a two-year SOL on wrongful death actions.  Fla. Stat. § 95.11(4)(d).

[16] The reasons for the Plaintiffs' 2012 MVD remained unexplained for six months.

582). The Defendants noted that about 30% of the cases where a Court Questionnaire <u>was</u> <u>returned</u> – to say nothing of the hundreds of cases where no questionnaire was returned – "were filed as personal injury actions in the names of already deceased smokers." (Doc. 582 at 2). The Defendants emphasized that:

> these defective complaints do not rest on some "contingent" or "alternative" pleading, as where a personal injury action is somehow pled along <u>with</u> a survival or wrongful death action. To the contrary, the complaints listing the 521 [Pre-Deceased Plaintiffs] assert <u>nothing</u> but a personal injury action— using the <u>present</u> tense in referring to the "Smoking Plaintiffs" and arguing that they "have <u>and will suffer</u>" as a result of their disease. . . . Nowhere do the complaints suggest that the smoker had died; and nowhere do they assert a wrongful death or survival action. To the contrary, the concluding allegation of each of the complaints states that each Smoking Plaintiff's injuries "are permanent <u>and continuing and as such will be suffered into the future</u>."

(<u>Id.</u> at 3–4) (emphases in original) (citations omitted). The Defendants further noted that "since these cases were filed solely as personal injury actions, it is clear that in no case did anyone even purport to authorize their filing on behalf of the estate." (<u>Id.</u> at 4). The Defendants added that Counsel had known about these defective complaints for at least six months, when they received the Court Questionnaires from the deceased plaintiffs' families. (<u>Id.</u> at 12 n.4). Yet Counsel took no action until after the Temporary Special Master reported the results of the Court Questionnaires and the Defendants moved to dismiss the cases.

### 1.     The Wilner Declaration

On April 6, 2012, Wilner filed a response to the Defendants' 2012 MTD (Doc. 589) along with the Declaration of Norwood Wilner (**"Wilner Declaration"**) (Doc. 589-1). Attempting to explain why he filed over 500 personal injury cases on behalf of dead plaintiffs, Wilner advised that by 1998, he "represented over 3,000 Florida smokers or their

families. These clients were signed into contractual agreements giving the firm latitude as to the appropriate method to preserve and advance their claim against the cigarette companies." (Doc. 589-1, p.1 ¶ 4) (emphasis added). He claimed that when Engle III was decided:

> my firm had successfully remained in contact with most but not all of these clients during the decade long period between their initial contact with the firm and [Engle III]. Unfortunately, some had been lost to follow up, usually because they had died and their heirs or family were unaware of their having requested representation for cigarette-related injuries. However, after consulting with a legal ethicist who had been the Ethics Director of the Florida Bar from 1989–1997, I came to view it as my professional duty to make protective filings on behalf of these clients whom we could not locate prior to the time their claims had to be filed in order to be preserved.

(Id., p.2 ¶ 7) (emphasis added). Admitting that he filed suit on behalf of over 500 plaintiffs without knowing their status, Wilner asserted that

> [b]ecause the status of the original claimant was unknown at the obligatory deadline for filing damage claims, and because the Florida Supreme Court did not elaborate on what format was required for a "damage claim," I elected to list all claimants of unknown status under the name of the injured or deceased party, who had first contacted me or my firm. These claims were filed as a list in groups of 200, nominally under the name of the injured party.

(Id., p.2 ¶ 8). Finally, Wilner asserted that "[i]n the time following the filing, efforts to locate survivors were successful in all but a few cases, and those survivors ratified the filings nunc pro tunc." (Id. p.2, ¶ 9) (emphasis added). Despite these alleged "nunc pro tunc" ratifications, Wilner never moved to amend any of the complaints, and he never let the Court or anyone else know that more than 500 personal injury complaints named a dead plaintiff.

Like this Court, the Eleventh Circuit was not satisfied by the Wilner Declaration:

> That's it. We are not told what The Wilner Firm did to keep up with its clients during the decade or so that Engle was winding through state court, how many

of those clients it lost touch with before <u>Engle III</u> came down in December 2006, what efforts it took following <u>Engle III</u> to reestablish contact, or how many of these missing clients it failed to contact before a lawsuit was filed on their behalf in January 2008. Nor are we told what information Mr. Wilner used to draft complaints for the missing clients, when those clients had last been in contact with the firm, or what efforts were taken to update client information and otherwise investigate the validity of their cases. And Mr. Wilner's declaration did not even mention, much less explain, how his firm came to file personal injury cases on behalf of smokers who died before the mid-'90s—who obviously did not contact his firm to request representation.

<u>In re Engle Cases</u>, 767 F.3d at 1110–11.

## 2. The June 2012 Hearing

To address the issues raised in the 2012 Temporary Special Master's Report and Defendants' 2012 motion to dismiss, the Court held another hearing on June 24, 2012 ("**June 2012 Hearing**"). (Doc. 677). Wilner did not attend the June 2012 Hearing, so the Court questioned Wilner's co-counsel— Elizabeth Cabraser of Lieff Cabraser—concerning the many suspect statements in the Wilner Declaration. As the Eleventh Circuit recounted:

> In light of the fact that Mr. Wilner hadn't had any recent contact with these "clients" when he filed claims on their behalf in 2008, the court found it highly unlikely that he had any authorization to file suit or that he had investigated the validity of these claims. Moreover, the [C]ourt pointed out, a number of the [Pre-Deceased Plaintiffs] had died before Mr. Wilner even started collecting tobacco clients—a group that Mr. Wilner's declaration had not even mentioned. Ms. Cabraser didn't have any answers for the court; she explained that she hadn't been around back then and so she just stood on Mr. Wilner's (incomplete) declaration.
>
> The [C]ourt also doubted that [Counsel] had really tracked down and received authorization "<u>nunc pro tunc</u>" from these [Pre-Deceased Plaintiffs'] survivors. In fact, the court asked Ms. Cabraser if the attorneys had only learned of all these [Pre-Deceased Plaintiffs] once they received responses to the [Court Questionnaires]; her reply: "I don't know." As for the suggestion that the [S]tay—which the [C]ourt left in place at the parties' request to help manage the mass of cases—absolved [C]ounsel of any obligation to fix their mistakes in a timely manner or otherwise inform the court that in 521 of the

cases they had pled the wrong cause of action and named the wrong plaintiff, the court tersely responded, "Really?" And addressing [C]ounsel's request that they now be allowed to go back and fix all their mistakes, the [C]ourt had this to say:

> These cases were filed, clearly, with no authorization from the client, with no compliance with Rule 11, with no good faith inquiry into whether or not there was a viable basis for a claim, and now the Court is being asked under the purview of Rule 15 to somehow allow you to amend and relate back to a pleading that was filed on behalf of someone that was long dead and never authorized the institution of the action somehow under the rubric of doing justice and putting the Court in the position of ["]how can you not allow these people to have a claim brought on their behalf[?"]
>
> It's an untenable situation, [Ms. Cabraser], that you are asking the Court to occupy . . . .

In re Engle Cases, 767 F.3d at 1101–02 (quoting Doc. 677 at 59–60).

The Court explained to counsel that the volume of cases did not lessen their obligations reasonably to investigate the claims and remain up-to-date on the status of the plaintiffs.

> JUDGE DALTON: [Ms.] Barnett, I don't mean for either you or [Ms. Cabraser] to be the whipping posts on this, but we have tried to make this point to Mr. Wilner and his firm from the outset that the volume of claims is a given. We understand that. We understand the practical difficulty of trying to manage that because we are experiencing it ourselves.
>
> That said, as we have expressed to Mr. Wilner, the volume of claims does not render the fundamental precepts of lawyer-client responsibilities, vis-à-vis the client and vis-à-vis the Court as procedural niceties.
>
> The rules with respect to filing papers, prosecuting claims on behalf of people that you don't truly represent, that's not something that the Court is inclined to overlook. And we have tried to make that point. We have tried to do it in a way that is as accommodating as we can be to the difficulties that [C]ounsel is obviously having in trying to manage this large group of people; but there comes a day—and that day is here—where the Court really is left with no

option other than to say, is this a viable claim, do you really represent this person, does this person wish to pursue this claim. And if you continue to tell us that the answer to those questions is in the affirmative and it turns out that it's not true, there are going to be consequences. And I don't say that in a way to try to hold a sledge hammer over the plaintiffs' heads.

I'm simply trying to communicate to you all the fact that we have been struggling with this amongst ourselves trying to figure out how do we make sure that the people who have meritorious claims, that are not barred by operation of law, have full and open access to the judicial process to get those claims heard.

We have four federal judges sitting up here trying to work through some of this labyrinth of issues that are presented by these claims; but I need you all - - and I think I speak on behalf of my colleagues -- to hear this loud and clear. If there are filings from this point forward on behalf of people that you do not represent, who do not wish to have the claims brought, that there are going to be Rule 11 consequences for that**.**

(Doc. 677 at 40–41).

The Court questioned whether the 500-plus predeceased personal injury plaintiffs

ever qualified as Wilner's "clients" to begin with:

JUDGE DALTON: [Ms. Cabraser], that's the problem. It couldn't have been your client. And I say "you" collectively. It couldn't have been your client, because if it were your client, you would have had an authority to represent them. You would have had a conversation with your client. You would have had your client's authorization to proceed. Your client would have authorized you to avail him or herself of the court system and authorized you to file a complaint on his or her behalf seeking redress for injury.

You couldn't possibly file on behalf of somebody who is dead. You couldn't make a personal injury claim on behalf of someone who is dead. That could never happen because you would not have been able to obtain their signature on an authority to represent. Therein lies the problem.

These are not procedural niceties. These issues do not go away because there is a large volume of cases to be managed.

(Id. at 59) (emphasis added).

Counsel argued that the Court ought to allow them to substitute parties and amend the personal injury complaints so as to allege wrongful death claims in the names of survivors, even though they sat on the cases for four years and had no authority to file the personal injury complaints in the first place. The Court disagreed:

> JUDGE DALTON: … These cases were filed when there is no possible way—because the people were dead, there is no possible way that these actions were authorized. Now the Court is being asked to go back and allow amendments to these complaints to allow survivors to make a claim on behalf of individuals long dead when these claims that were made—and at least if Mr. Grossi's assertion is correct, and I'm not accepting it one way or another—but if his assertion is correct, these people are not members of the Engle class.
>
> Now the Court is being asked to do this winnowing process to go through and look at the bona fides of these cases to determine whether or not—that's why Rule 11 exists. That's why it's there.
>
> It's not the Court's responsibility to engage in this winnowing process. The Court's responsibility is to take counsel to task when complaints are filed that are not authorized, for which there has been no affirmative act by the client to engage the lawyer to request that those services be expended on his or her behalf.
>
> As I said, I appreciate your posture in the case, Miss [Cabraser], and your firm's posture in the case; but if Mr. Wilner was here, I would be asking Mr. Wilner this question, or the lawyer whose name appears on the complaint that was filed, really, what possible—what possible right did you have—what possible explanation could you give for representing to the Court that I have done a good faith investigation into the facts and circumstances surrounding this case and am prepared to certify to the Court that the claim is bona fide, it is viable, and that it is made in good faith?
>
> I would submit to you that at least as far as these claims are concerned that that certification to the extent that it was made is unsupportable.

(Id. at 63–64) (emphasis added).

The Court also took exception to the part of the Wilner Declaration (Doc. 589-1), where he stated that by 1998 he represented over 3,000 Florida smokers or their families:

> JUDGE DALTON: Again, it may be unfair to put you in this position, [Ms. Cabraser], but I'm looking at this declaration that you've referred to, and Mr. Wilner has certified to the Court that by 1998 he represented over 3,000 Florida smokers or their families. I'm now quoting.
>
> > "These clients were signed into contractual agreements giving the firm latitude as to the appropriate method to preserve and advance their claim against the cigarette companies."
>
> I guess my question is, how could I credit that statement in light of 550, plus or minus, cases that were filed on behalf of individuals who were represented to be alive who in fact were dead? How could I credit this statement in the certification?
>
> > *   *   *
>
> JUDGE HOWARD: Part of the difficulty with that is that we are looking at this affidavit that says that by 1998 Mr. Wilner was representing 3,000 Florida smokers or their families and they signed contractual agreements; and I'm really pretty bad at math, but my rough math is that 175 of these people or so, 176, were dead before 1998. Some of them were dead for a really long time. Twenty years before 1998; but by 1997, all of these people were dead and lawsuits were filed on their behalf.
>
> I don't see how -- I guess I can't accept that somebody who had been dead that long that their status was unclear in 2007 and 2008 when these lawsuits were filed. That just doesn't pass any test. It's just too easy these days to find out if somebody is alive or dead.

(Id. at 65, 69–70).  The Court made no rulings at the June 2012 Hearing, but took the matter under advisement.

## G.     The Denton Juror

As if to drive home the point that Wilner filed claims without authorization to do so, a month after the June 2012 hearing there was an incident in a federal Engle case being tried

in this Court where a <u>sitting juror discovered that, unbeknownst to her, she too was an Engle</u> <u>plaintiff in a suit filed by Wilner and Farah</u>. During the trial in <u>Denton v. R.J. Reynolds</u> <u>Tobacco Co., et al.</u>, Case No. 3:09-cv-10036, the Defendants alerted the Court that one of the jurors, Shirley Larramore, had an <u>Engle</u> complaint pending in her name. (Case No. 3:09-cv-10036, Doc. 189 at 92-93; <u>id</u>. at Doc. 190 at 27–30; <u>id</u>. at Doc. 200 at 157–59). Although Ms. Larramore was the plaintiff named in Case No. 3:09-cv-13138, it was clear that she was unaware of the case:

> THE COURT: Do you know, ma'am, whether you and [your husband] or either one of you were ever part of the <u>Engle</u> [C]lass or ever part of the lawsuit that was filed on behalf of tobacco smokers?
>
> JUROR LARRAMORE: No. Now, some people, some lawyer from—I can't remember if it was California or Washington, called me, and I denied the right to be in that lawsuit.
>
> THE COURT: Okay. Do you know if either you or your husband were ever represented by either Chuck [Charlie] Farah or the law firm of Farah and Farah?
>
> JUROR LARRAMORE: No, neither one of us. We have not been involved in any lawsuits.
>
> THE COURT: Okay. And do you know a Woody Wilner or a Norwood Wilner?
>
> JUROR LARRAMORE: I've heard of them, yes.
>
> THE COURT: <u>Okay. Did you ever sign up to be represented by</u> <u>them?</u>
>
> JUROR LARRAMORE: <u>At one time I thought about it, and my</u> <u>husband and I thought about it, and we said, "That's not us";</u> <u>that we would not get involved in a lawsuit. And I never</u> <u>answered any of their letters or anything they sent. I</u>

> acknowledged no phone calls from them because I have caller
> ID and I wouldn't even answer the phone.

(Case No. 3:09-cv-10036, Doc. 189 at 92–93) (emphasis added). Ms. Larramore was shocked to learn Wilner had filed a lawsuit on her behalf anyway, and was relieved to learn that it would be dismissed. (Id. at Doc. 190 at 27–28). In the meantime, Wilner's actions disrupted the Denton trial, as the Court had to query Ms. Larramore before dismissing her from the jury.

The Larramore action was not the last case to be dismissed under circumstances indicating that sanctions against Counsel might be warranted. Accordingly, beginning on August 23, 2012 (Doc. 758), the Court began reserving Rule 11 jurisdiction each time it dismissed Federal Engle Actions. (See, e.g., Docs. 780, 835, 864, 909, 925, 929).

## H.  Case Dismissals in 2012 and 2013 and Appointment of Special Master

On July 31, 2012, Counsel finally explained the reasons why they had moved in January 2012 to dismiss 189 cases. (See Docs. 452, 718). Specifically, Counsel moved for the voluntary[17] dismissals because: (a) two plaintiffs were involved in Duplicate State Actions; (b) five plaintiffs had no Engle disease; (c) 58 plaintiffs did not satisfy Engle's requirement of Florida residency; (d) 36 plaintiffs did not wish to pursue the litigation; (e) 53 actions were barred by the SOL; and (f) 35 actions were brought on behalf of Non-Smoker Plaintiffs. Alarmed by some of these reasons—particularly, the Non-Smoker

---

[17] The voluntariness of these dismissals is questionable, however, given that Counsel only filed the motion immediately after the Temporary Special Master began to report on the results of the Court-ordered questionnaire process, which began to reveal that hundreds of Engle complaints were not viable. Recall that before the questionnaire process, Counsel insisted that any inquiry was unnecessary because all of the pending Engle complaints were viable and satisfied Rule 11.

Plaintiffs—the Court nonetheless: (a) granted the plaintiffs' motion to dismiss; (b) dismissed the cases; and (c) reserved jurisdiction over each of the 189 cases "for the limited purpose of making further inquiry and addressing the circumstances surrounding the filing of each of these cases, as well as any Rule 11 implications." (Doc. 780 at 2, 3). In September 2012, the Court also dismissed 644 cases because no Court Questionnaire had ever been returned, likewise reserving jurisdiction to make a Rule 11 inquiry. (Doc. 787). Thus, by the end of September 2012, 1,800 Federal Engle Actions remained pending.

The Court continued to dismiss cases that did not belong on the Engle Docket. In November 2012, the Court dismissed 37 cases that were barred by the SOL. (Docs. 835, 835-1). In January 2013, the Court dismissed the 521 personal injury cases filed on behalf of dead plaintiffs ("**January 2013 Order**"). (Doc. 925). Recalling Wilner's contention that he received filing authorization from the Pre-Deceased Plaintiffs' survivors "nunc pro tunc," the Court observed that:

> It is not clear at this point . . . when Plaintiffs' counsel located the survivors and whether they did so as a result of the Court-ordered questionnaire process, as a result of [Counsel's] independent efforts, or both. What is clear, however, is that Plaintiffs' counsel made no effort to bring to the Court's attention, until required to do so by the [Court Questionnaire] process, that they had filed suits in the name of over 500 dead people.

(Id. at 4, n.3). Further,

> Mr. Wilner acknowledges in his declaration that these cases were "protective filings" on behalf of clients who could not be located and whose status was unknown. (Doc. 589-1 at ¶7). However, whether counsel undertook any significant effort during that year to confirm the status of their clients remains unestablished in the record. The filing of personal injury claims

> on behalf of these 521 individuals who were already dead (some
> had been dead for many years) suggests counsel may not have.

(Id. at 10).

Finally, the Court rejected Wilner's argument that he thought the Stay absolved him of his duty to correct hundreds of defective complaints. (Id. at 10-11). The Stay had not prevented counsel from filing protective motions to substitute personal representatives in other cases when a plaintiff died while the action was pending. (Id. at 11). The Court added that the

> circumstances of the filing of the 521 cases are now the subject
> of a Rule 11 motion filed by the Defendants (Doc. 813), which
> Plaintiffs oppose. (Doc. 822; Doc. 824). The Court declines to
> address this issue or the Rule 11 motion further in the context
> of this Order. However, the Court will reserve jurisdiction over
> these cases for the limited purpose of making further inquiry
> and addressing the circumstances of the filing of these cases, as
> well as any Rule 11 implications.

(Id. at 11, n.8). After the January 2013 Order, 1,200 Federal Engle Actions remained pending.

Between February 2013 and August 2013, the Court dismissed over 300 more cases. (See Docs. 929, 951, 1101, 1102, 1130). Notable were the Court's Orders in June 2013, in which it dismissed on the Defendants' motions another 67 cases that involved Pre-Deceased Plaintiffs' personal injury claims (Doc. 1101), as well as another 151 cases where the plaintiff failed to return a questionnaire (Doc. 1102). By the end of August 2013, only 1,000 Federal Engle Actions remained pending.

Pause to reflect how much things changed between mid-2011, when the Engle Docket stood at 2,900 cases, and August 2013, by which time only about a third of that

number remained. In May 2011, Counsel insisted there was no need to send questionnaires to the plaintiffs; that counsel had "ongoing and routine communications" with nearly all the plaintiffs; that any data gathered by questionnaires would "not result in a 'substantial reduction in the number of cases'"; that significant "winnowing ha[d] already occurred"; and that "there is no longer any sizeable group of cases ripe for dismissal." (Doc. 158 at 14–15). The next month, Wilner stood before the Court and represented that he was in contact with 2,600 plaintiffs, and that he could file Rule 11 certifications for each of the remaining 2,900 cases. But Counsel's representations could not have been more wrong. By August 2013, it had become clear that hundreds of cases were not viable, for "[a]s any lawyer worth his salt knows, a dead person cannot maintain a personal injury claim." In re Engle Cases, 767 F.3d at 1086–87. Many more cases were not viable for various other reasons, including some where plaintiffs never smoked or never authorized a lawsuit.

The winnowed Engle Docket progressively shrank, with the Court trying cases and others settling or being dismissed. In February 2015, the tobacco companies and the remaining plaintiffs announced that they had reached a tentative settlement valued at $100 million. (See Doc. 1919). Each of the last 415 plaintiffs eventually ratified the settlement ("**Settlement Agreement**") (see Doc. 2092), and the Court approved the creation of the Federal Engle Settlement Fund to disburse the settlement proceeds and attorneys' fees (Doc. 2090). The Court made clear, however, that the settlement of the remaining cases would not end the Court's inquiry into whether Counsel violated Rule 11, 28 U.S.C. § 1927, or the Local Rules. (Doc. 2094 at 2–3). Thus, the Court required that the amounts set aside in the

settlement fund to pay attorneys' fees and costs be frozen until it could adjudicate the sanctions issue.

Because "the Court wishe[d] to maintain its role as [a] neutral adjudicator of these matters," it proposed "appointing the United States Attorney to investigate the issues and recommend to the Court how it ought to proceed under Rule 11, § 1927, the Local Rules, the Court's inherent authority, and its obligation to ensure the appropriateness of attorney's fees and costs under the Settlement Agreement." (Id. at 4). The Court solicited the parties' feedback. (Id.).

The Defendants agreed to withdraw their Rule 11 motion as part of the Settlement Agreement; as such, they took no position on the sanctions issue. (Doc. 2098). Meanwhile, Counsel argued that such an investigation was unnecessary. (Docs. 2097, 2100, 2101, 2102). On December 22, 2015, the Court appointed the U.S. Attorney to serve as a Special Master (distinct from the Temporary Special Master) to investigate whether Counsel's conduct warranted sanctions under Rule 11, 28 U.S.C. § 1927, or the Court's inherent authority ("**Referral Order**"). (Doc. 2108). The Referral Order delineated specific issues and incidents of concern (id. at 3-6), directed the Special Master to investigate, and set a schedule for the submission of a Report and Recommendation, objections, and a response (id. at 6-7).

## I.     The 2016 Report and Recommendation

Seven months later, the Special Master submitted the comprehensive 298-page 2016 R&R that is before the Court (Doc. 2147), along with several thousand pages of exhibits. While recommending no sanctions against the other firms representing plaintiffs, the

Special Master found that Wilner and Farah had violated Rule 11, 28 U.S.C. § 1927, the Court's Local Rules, and the Florida Rules of Professional Conduct. The Special Master recommended, among other things, that the Court order Counsel to disgorge all attorney's fees and costs recoverable in this <u>Engle</u> Litigation.[18] Counsel filed Objections totaling 242 pages (Doc. 2165), along with over 1,800 pages of exhibits. The Special Master filed a 48-page Response. (Doc. 2170).

**J.      The December 2016 Hearing**

The matter came before the Court for a day-long hearing on December 13, 2016, during which the Court heard argument from both sides, as well as extensive remarks from Wilner and a more limited statement from Farah. (<u>See</u> Doc. 2174 at 90–143). The analysis and conclusions that follow are informed by the Court's familiarity with the record, the comprehensive briefs and exhibits submitted by both sides, and the December 13, 2016 hearing.

**PART II**

**Procedural Due Process**

Before discussing whether Wilner's and Farah's conduct is sanctionable, the Court addresses an issue that they raised for the first time at the December 13, 2016 sanctions hearing. Although nowhere argued in their 242-page objections to the 2016 R&R– or at any other time in the months after the hearing was scheduled – Counsel protested on the morning

---

[18] Because there is litigation pending among the plaintiffs' firms as to how to allocate attorneys' fees, the amount due to Wilner and Farah is unknown. However, from a total pool of approximately $39 million set aside for attorneys' fees, they are claiming entitlement to at least $15,600,000 plus costs.

of the hearing that the hearing would not afford them adequate procedural due process. Counsel argued that the Court must give them the same procedural due process that attends a criminal trial: the right to present witness testimony; the right to discovery; the right to a trial by jury; and the right to require that the Special Master prove violations of Rule 11, 28 U.S.C. § 1927, and any other ethical duties beyond a reasonable doubt. The Court disagrees. Below, the Court explains why the procedures accorded Wilner and Farah satisfy the requirements of procedural due process, as well as the particular procedural requirements of Rule 11.

### A. Constitutional Requirements

The Fifth Amendment guarantees that no person shall be deprived of life, liberty, or property without the due process of law. U.S. Const., amend. V. A court must comport with the mandates of due process when sanctioning lawyers for abusive litigation practices. Chambers v. NASCO, 501 U.S. 32, 50 (1991); Roadway Exp., Inc. v. Piper, 447 U.S. 752, 767 (1980). What process is due is a more difficult question however, as "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895 (1961). While courts have framed the due process protections in the sanctions context somewhat differently depending on the source of the court's sanctioning authority, the requirements are similar in substance. In general, regardless of whether the Court invokes Rule 11, 28 U.S.C. § 1927, or its inherent authority, it must provide a lawyer (or a party) notice of the possibility of sanctions, the reasons why the court is contemplating sanctions,

and an opportunity to respond. <u>Amlong & Amlong, P.A. v. Denny's, Inc.</u>, 500 F.3d 1230, 1242 (11th Cir. 2007) ("Plainly, an attorney threatened with sanctions under § 1927 is entitled to a hearing.") (citing <u>Reynolds v. Roberts</u>, 207 F.3d 1288, 1302 (11th Cir. 2000)); <u>Thomas v. Tenneco Packaging Co., Inc.</u>, 293 F.3d 1306, 1321 (11th Cir. 2002) (a lawyer facing sanctions pursuant to a court's inherent authority "must be provided with notice and 'an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions.'") (quoting <u>In re Mroz</u>, 65 F.3d 1567, 1575-76 (11th Cir. 1995)); <u>Donaldson v. Clark</u>, 819 F.2d 1551, 1559-60 (11th Cir. 1987) (en banc) ("Due process requires that the attorney … has fair notice of the possible imposition of Rule 11 sanctions and of the reasons for their imposition," as well as "an opportunity to respond, orally or in writing as may be appropriate. . . .").

What due process does not require is that the Court give Counsel a full-blown criminal trial. The Eleventh Circuit has held that lawyers facing Rule 11 sanctions are not entitled to the panoply of procedures that a criminal proceeding entails. <u>Donaldson</u>, 819 F.2d at 1558-61. "Nothing in the text of Rule 11 or in the Advisory Committee Note indicates that due process requires a court to follow the procedures called for by Fed. R. Crim. P. 42(b) for criminal contempt proceedings before it can impose a monetary sanction pursuant to Rule 11." <u>Id.</u> at 1558. Indeed, the Eleventh Circuit has

> explicitly rejected the argument that the punitive character of a monetary sanction imposed in a judicial disciplinary proceeding fixes the proceeding as one of criminal contempt, requiring the right to jury trial and analogous criminal procedural rights. <u>Kleiner</u>, 751 F.2d at 1209-10.[19] A violation of

---

[19] <u>Kleiner v. Nat'l Bank of Atlanta</u>, 751 F.2d 1193 (11th Cir. 1985).

Rule 11 is fundamentally different from an infraction of criminal contempt and therefore warrants different sanction proceedings.

> The bar bears a special administrative responsibility in the judicial process independent from the public at large. We frequently refer to attorneys as officers of the court. A monetary sanction for failure to carry out this special responsibility as an attorney differs from the more severe infractions of criminal contempt for which attorneys and members of the general public can become liable. The former is an unjustified failure to carry out an administrative responsibility as an officer of the court; the latter is an affront to the authority of the judge.

> Miranda v. Southern Pac. Transp. Co., 710 F.2d 516, 519 (9th Cir. 1983). "The court's power to impose appropriate sanctions on attorneys practicing before it 'springs from a different source than does the power to punish for criminal contempt.'" Kleiner, 751 F.2d at 1209 (citations omitted).

Donaldson, 819 F.2d at 1558-59. The Supreme Court has further said that judicial sanctions like those imposed under Rule 11, including the assessment of costs, "never have been considered criminal, and the imposition of civil, coercive fines to police the litigation process appears consistent with" its due process precedents. Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 833 (1994). Counsel's insistence on the full protection of criminal due process also runs counter to one of the objectives of Rule 11, which is to curb, not spawn, collateral litigation. Donaldson, 819 F.2d at 1559. Thus, to the extent the Court imposes sanctions under Rule 11, Counsel are not entitled to a criminal trial.

Likewise, the Court finds no authority for the notion that a lawyer facing sanctions under 28 U.S.C. § 1927 is entitled to a criminal trial. Rather, nearly every court to consider the question has held only that a lawyer is entitled to notice and an opportunity to respond – proceedings far short of a full-fledged criminal trial. See e.g., Amlong, 500 F.3d at 1242

(a lawyer facing sanctions under § 1927 is entitled to a hearing); <u>Resolution Trust Corp. v. Dabney</u>, 73 F.3d 262, 268 (10th Cir. 1995) (lawyer sanctioned under § 1927 and the court's inherent authority was entitled to notice and an opportunity to respond); <u>Jones v. Pittsburgh Nat'l Corp.</u>, 899 F.2d 1350, 1357 (3d Cir. 1990) ("Prior to sanctioning an attorney [under 28 U.S.C. § 1927], a court must provide the party to be sanctioned with notice of and some opportunity to respond to the charges.") (citation omitted).

Nor are Counsel entitled to a criminal trial to the extent the Court imposes sanctions under its inherent authority. Relying on <u>Bagwell</u>, 512 U.S. 821, Counsel argue that the Court is subjecting them to criminal contempt sanctions, and thus that they are entitled to criminal due process. But <u>Bagwell</u> does not support their position; <u>Bagwell</u> only concerned what process is required when a court imposes a <u>punitive</u> sanction for <u>indirect</u> contempt. <u>See id.</u> at 834 (noting that all sides agreed the case involved a non-compensatory sanction); <u>id.</u> at 827 n. 2 ("We address only the procedures required for adjudication of indirect contempts, i.e., those occurring out of court."). As the Court will explain, the sanction here is neither punitive nor is it for indirect contempt. As such, civil procedures are appropriate.

In <u>Bagwell</u>, a state court fined a union $64 million for committing multiple violations of an injunction during the course of a strike. <u>Id.</u> at 823-24. Of the $64 million fine, $52 million was payable to the Commonwealth of Virginia and the two counties impacted by the union's activities. All sides admitted, however, that the $52 million component of the sanction was punitive, as it was not calibrated to compensate the Commonwealth or the two counties for their harm. <u>Id.</u> at 834. Nevertheless, the state court characterized the contempt proceedings as civil and refused to give the union a jury trial. <u>Id.</u> at 824. The union argued

that the sanctions were criminal in nature, and thus that they should have had the protections that a criminal trial entails.

The Supreme Court agreed with the union and reversed the sanctions. The Court identified the issue as "whether these fines, despite their noncompensatory character, are coercive civil or criminal sanctions." Id. at 834. According to the Court, a contempt fine "is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained." Id. at 829 (quoting United States v. Mine Workers, 330 U.S. 258, 303-04 (1947)). Criminal sanctions, by comparison, are not designed to coerce obedience and do not offer the contemnor an opportunity to cure; they retrospectively impose punishment for completed acts of disobedience. Id. at 828-29 (citing Gompers v. Bucks Stove & Range Co., 221 U.S. 418 (1911)). Because the fine was admittedly noncompensatory, whether it qualified as a civil sanction turned on whether it was meant to coerce the union into compliance with a court order. Ultimately, however, the Court declined to classify the sanction based on whether it was designed to coerce obedience (as with a coercive civil contempt fine) or to punish disobedience (as with a punitive criminal contempt fine), noting the difficulty in distinguishing between the two because they share similar features – punitive criminal sanctions, for example, also have a coercive component because they threaten to penalize non-compliance. See id. at 836-37. Instead, "[o]ther considerations convince[d] [the Court] that the fines challenged here are criminal." Id. at 837. First, "[t]he union's sanctionable conduct did not occur in the court's presence or otherwise implicate the court's ability to maintain order and adjudicate the proceedings before it." Id. Second, the union's contumacy

did not involve simple, affirmative misdeeds, but "widespread, ongoing, out-of-court violations of a complex injunction," such that the Virginia court "effectively policed [the union's] compliance with an entire code of conduct that the court itself had imposed." Id. Third, "[t]he fines assessed were serious, totaling over $52 million." Id.[20] Under those circumstances, the Court held that "disinterested factfinding and evenhanded adjudication were essential, and petitioners were entitled to a criminal jury trial." Id. at 838.

This case is substantially distinguishable. First, the Court's sanction is compensatory, which places it outside the orbit of Bagwell. As discussed in greater detail in Part VI, infra, the sanction here is designed to compensate the Court for the waste of scarce judicial resources occasioned by Wilner's and Farah's misconduct.[21] No court has held that a compensatory fine tied directly to the damage inflicted upon the injured party, as it is here, is a punitive sanction that triggers criminal due process.[22] Indeed, Bagwell left "unaltered

---

[20] The Supreme Court declined to draw a line between petty contempt fines and serious criminal contempt fines, "since a $52 million fine unquestionably is a serious contempt sanction." Id. at 837 n.5. Where to draw that line also need not concern the Court here, because the sanction that the Court intends to impose is compensatory in nature, and thus does not qualify as a criminal penalty.

[21] Although compensatory sanctions are typically imposed by shifting litigation costs between adversaries, courts have the power to impose sanctions that compensate the court for the waste of judicial resources. See, e.g., Lasar v. Ford Motor Co., 399 F.3d 1101, 1109-13 (9th Cir. 2005) (affirming district court's imposition of $5,946.15 sanction, without giving counsel a criminal trial, because the sanction was designed to reimburse the court); Resolution Trust Corp., 73 F.3d at 267 (awareness of the costs imposed upon the judicial system is a relevant factor in determining the seriousness and extent of the sanction appropriate in certain cases) (citing In re Baker, 744 F.2d 1438, 1442 (10th Cir. 1984)).

[22] Even the cases on which Counsel rely expressly exclude compensatory civil contempt sanctions from their holdings. See, e.g., U.S. v. Twentieth Century Fox Film Corp., 882 F.2d 656, 661-65 & n.1 (2d Cir. 1989) (although holding that a jury trial was required before imposing a $100,000 criminal contempt fine, excluding civil compensatory sanctions from its holding).

the longstanding authority of judges to adjudicate direct contempts summarily, and to enter broad compensatory awards for all contempts through civil proceedings." Id. at 838 (citing Sheet Metal Workers v. EEOC, 478 U.S. 421 (1986)). Because the sanctions imposed here are directly tied to the consumption of scarce public resources, the sanction is compensatory, which places it in the category of civil sanctions. Id. at 829 (A contempt fine "is considered civil and remedial if it … 'compensate[s] the complainant for losses sustained.'") (quoting Mine Workers, 330 U.S. at 303-04).

Second, today's sanctions are not for out-of-court misconduct, i.e., indirect contempt. Instead, the sanction is for conduct that occurred in front of the Court – that is, for frivolous allegations and misleading statements by Counsel in court filings and in oral pronouncements directly before the undersigned judges. While "contempts committed beyond the Court's presence where the judge has no personal knowledge of the material facts are especially suited for trial by jury," Green v. United States, 356 U.S. 165, 217 n.33 (1958) (Black, J., dissenting), "the contempt's occurrence before the Court reduces the need for extensive factfinding and the likelihood of an erroneous deprivation." Bagwell, 512 U.S. at 832. When, as here, "an attorney has failed to present necessary factual support for claims despite several opportunities to do so . . . , further hearing on the sanctions issue may well

---

Indeed, in Lasar, 399 F.3d at 1109-13, the Ninth Circuit affirmed a district court's imposition of a $5,496.15 sanction, without giving counsel a criminal trial, because the court designed the sanction to compensate itself for the costs of the lawyer's misconduct. The Ninth Circuit recognized that the sanction bore some of the hallmarks of a punitive sanction, such as the fact that it was payable to the court and that it was imposed for accomplished acts of misconduct, but it noted that "a court's decision to assess costs has 'never . . . been considered [a] criminal' sanction." Id. at 1111 (quoting Bagwell, 512 U.S. at 833).

be not only unnecessary but also a waste of judicial resources." <u>Donaldson</u>, 819 F.2d at 1561. Moreover, the Court's power to impose sanctions "is at its pinnacle . . . where contumacious conduct threatens a court's immediate ability to conduct its proceedings." <u>Bagwell</u>, 512 U.S. at 832. Wilner's and Farah's contumacious behavior not only occurred directly in the Court's presence, but it disrupted the Court's ability to manage the federal <u>Engle</u> litigation.

Additionally, the Court is not imposing sanctions solely to police Counsel's "compliance with an entire code of conduct that the court itself had imposed." <u>Id.</u> at 837. To the contrary, as Parts III, IV, and V make clear, the Court imposes sanctions based on Counsel's failure to comply with their obligations as officers of the court under Rule 11, 28 U.S.C. § 1927, and the Florida Rules of Professional Conduct. One of the reservations the Supreme Court expressed with contempt sanctions in <u>Bagwell</u> was "the fusion of legislative, executive, and judicial powers" in the judge; that is, that "civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." <u>Id.</u> at 831. According to the Supreme Court, this fusion of powers created a particularly compelling argument for the necessity of a jury trial "'as a protection against the arbitrary exercise of official power.'" <u>Id.</u> at 831-32 (quoting <u>Bloom v. Illinois</u>, 391 U.S. 194, 202 (1968)). Here though, the Court does not sanction Counsel for wrongdoing defined only by the Court. Rather, the Court sanctions Counsel for wrongdoing that has been defined by other authorities – by the Federal Rules of Civil Procedure, by Congress, and by the Florida Bar. As such, any concern that the Court might arbitrarily define sanctionable conduct is misplaced.

What due process does require is that Counsel receive notice of the possibility of sanctions and an opportunity to respond. Donaldson, 819 F.2d at 1559-60; Amlong, 500 F.3d at 1242; Thomas, 293 F.3d at 1321. With respect to notice, Counsel received ample warning that sanctions may be imposed, the authorities under which sanctions might be imposed, and the reasons why. As early as the hearing on June 6, 2012, the Court warned Counsel that there may be "Rule 11 consequences" for the manner in which they conducted the federal Engle litigation. (Doc. 677 at 41). Beginning in August 2012, the Court began including a notation in each order dismissing cases that it was "reserv[ing] jurisdiction to make further inquiry and address the circumstances surrounding the filing of this case, and any Rule 11 implications." (E.g., Doc. 758 at 2). On October 26, 2012, the defendants filed their own "Motion for an Inquiry Under Rule 11 as to Cases Filed as Personal Injury Actions in the Names of Deceased 'Plaintiffs'" (Doc. 813), giving Counsel further notice of the specter of sanctions. In November 2015, as the Court ordered the disbursement of proceeds from the global settlement, the Court advised Counsel that sanctions proceedings were forthcoming, and invited Counsel to "make whatever arguments they wish or any suggestions as to how the Court ought to navigate this unusual situation." (Doc. 2094 at 2-4). Then on December 22, 2015, after hearing from the parties, the Court appointed the Special Master so that the Court could maintain its role as a neutral arbiter in the sanctions proceedings. (Doc. 2108). In so doing, the Court laid out the specific conduct that the Court thought warranted investigation, the authorities that might justify the imposition of sanctions (including Rule 11, 28 U.S.C. § 1927, and the Court's inherent power), and the procedures that the Court intended to follow. (Id.). Finally, the Special Master's

comprehensive 2016 R&R (Doc. 2147) laid out in painstaking detail the conduct that the Special Master believes warrants sanctions, the reasons why, and the applicable authorities. Thus, there can be no dispute that Counsel received ample notice.

Nor can there be any dispute that Counsel had an adequate opportunity to respond. At the Court's invitation, Counsel responded to the Court's proposal to appoint a Special Master. (Doc. 2102). This gave Counsel an initial opportunity to address the Court's concerns, as well as a chance to give input on the procedures for determining whether sanctionable conduct occurred. (Counsel did not at that time suggest that they were entitled to a criminal trial). During the Special Master's investigation itself, Counsel had several opportunities to justify their conduct to the Special Master, as reflected by several exchanges between the Special Master and the Wilner Firm. (E.g., Ex. 1, 6, and 10 to 2016 R&R). After the Special Master issued his 2016 R&R, Counsel had the opportunity to respond to the Special Master's findings, and they did so, filing an extensive 242-page objection, along with over 1,800 pages of exhibits. (Doc. 2165, Objections).

Case law suggests that the Court could have stopped there – that an opportunity to file a written response is enough. See Thomas, 293 F.3d at 1320-21 (a lawyer facing sanctions pursuant to a court's inherent power "must be provided with notice and 'an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions.'") (quoting In re Mroz, 65 F.3d at 1575-76); Baker v. Alderman, 158 F.3d 516, 526 (11th Cir. 1998) (although it is "prudent for a district judge to hold a hearing before imposing sanctions," there is "no requirement [under Rule 11] that a hearing be conducted before sanctions are awarded."); G.J.B. & Assoc., Inc. v. Singleton, 913 F.2d 824, 830 (10th

Cir. 1992) (procedural due process requires that an attorney have notice and an opportunity to respond before a court imposes Rule 11 sanctions, but it does not require the court to hold a separate oral hearing) (citing Braley v. Campbell, 832 F.2d 1504, 1514-15 (10th Cir. 1987) (en banc)). However, in view of the seriousness of the matter, the Court provided further procedural safeguards. The Court held a day-long hearing on December 13, 2016, during which the Court entertained argument from Holland and Knight, whom Wilner and Farah hired to represent them on the sanctions issue, and allowed Wilner and Farah to speak at length. (See generally, Doc. 2174, Sanctions Hearing Transcript).

The Court is satisfied that Wilner and Farah have received more than adequate procedural due process. Because the Court intends to impose a civil compensatory sanction for misconduct that occurred before the Court, and which directly interfered with the administration of the federal Engle litigation, civil procedures are appropriate. The Court has given Wilner and Farah ample notice and opportunity to defend themselves, both in writing and in person.

### B. Rule 11 Procedural Requirements

The Court must also be satisfied, to the extent it imposes sanctions under Rule 11, that Rule 11's own procedural requirements have been met.[23] Rule 11 provides that "[o]n its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3).

---

[23] Beyond the mandates of procedural due process, neither 28 U.S.C. § 1927 nor inherent authority sanctions carry their own additional procedural requirements.

However, a court may not impose a monetary sanction "on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned." Fed. R. Civ. P. 11(c)(5)(B).

This Court has not entered an order formally titled an "order to show cause." The Eleventh Circuit has held, however, that "[w]hile formal compliance with Rule 11(c)(1)(B)[24] is the ideal, we apply a flexible standard, so in many cases substantial compliance may suffice." Kaplan v. DaimlerChrysler, A.G., 331 F.3d 1251, 1256-57 (11th Cir. 2003) (citations omitted). The Court has substantially complied with Rule 11(c)(5)(B)'s requirement that it issue a show cause order before imposing sanctions sua sponte. As recounted in Part II.A above, the Court entered multiple orders notifying Counsel of the prospect of Rule 11 sanctions.[25] The Order appointing the Special Master (Doc. 2108), identified the conduct that the Court thought warranted investigation, and set a deadline for Counsel to respond to the 2016 R&R, effectively serving as an order for Counsel to show cause why they should not be sanctioned. Issuing a further show cause order at this point, after having received hundreds of pages of briefing on the issue of sanctions, thousands of pages of exhibits, and having held an oral hearing, would be superfluous. As such, the Court concludes that it has satisfied Rule 11's procedural requirements for the imposition of sanctions.

---

[24] Rule 11(c)(1)(B) has since been renumbered Rule 11(c)(5)(B).

[25] In proceeding this way, the Court was able to concentrate on adjudicating the viable Engle claims while reserving Rule 11 consideration for later.

A.     **Rule 11 in General**

Under Rule 11 of the Federal Rules of Civil Procedure:

> [b]y presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1)     it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2)     the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3)     the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4)     the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

"If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). A court has authority on its own initiative to "order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3).

The purpose of Rule 11 is to "reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers." Massengale v. Ray, 267 F.3d 1298, 1302 (11th Cir. 2001) (citing Donaldson, 819 F.2d at 1556). A district court may impose sanctions:

> (1) when the party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) when the party files a pleading in bad faith for an improper purpose.

Anderson v. Smithfield Foods, Inc., 353 F.3d 912, 915 (11th Cir. 2003) (internal quotations and citations omitted).

"Rule 11 applies to all papers filed in a suit." Turner v. Sungard Bus. Sys., Inc., 91 F.3d 1418, 1421 (11th Cir. 1996) (citing Thomas v. Capital Sec. Servs., Inc., 836 F.2d 866, 870, 873 (5th Cir. 1988) (en banc)). In 1993, the Rule was amended also to prohibit a lawyer from "later advocating" a frivolous pleading, motion, or other paper. Thus:

> [A] litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit. For example, an attorney who during a pretrial conference insists on a claim or defense should be viewed as "presenting to the court" that contention and would be subject to the obligations of subdivision (b) measured as of that time.

Id. at 1422 (quoting Fed. R. Civ. P. 11, Adv. Cmt. Note, 1993 amend.) (emphasis added). The Rule "emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable. . . ." Fed. R. Civ. P. 11, Adv. Cmt. Note, 1993 amend. "Rule 11 requires [litigants] to make reasonable inquiries into the

veracity of information filed before the court and to advise the court of any changes." Attwood v. Singletary, 105 F.3d 610, 613 (11th Cir. 1997) (per curiam). "As officers of the court, [lawyers] [a]re duty bound to inform the court of the information in counsel's complaints that they kn[o]w to be false—even if the court ha[s]n't repeatedly asked them for that information." In re Engle Cases, 767 F.3d at 1117 (citations omitted).

The term "later advocate" suggests that a lawyer must engage in some sort of affirmative conduct to violate the continuing duty of candor. However, in Turner, the sanctioned attorney simply filed a notice of appearance to replace previous counsel, who had withdrawn upon discovering that the plaintiff's contentions were factually unsupported. 91 F.3d at 1420, 1421. The district court found that, from the moment the second lawyer appeared in the case, he knew "that there was no merit to the plaintiff's assertions, or, at the very least, he consciously decided not to inquire of the merits." Id. at 1421. The Eleventh Circuit reasoned that "[b]y appearing in this case, [counsel] affirmed to the court that the case had arguable merit. In this sense, it was as if [counsel] had refiled the complaint. To use Rule 11's words, he was 'later advocating' that the 'factual contentions [in the complaint] have evidentiary support.'" Id. (quoting Fed. R. Civ. P. 11(b)).

While Rule 11 does not apply to papers originally filed in state court, Tompkins v. Cyr, 202 F.3d 770, 787 (5th Cir. 2000), the continuing duty of candor discussed above

> has diminished the importance of this point . . . by making the certification reflected in the signature continuous, at least in the sense that the party cannot base her advocacy in the federal district court on a state-filed document that does not satisfy Rule 11. The signer has an obligation not to re-present a motion or pleading that violates Rule 11 and to refrain from advocating its objectionable content once the action is removed.

Wright & Miller, Fed. Prac. & Proc. Civ. § 1337.1 (3d ed.). As Rule 11's commentary states:

> [I]f after a notice of removal is filed, a party urges in federal court the allegations of a pleading filed in state court (whether as claims, defenses, or in disputes regarding removal or remand), it would be viewed as "presenting"—and hence certifying to the district court under Rule 11—those allegations.

Fed. R. Civ. P. 11, Adv. Cmt. Note, 1993 amend., subdivisions (b) and (c).

## B. An Objective Bad Faith Standard Applies to Court-Initiated Rule 11 Sanctions

The standard for evaluating conduct under Rule 11 is ordinarily "reasonableness under the circumstances" and "what was reasonable to believe at the time" the litigant made the allegedly frivolous contention. Baker, 158 F.3d at 524 (footnote omitted).[26] "Hence, courts determine whether a reasonable attorney in like circumstances could believe his actions were factually and legally justified." Kaplan, 331 F.3d at 1255 (citing Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1294 (11th Cir. 2002)). "[B]ad faith" is not necessarily required to violate Rule 11. Chambers, 501 U.S. at 47 & n.11 ("Rule 11 . . . imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith."); see Donaldson, 819 F.2d at 1556.

Courts therefore follow a two-step inquiry in determining whether to impose Rule 11 sanctions, assessing (1) whether the claim is objectively frivolous, and if so, (2) whether the person who signed the pleading should have been aware that it was objectively frivolous. Baker, 158 F.3d at 524. Put another way, a court first determines "whether the party's claims

---

[26] "This standard is more stringent than the original good-faith formula and thus it is expected that a greater range of circumstances will trigger its violation. See Nemeroff v. Abelson, 620 F.2d 339 (2d Cir. 1980)." Fed. R. Civ. P. 11, Adv. Cmt. Note, 1983 amend.

are objectively frivolous—in view of the facts or law—and then, if they are, whether the person who signed the pleadings should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry." <u>Worldwide Primates, Inc. v. McGreal</u> (<u>Worldwide Primates II</u>), 87 F.3d 1252, 1254 (11th Cir. 1996).[27]

In <u>Kaplan</u>, the Eleventh Circuit held that a higher standard—"akin to contempt"—applies when a court imposes Rule 11 sanctions <u>sua</u> <u>sponte</u>. 331 F.3d at 1255. As the Eleventh Circuit explained:

> <u>Court-initiated</u> sanctions under Rule 11(c)(1)(B) do not involve the "safe harbor" provision contained in Rule 11(c)(1)(A). <u>In re Pennie & Edmonds LLP</u>, 323 F.3d 86, 89 (2d Cir. 2003). That provision ordinarily gives a lawyer or litigant 21 days within which to correct or withdraw the challenged submission. <u>Id.</u> at 89.
>
> Because "no 'safe harbor' opportunity exists to withdraw or correct a submission challenged in a court-initiated proceeding," <u>id.</u>, Rule 11's drafters commented on Rule 11(c)(1)(B)'s compensating protections: The initiating court must employ (1) a "show-cause" order to provide notice and an opportunity to be heard; and (2) a higher standard ("akin to contempt") than in the case of party-initiated sanctions.
>
> Other circuits apply the "akin to contempt" rationale to court-initiated, Rule 11 sanctions. <u>Hunter v. Earthgrains Co. Bakery</u>, 281 F.3d 144, 151 (4th Cir. 2002); <u>Barber v. Miller</u>, 146 F.3d 707, 711 (9th Cir. 1998). Sua sponte Rule 11 sanctions, then, must be reviewed with "particular stringency." <u>Pennie</u>, 323 F.3d at 90; <u>MHC Inv. Co. v. Racom Corp.</u>, 323 F.3d 620, 623 (8th Cir. 2003); <u>Hunter</u>, 281 F.3d at 153; <u>United Nat'l Ins. Co. v. R & D Latex Corp.</u>, 242 F.3d 1102, 1115 (9th Cir. 2001).

---

[27] "The reasonableness of the inquiry may depend on such factors as how much time for investigation was available to the signer, [or] whether he had to rely on a client for information as to the facts underlying the violative document." <u>Id.</u> (internal quotations and citation omitted).

Kaplan, 331 F.3d at 1255 (emphasis in original) (footnote omitted).[28]

The Eleventh Circuit did not articulate how the "akin to contempt" standard differs from the "reasonable under the circumstances" standard, except to say that "[s]ua sponte Rule 11 sanctions . . . must be reviewed with 'particular stringency.'" Id. (citations omitted). The Eleventh Circuit also declined to resolve whether the "akin to contempt" standard requires a showing of subjective bad faith, or something else. Id. at 1256.

The Second Circuit has held that a court must apply the "akin to contempt" standard when imposing sua sponte Rule 11 sanctions, and further, that the "akin to contempt" standard requires proof of subjective bad faith. In re Pennie, 323 F.3d at 91. That opinion, however, was accompanied by a formidable dissent, in which Judge Underhill contended that Rule 11 does not require a court to find subjective bad faith before imposing sanctions on its own. Id. at 93–102 (Underhill, J., dissenting). Judge Underhill wrote that the rules committee deliberately abandoned a subjective bad faith standard in favor of the "reasonable under the circumstances" standard with the 1983 amendments, and that nothing in Rule 11 requires a different standard to apply when a court proceeds sua sponte.

The First Circuit also disagreed with the Pennie majority, and held that the standard for imposing Rule 11 sanctions sua sponte is still reasonableness-under-the-circumstances. Young v. City of Providence ex rel. Napolitano, 404 F.3d 33, 39–40 (1st Cir. 2005). The

---

[28] If the rationale for imposing a higher standard in the context of sua sponte Rule 11 sanctions is that the sanctioned party lacks a safe harbor, the Court observes that Wilner and Farah did, in fact, have several safe harbor equivalents. As recounted in Part I, the Court gave Wilner and Farah numerous opportunities to voluntarily purge meritless cases from the Engle docket, as well as several warnings about potential Rule 11 ramifications. Nevertheless, they failed to comply with the Court's orders or to heed these warnings.

First Circuit acknowledged that "judges must be especially careful where they are both prosecutor and judge; but careful appellate review is the answer to this concern." Id. at 40.[29] Likewise, the Fifth Circuit rejected the contention that a subjective bad faith standard applies where a court imposes Rule 11 sanctions on its own initiative. Jenkins v. Methodist Hosps. of Dallas, Inc., 478 F.3d 255, 264 (5th Cir. 2007).

After careful research, this Court is not aware of any other circuit court of appeals, beyond the Second Circuit, holding that sua sponte Rule 11 sanctions require a showing of subjective bad faith.[30] Those other courts of appeals that have held that sua sponte Rule 11 sanctions are "akin to contempt" have not adopted a subjective bad faith standard. See e.g., Hunter, 281 F.3d at 151 (Fourth Circuit opinion observing that Rule 11's advisory notes contemplated that sua sponte sanctions would only be imposed in situations akin to a contempt of court, but not discussing a subjective bad faith standard); Barber, 146 F.3d at 711 (Ninth Circuit decision observing that Rule 11's advisory notes anticipated that a court would only impose sua sponte sanctions in situations akin to contempt, but not mentioning application of a subjective bad faith standard).

The Eleventh Circuit's requirement that sua sponte Rule 11 sanctions apply only in situations "akin to contempt" does not require proof of subjective bad faith in any event,

---

[29] In this case, the Court has ameliorated the "judge as prosecutor" concern by appointing the Special Master to allow the Court to retain its traditional judicial role.

[30] The Court recognizes that in an unpublished district court order, Hodge v. Orlando Utils. Comm'n, Case No. 6:09-cv-1059-Orl-19DAB, 2010 WL 376019, at *5–*6 (M.D. Fla. Jan. 25, 2010), a judge of this district applied a subjective bad faith standard in the context of court-initiated Rule 11 sanctions. For the reasons expressed herein, however, we decline to adopt this standard.

because the Eleventh Circuit does not require proof of subjective bad faith in contempt proceedings. "[T]he focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors . . ., but whether in fact their conduct complied with the order at issue." Howard Johnson Co., Inc. v. Khimani, 892 F.2d 1512, 1516 (11th Cir. 1990) (citing Jim Walter Res., Inc. v. Int'l Union, United Mine Workers of Am., 609 F.2d 165, 168 (5th Cir. 1980)). "The absence of wilfulness does not relieve from civil contempt." McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949).[31]

Most significantly, a subjective standard finds no support in the language of Rule 11. Nothing in the text or commentary to the current version suggests that, even when a court acts on its own initiative, sanctions may be imposed only if a litigant filed a frivolous claim knowingly or purposefully. On the contrary, Rule 11 was amended in 1983 for the precise purpose of replacing a subjective standard with an objective one. Fed. R. Civ. P. 11, Adv. Cmt. Note, 1983 amend.; Hashemi v. Campaigner Pubs., Inc., 784 F.2d 1581, 1583 (11th Cir. 1986).

---

[31] Moreover, sanctions under the more onerous standards of 28 U.S.C. § 1927 and the judiciary's inherent authority do not require proof of subjective bad faith. Rather, objective bad faith, which encompasses recklessness, is the standard for imposing sanctions under those authorities. Amlong, 500 F.3d at 1239-41 (rejecting a subjective bad faith standard in favor of an objective bad faith standard for § 1927 sanctions, and explaining that "reckless" conduct is enough to justify sanctions under § 1927); Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998) ("A finding of bad faith [for purposes of inherent authority sanctions] is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.") (alteration and emphasis added). It would be anomalous if sua sponte Rule 11 sanctions required proof of subjective bad faith, which would be a different and more demanding standard than that required to impose sanctions under 28 U.S.C. § 1927 or the Court's inherent authority.

Accordingly, proof of subjective bad faith is not required to impose court-initiated sanctions under Rule 11. Rather, for sua sponte Rule 11 sanctions, the standard that should apply is the same one that applies under 28 U.S.C. § 1927 and the Court's inherent authority when a party makes a frivolous argument[32] – objective bad faith. Using objective bad faith as the threshold to support sua sponte Rule 11 sanctions ensures both that only egregious misconduct will be penalized while preserving Rule 11's incorporation of an objective reasonableness standard.

Objective bad faith arises where an attorney "knowingly or recklessly pursue[s] a frivolous claim or needlessly obstruct[s] the litigation of a non-frivolous claim." Amlong, 500 F.3d at 1242 (first and third emphases in original; second emphasis added). A party could demonstrate bad faith, for example, "by delaying or disrupting the litigation or hampering enforcement of a court order." Barnes, 158 F.3d at 1214. "If particularly egregious, the pursuit of a claim without reasonable inquiry into the underlying facts can be the basis for a finding of bad faith" as well. Id. Recklessness is enough to support a finding of objective bad faith, even if the attorney does not act knowingly and malevolently. See Amlong, 500 F.3d at 1239–41. "[R]eckless conduct simply means conduct that grossly deviates from reasonable conduct." Id. at 1240 (citing Schwartz v. Millon Air, Inc., 341 F.3d 1220, 1227 (11th Cir. 2003)); W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 34 (5th ed. 1984); Black's Law Dictionary, 1298-99 (8th ed. 2004).

---

[32] The Eleventh Circuit recently clarified that the standard for inherent authority sanctions is typically subjective bad faith, but that a lawyer's conduct is "tantamount to bad faith" when (s)he recklessly advances a frivolous argument. See Purchasing Power, LLC v. Bluestem Brands, Inc., 851 F.3d 1218, 1223-25 (11th Cir. 2017).

**C.    Application of Rule 11 to Dead Plaintiffs' Personal Injury Actions**

**1.    Facts**

Counsel concede that the facts concerning the filing, maintenance, and eventual dismissal of 588 actions involving Pre-Deceased Plaintiffs ("**588 Actions**") are not in dispute. (Objections at 76–77). As discussed more fully in Part I and In re Engle Cases,[33] the Court learned in 2012 and 2013 that Counsel had filed personal injury complaints in the 588 Actions on behalf of people who were already dead as of the filing date. In 554 of the 588 Actions, or about 95%, the plaintiff had been dead for a year or longer before Counsel filed the complaints. See In re Engle Cases, 767 F.3d at 1096 n.16; (Docs. 933-1, 937-1). The Court did not discover this astonishing fact until the actions had been pending for four years, and the Court ordered Wilner to mail the Court Questionnaires to over 2,600 plaintiffs. Not once during those four years did Counsel do anything to advise the Court or opposing counsel about the fatally defective complaints. To the contrary, Counsel repeatedly resisted proposals that someone inquire into the status of the plaintiffs, and insisted that they were in contact with their clients and that they would be willing to certify that the complaints satisfied Rule 11.

**2.    The 588 Actions Were Objectively Frivolous**

The complaints filed in the 588 Actions were objectively frivolous. As the Eleventh Circuit observed, "any lawyer worth his salt knows [that] a dead person cannot maintain a

---

[33] The Court incorporates the Eleventh Circuit's opinion in In re Engle Cases, 767 F.3d 1082, which contains a comprehensive discussion of the facts surrounding the Pre-Deceased Plaintiffs' actions.

personal injury claim." <u>In re Engle Cases</u>, 767 F.3d at 1086–87. The complaints listing the 588 Pre-Deceased Plaintiffs alleged only a personal injury action— using the present or future tense in referring to the "Smoking Plaintiffs," and asserting that they "have and will suffer" as a result of their disease. (<u>E.g.</u>, <u>Edwin Moody et al. v. R.J. Reynolds Tobacco Co.</u>, Case No. 3:08-cv-155-J-32HTS, Doc. 2, Complaint at ¶ 1.10). Nowhere did the complaints suggest that the smoker had died, and nowhere did they assert an alternative wrongful death or survival action. To the contrary, the concluding allegation in each complaint stated that each plaintiff's injuries "are permanent and continuing and as such will be suffered into the future." (<u>E.g.</u>, <u>id.</u> at ¶ 11.1). These allegations were demonstrably false.

The complaints in the 588 Actions were also frivolous because Counsel lacked authorization to file or maintain them. "Perhaps the most basic factual contentions implicit in a complaint are that the plaintiff consents to the filing of suit and prays for the relief requested." <u>In re Deep Vein Thrombosis</u>, No. MDL-04-1606 VRW, 2008 WL 2568269, at *1 (N.D. Cal. Jun. 24, 2008). The dead plaintiffs obviously could not have authorized Counsel to bring lawsuits on their behalf. Nor did Counsel have authorization from the Pre-Deceased Plaintiffs' estates or their survivors because Counsel pled the complaints as personal injury actions on behalf of the Pre-Deceased Plaintiffs themselves. Therefore, "the most basic factual contention implicit" in the 588 personal injury complaints, i.e., that the plaintiff authorized and prayed for the relief requested, was untrue.

### 3. Counsel "Later Advocated" the 588 Complaints in this Court

Counsel originally filed the 588 Actions in state court (where Rule 11 does not apply) in January 2008, and the Defendants removed the cases to this Court a month later. The

question is therefore whether Counsel "later advocated" the frivolous complaints once they were pending here.

Recall that in <u>Turner</u>, 91 F.3d at 1421, the Eleventh Circuit equated filing a "notice of appearance" with "later advocating" a complaint. Here, Counsel's conduct in federal court easily amounted to "later advocating" the 588 personal injury complaints. On several occasions, Counsel reaffirmed to the Court, orally and in writing, implicitly and explicitly, that the pending complaints had factual merit.

It began shortly after the cases were removed to this Court when, in March 2008, Counsel filed a case management report "on behalf of approximately 4000 claimants," asserting that "[a]ll plaintiffs come with[in] the Engle class definition specified by the Florida Supreme Court and thus share the Engle I verdict." (<u>Nestor Amoros, et al. v. R.J. Reynolds Tobacco Co., et al.</u>, Case No. 3:07-cv-760-J-25HTS, Doc. 35-2 at 1, 17). Counsel further represented that all of the cases were viable when he filed a case management brief "on behalf of approximately 3800 claimants" in November 2010, in which Wilner ridiculed the Defendants' proposal to process 3,800 cases individually as a "millennium plan," and recommended trying the cases in groups of 100 to 500. (Doc. 25 at 1, 10-13). Counsel's advocacy of the frivolous complaints then continued after the December 2010 Order, in which the Court directed Counsel to "carefully and individually review each of the roughly 3800 remaining cases and to determine which of those cases is presently due to be dismissed." (Doc. 42 at 7). The Court reminded Counsel that they had a "continuing obligation throughout this litigation to inform [opposing counsel] and the Court when any of the remaining cases is due to be dismissed for any reason." (<u>Id.</u> at 8). The Defendants

recommended that Counsel contact the plaintiffs to gather basic information about their status and their claims, with the goal of identifying meritless cases. (Doc. 48 at 1–4). Wilner balked at this suggestion, In re Engle Cases, 767 F.3d at 1092 (citing Doc. 61 at 3), and contended that any information obtained from individual interviews "would not be worth much to anyone" (Doc. 61 at 3). Counsel wrote that they had individual files for each Plaintiff, that they would "make a good faith effort" to screen out non-viable cases, and that they only expected "to identify something like ten percent of the filed cases as appropriate for dismissal." (Id.). When time came to respond to the Court's December 2010 Order, Counsel failed to identify any of the 588 Actions, thereby implying that the actions were still viable.

Counsel pushed back even more forcefully when the Temporary Special Master made his questionnaire recommendation. (See Doc. 158 at 14-15). Counsel asserted that contacting the plaintiffs was unnecessary because they had "ongoing and routine communications" with them. Counsel insisted that interviewing the plaintiffs would "not result in 'a substantial reduction in the number of cases,'" because significant "winnowing ha[d] already occurred," and there was "no longer any sizeable group of cases ripe for dismissal." Counsel assured the Court that "[t]here is no need for the tremendous expense of energy and resources for a third party to poll the remaining plaintiffs because counsel already possess the vast majority of this data, and are working diligently to fill in all gaps." Further, Counsel represented that they were "engaged in a constant and ongoing process of updating information and will continue to take appropriate steps if additional clients become

unable or unwilling to pursue their claims." (Id. at 17).[34] The import of these assertions was that the remaining Engle-progeny cases—or at least the vast majority of them—had a living, willing plaintiff with a viable claim.

Wilner's advocacy for the 588 Actions did not end there. At the June 2011 Hearing, Wilner stood before the Court and represented that all the plaintiffs (less 332, whose cases were dismissed for different reasons) "were alive, present, willing, and all that," that all the remaining cases were "ready and able" to proceed, and that he would be willing to certify that all of the 2,900 remaining complaints complied with Rule 11. Under Rule 11, statements like these "during a pretrial conference insist[ing] on a claim or defense should be viewed as 'presenting to the court' that contention and would be subject to the obligations of subdivision (b) measured as of that time." Fed. R. Civ. P. 11, Adv. Cmt. Note, 1993 amend., subdivisions (b) and (c). Wilner's remarks were an affirmation that all of the remaining actions, including the 588 Actions, had legal and factual merit. As the Court found out following the mandatory Court Questionnaire process, Wilner's representations grossly overstated the number of viable complaints.[35]

---

[34] Whatever this "constant and ongoing process" was, it did not lead Counsel to take any steps at all to address the 588 Actions (at least not until after the Court unearthed the errors).

[35] The commentary to Rule 11 states that "[i]t does not cover matters arising for the first time during oral presentations to the court, when counsel may make statements that would not have been made if there had been more time for study and reflection." Fed. R. Civ. P. 11(b), cmt. to 1993 Amendment. Seizing on that comment, Wilner argues he should not be held liable for any assertions he made for only the first time at the June 2011 Hearing. (Objections at 110). Wilner's argument is unavailing because the June 2011 Hearing was not the first time Counsel had asserted that they were in contact with the plaintiffs and that the remaining cases had merit. (See Docs. 61, 158).

### 4.    Counsel Advocated Personal Injury Claims in Objective Bad Faith

Thus the issue comes down to whether Counsel advocated the 588 Actions in objective bad faith. At the very least, Counsel were reckless in filing personal injury complaints without any recent contact with the plaintiffs or any investigation into whether the plaintiffs were even alive, and then in urging the Court that these cases had merit.

As noted in Part I, in the 1990's Wilner took down the names of numerous Potential Plaintiffs, but he lost contact with thousands of them in the decade that followed. After Engle III, Wilner tried to get in touch with roughly 6,000 Potential Plaintiffs, but as the Engle filing deadline approached, Wilner decided he would file complaints on behalf of those he could not reach. (See Doc. 589-1 at 2). Never mind that Wilner's last contact with hundreds of the Potential Plaintiffs was a decade old. (See Doc. 822-1 at 2–9). Never mind that the only thing some of these people did was contact Wilner's firm a decade earlier with a general interest in suing a tobacco company. And never mind that Wilner had no idea whether the Potential Plaintiffs were still interested in pursuing litigation or were even still alive.

In his "**Verified Response**" to the Defendants' now-withdrawn Rule 11 motion, Wilner wrote that he was "duty bound to presume [he] represented each client who made

---

(footnote 35 cont'd) The principle behind that commentary is that an attorney should not be sanctioned for making an on-the-spot representation without the opportunity for study and reflection. Wilner's representations during the June 2011 Hearing were not of that character. Since December 2010, the Court had been seeking ways to sort out viable cases from non-viable cases. Thus, Wilner knew going into the June 2011 Hearing that the Court's goal was to get a handle on the number of viable cases and the number of plaintiffs willing and able to proceed. Wilner had ample opportunity before the June 2011 Hearing to study and reflect on how many of the 2,900 then-pending cases had a willing and able Plaintiff with a colorable claim. Indeed, the December 2010 Order required Wilner to be aware of any cases that lacked merit.

contact" with him many years earlier. (Doc. 822 at 18). This leads the Court to the same "inevitable conclusion" as the Eleventh Circuit: "that [Wilner] filed lawsuits in 2008 for many individuals whose last, and perhaps only, contact with his firm was nearly a decade earlier, who never authorized him to file suit, and who, in all likelihood, had no earthly idea that Wilner considered himself to be their lawyer." In re Engle Cases, 767 F.3d at 1112.

The Special Master's investigation bears out the conclusion that Wilner filed the vast majority of the lawsuits without conducting any pre-suit investigation. Wilner's records from the 1995–2007 timeframe contain little indication that he communicated with his so-called "clients," investigated their claims, or obtained authorization to file lawsuits on their behalf. To the extent Wilner attempted any investigation, he generally did so well after he filed the complaints, as reflected by the July 2009 Letters he mailed to 2,756 Letter Recipients in 2009 and 2010. The July 2009 Letters announced that Wilner had filed a complaint in a plaintiff's name and asked the Letter Recipient to execute and return the Counsel Questionnaire, records release form, and authorization to represent —18 months after filing the complaints. The July 2009 Letter shows that in over 2,700 cases, Wilner did not obtain such basic information before filing the lawsuits, and once he did obtain such information (or found he could not do so), Wilner did not amend or withdraw any of the Federal Engle Complaints.

Wilner virtually admitted at the December 2016 Hearing that his approach to filing the complaints was to file-first-and-ask-questions-later by stating that his firm lacked "the ability to contact 7,000 people in a year," so instead they opted to file the complaints and

then determine whether the cases were viable. (See Doc. 2174 at 98-100). Even this they failed to do, seeing how many frivolous cases survived for over four years.

Wilner made a conscious decision to file hundreds of complaints without knowing the current status of the plaintiff, without knowing whether the plaintiff wanted to pursue an individual lawsuit, and without knowing whether the plaintiff was even alive.[36] Then, despite <u>knowing</u> that the large volume of claims imposed significant strains on judicial resources, Wilner used the volume of claims (which he achieved through his own unethical behavior) as leverage to advocate his style of case management. (<u>See</u> Doc. 25 at 10-13). Although Wilner actually might not have known that 588 of the personal injury plaintiffs were dead, he must have known that, without having had contact with them in years, he had no basis to file claims on their behalf. Despite this, Wilner resisted suggestions that there be an inquiry into the status of the plaintiffs. Instead, he wrongly insisted that such inquiries would be a waste of time because all the non-viable cases had been eliminated.

Wilner told the Court in June 2011 that the 588 Predeceased Plaintiffs were alive, willing, and able to proceed, even though he did not know whether that was true. And Wilner told the Court he would be willing to file Rule 11 certifications in all of the remaining 2,900 cases, despite knowing he had filed hundreds of personal injury actions without any idea whether the plaintiff was alive or dead, or even whether they wanted to pursue a claim. Such conduct is not merely negligent; it is an egregious display of deliberate indifference to the

---

[36] According to the data (Doc. 822-1 at 2–9) attached to Wilner's "Verified Response," Wilner's last contact with over 300 of the Pre-Deceased Plaintiffs was <u>a</u> <u>decade</u> or more before he filed the complaints. For over 400 Pre-Deceased Plaintiffs, the last contact was 5 years old or more.

truth or falsity of his assertions: "[i]f particularly egregious, the pursuit of a claim without reasonable inquiry into the underlying facts can be the basis for a finding of bad faith." Barnes, 158 F.3d at 1214. That is exactly what happened here.

Wilner has claimed that by June 2008, he had located survivors for nearly 400 of the 588 Actions, and that the survivors eventually ratified the complaints "nunc pro tunc" (though it is not clear whether the survivors "ratified" the complaints immediately, or whether they did so at some later point). (Objections at 77; Doc. 589-1 at 2; Doc. 822 at 8). Even if true, such ratifications hardly help Wilner. If anything, it shows that Wilner actually knew in June 2008 that hundreds of personal injury complaints named a dead plaintiff. Yet he never told anyone. Instead—three years later—Wilner told the Court the opposite when he insisted that the plaintiffs were "alive, willing, [and] present," and that the plaintiffs were "ready and able" to proceed.[37] And in so doing, he also made it impossible for survivors to pursue any wrongful death claims which may have been viable.

In some cases Counsel must have known that the personal injury plaintiffs were deceased. Wilner's internal data showed that he had "contact" with more than 100 of the Pre-Deceased Plaintiffs after their date of death. One can infer he spoke to a survivor and

---

[37] Wilner tries to explain away his failure to correct the complaints by claiming he thought the Stay relieved him of any obligation to do so. That explanation has no currency with this Court or the Eleventh Circuit. See In re Engle Cases, 767 F.3d at 1115-18. First, Counsel themselves did not interpret the Stay as barring them from amending complaints when they had something to gain from it. See id. at 1116 n.35. Even while the Stay was in place, Counsel filed at least 90 motions to amend personal injury complaints, and to substitute parties, when a personal injury plaintiff died after filing. Id. at 1116 (citing Doc. 925 at 11; Doc. 1128). There was no reason why Counsel could not have done the same in the predeceased personal injury plaintiffs' cases. Second, the Stay did not go into effect until October 2008, whereas Wilner claims he located around 400 survivors by June 2008. Even had the Stay offered an excuse, it would not explain why Wilner did nothing between June 2008 and October 2008 to correct the filings.

knew the smoker had died.  See In re Engle Cases, 767 F.3d at 1112-13; (Doc. 822 at 14).

Wilner has never been able to explain why he nevertheless filed and continued to advocate

these personal injury actions. In re Engle Cases, 767 F.3d at 1112-13; (see also Objections

at 77–78).

As for Farah, the firm's own internal records also showed that some of the plaintiffs

were deceased. For example, Farah knew in November 2006 that Alberta Aiken,

Case No. 3:09-cv-14009, had died. (2016 R&R at 64). Farah sent a letter terminating the

representation in May 2007; he reopened the file in September 2007; he sent a second

termination letter in November 2007; yet he filed a personal injury action on Ms. Aiken's

behalf in January 2008.  (Id. at 64–65). Similarly, Farah filed a personal injury complaint

on behalf of Rosalee Rogers, Case No. 3:09-cv-12287, even though his internal records

noted that Ms. Rogers was "deceased." (Id. at 65). Thus, both Wilner and Farah must have

known that some of the personal injury plaintiffs were dead.

Making matters worse, Counsel's conduct during the litigation evinced an intent to

obscure the fact that they had filed hundreds of complaints on behalf of people whose status

they did not know, or worse, whom they knew were dead. Counsel vigorously opposed

recommendations from the Temporary Special Master and Defendants that someone inquire

into the status of the plaintiffs.[38]

---

[38] In a bit of revisionist history, Wilner tried to offer an innocuous explanation for his opposition to the Court Questionnaire —that he worried that a questionnaire coming from the Court might frighten the plaintiff and cause him not to answer. (Doc. 2174 at 106–07). That was not at all among the reasons Counsel gave when they objected to proposals to inquire into the status of the plaintiffs. Rather, Counsel consistently asserted that the Court Questionnaires were an unnecessary exercise because: Counsel had complete files for all of the plaintiffs; any information gleaned from

Wilner also gave vague, incomplete, or shifting explanations about how and why he maintained hundreds of lawsuits in the names of dead people. Compare, for example, the Wilner Declaration (Doc. 589-1) with the Verified Response (Doc. 822) to the Defendants' motion for a Rule 11 inquiry. As the Eleventh Circuit observed, much of the Verified Response "was inconsistent with his earlier sworn declaration." In re Engle Cases, 767 F.3d at 1102. The Eleventh Circuit catalogued these discrepancies, including Wilner's changing stories about whether the plaintiffs had signed representation agreements with him (yes according to the Wilner Declaration, no according to the Verified Response), and whether he had remained in touch with the Potential Plaintiffs during the decade long period between initial contact and Engle III (yes according to the Wilner Declaration, not necessarily according to the Verified Response). In re Engle Cases, 767 F.3d at 1111–13 (footnote omitted).

The Court finds that Counsel acted in objective bad faith, "akin to contempt," when they continued to advocate the 588 Actions. At the least, Counsel displayed reckless indifference to whether the assertions in the personal injury complaints were true or false. With respect to some cases, Counsel must have known that the personal injury plaintiff was dead. Nevertheless, they insisted that all the plaintiffs were "alive, willing, present, and all that," and that they would be willing to certify that the complaints complied with Rule 11. In so doing, Counsel suppressed the fact that the 588 Actions were frivolous, thereby frustrating the Court's ability to shed meritless actions from the voluminous Engle Docket,

---

individual interviews "would not be worth much to anyone"; and the Court Questionnaires would "not result in 'a substantial reduction in the number of cases.'"

which in turn delayed the adjudication of viable actions. Accordingly, Counsel's advocacy of the 588 Actions warrants Rule 11 sanctions.

### 5. Counsel's Objections

Counsel concede that there were "critical flaws" in their actions (Objections at 48), but they deny that their conduct warrants sanctions.[39] Counsel's overarching objection is that, to the extent there were any frivolous or unauthorized filings, it was not their fault. Instead, it was the Florida Supreme Court's fault for giving thousands of tobacco plaintiffs only a year in which to file individual damage actions. Counsel claim that Engle III, which required thousands to file individual lawsuits, was unforeseeable.

---

[39] One of Counsel's objections is that when they filed the complaints, they relied on Florida Ethics Opinion ("**FEO**") 72-36 (Revised) (1987). There, "the Florida Bar Professional Ethics Committee addressed the issue of whether a lawyer retained for litigation by a client who has since disappeared is obligated to file suit in order to toll the applicable statute of limitations." (Doc. 2147 at 118). In the revised 1987 Opinion, the committee decided that an attorney may, but is not required to, file a complaint on behalf of a missing client if (1) the client's unavailability is not due to the attorney's neglect or inaction; and (2) either (a) the attorney believes there is no reasonable chance that the client will return or (b) the client has breached the attorney-client employment agreement by making himself unavailable. Fla. Ethics Opinion 72-36 (Reconsideration) (1987).

The Special Master recommends that Counsel's reliance on FEO 72-36 is misplaced (Doc. 2147 at 118–20), and the Court agrees. The circumstances of FEO 72-36 and this case are distinguishable. First, the attorney in FEO 72-36 (Revised) had a contingency fee contract to represent the missing client, whereas here Counsel did not have any representation agreements for the vast majority of the plaintiffs at the time they filed the complaints, nor was it clear they were ever "clients." (Id. at 183). Second, the lawyer in FEO 72-36 (Revised) had lost contact with the client through no fault of his own. Here by contrast, it was Counsel's own inaction that caused them to lose contact with hundreds of the plaintiffs.

Even if FEO 72-36 (Revised) subjectively satisfied Wilner that he was doing the right thing, it would not relieve him from sanctions, because the standard is an objective one. See Norelus v. Denny's Inc., 628 F.3d 1270, 1283-84 (11th Cir. 2010) (fact that plaintiff's lawyer was subjectively satisfied that client was telling the truth about sexual assault allegations, after passing a lie detector test, did not relieve attorney from sanctions for acting in objective bad faith under 28 U.S.C. § 1927).

Counsel further argue that errors were inevitable given the sheer volume of cases and Engle III's filing deadline, and any errors resulted from an impossible dilemma, where they faced just two choices: (1) filing only "perfectly-curated" claims at the expense of forfeiting many potentially meritorious ones; or (2) filing on behalf of everyone to preserve all the meritorious claims, at the expense of including some frivolous ones. (See Objections at 2, 167). As to why they didn't refer some cases to other lawyers to ease their burden, Counsel assert that they were the only lawyers within 150 miles of Jacksonville who were competent and willing to handle tobacco cases. (Id. at 10). Counsel further complain that it would be unfair to fault them for lacking the resources to file over 3,700 complaints. They contend "this is not a case where a lawyer bit off more than he could chew. It is more akin to a case in which an initially small matter ballooned due to an unforeseen event." (Id. at 125).

None of these explanations withstand scrutiny. This Court, as did the Eleventh Circuit, rejects the argument that the volume of cases or Engle III's filing deadline can serve as an excuse.

> Even if Engle III had created an unforeseen hardship, such exigencies did not excuse Mr. Wilner from his Rule 11 obligations at the time of filing . . . . As the District Court put it during one of the many hearings required to sort through the problems with Mr. Wilner's bulk filing, "the volume of claims does not render the fundamental precepts of lawyer-client responsibilities, vis-à-vis the client and vis-à-vis the Court as procedural niceties." Doc. 677, at 40. The solution to managing these types of mass actions is surely not that the standard of care diminishes as the number of cases grows.

In re Engle Cases, 767 F.3d at 1114 (emphasis added). Thus, this Court rejects the notion that the volume of claims somehow lessens an attorney's obligations under Rule 11.

Accepting that proposition yields the perverse implication that a lawyer could overwhelm defendants and the court with a tidal wave of lawsuits, and at the same time bear diminished responsibility for filing claims that lack factual support. That simply cannot be. Rule 11 imposes the same obligations on a lawyer regardless of whether he files one complaint or 10,000 complaints.[40]

This Court also rejects the false dilemma that Counsel try to portray—that of an unpalatable binary choice. There were other options:

> If Mr. Wilner lacked the resources required to fulfil his obligations to his clients <u>and</u> <u>the</u> <u>court</u>, he should have enlisted the services of another firm during the <u>Engle</u> savings period (as he did in 2011) or he should have pared down the volume of claims to something that he could manage.

<u>In re Engle Cases</u>, 767 F.3d at 1114–15 (emphasis in original). Although Counsel suggest that they were the only lawyers within 150 miles of Jacksonville who were willing and competent to handle tobacco cases, this naked, unsupported assertion unfairly denigrates the bar in northeast Florida. In any event, other law firms, such as Lieff Cabraser and Motley Rice, <u>were</u> available to assist Counsel, as demonstrated by their appearance in 2011-12.

Nor was the fallout from <u>Engle III</u> unforeseeable. Wilner knew in advance that thousands of plaintiffs would have to file individual damages actions. As, the Eleventh Circuit wrote:

> [I]t was contemplated as far back as the Dade County Circuit Court's three-phase trial plan that certain elements of each class member's case would have to be tried separately. Presumably that's the whole reason Mr. Wilner signed up so many clients in

---

[40] Of course, when dealing with a volume of litigants there may be occasional mistakes or misunderstandings which would not warrant sanctions. That is not what we write about here.

the 1990s. Thus, we cannot blindly accept plaintiffs' counsel's suppositions that "[t]he Engle proceedings gave no hint, until the final decision by the Florida Supreme Court, that individual damage claims would be authorized," Doc. 589–1, at 2, or that there was "no need to monitor individual class members" until Engle III came down, Doc. 822, at 4.

In re Engle Cases, 767 F.3d at 1114.

Additionally, the notion that Wilner never saw Engle III coming, and that he was unaware of the logistical challenges it would pose, is simply false. Wilner himself filed an amicus brief in 2003, in Engle III, urging the Florida Supreme Court not to decertify the Engle Class because of how impracticable trying thousands of individual damages actions would be. Engle III, 945 So. 2d 1246, Amicus Brief of Tobacco Trial Lawyers Association in Support of Petitioner, 2003 WL 23718399, at *3 (2003). Wilner (the signatory on the brief) told the Florida Supreme Court:

> The undersigned's firm . . . represents more than 1800 individuals who suffer from cigarette related injuries and who have retained his firm to represent their interests only as class members in the Engle class action—they have specifically been advised and have agreed that our firm cannot represent them in pursuing individual suits against the tobacco industry due to the time, expense, and difficulty such representation would require.

Id. (first emphasis in original; second emphasis added). Wilner's amicus brief reveals two things. First, as early as 2003, he was aware that the Florida Supreme Court was considering decertifying the Engle class, which refutes his contention that Engle III was

"unforeseeable." Second, he knew he lacked the resources to handle 1,800 cases, let alone 3,700 complaints. He said so himself.[41]

Finally, Counsel argue that even if the Court finds that they violated Rule 11, the Court is confined by Rule 11(c)(5)(B) to imposing only non-monetary sanctions. (Objections at 113–15). Rule 11(c)(5)(B) provides that "[t]he court must not impose a monetary sanction … (B) on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned."  Fed. R. Civ. P. 11(c)(5)(B). Counsel contend that the rule prevents the Court from imposing monetary sanctions sua sponte because the parties settled or dismissed the underlying cases before the Court issued a show cause order.  (Objections at 113).

The Court is not restricted by Rule 11(c)(5)(B) from imposing monetary sanctions as to the 588 Actions because the parties did not settle these actions. Rule 11(c)(5)(B)'s prohibition on monetary sanctions applies only to cases that the parties settle or voluntarily dismiss before a show cause order issues. It does not apply to cases, like these, that were resolved through a contested motion to dismiss. As such, Rule 11(c)(5)(B) offers Counsel no shelter from monetary sanctions as to the 588 Actions.

---

[41] The block quote from Wilner's amicus brief also reinforces the notion that Wilner lacked authorization to file individual damages actions on behalf of his "clients." Indeed, Wilner expressly told his "clients" that he would not file an individual lawsuit on their behalf, and he emphasized that he represented these individuals "only as class members." Thus, Wilner's "clients," if they were in fact clients, could not have understood their relationship as extending to the prosecution of an individual lawsuit. As one Defendant pointed out, "the fact that an individual might have been interested in participating as a passive class member in a case that might potentially be resolved on a classwide basis did not mean that he or she was legally authorized or willing to file an individual contested lawsuit."  (Doc. 360 at 2).

### D. Rule 11's Application to Other Cases

As the Court explains in Parts IV and V <u>infra</u>, the 588 Actions discussed above are not the only ones that the Court finds sanctionable. Sanctions under 28 U.S.C. § 1927 and the Court's inherent authority are warranted for Counsel's assertion of claims on behalf of Non-Smoker Plaintiffs, living plaintiffs who did not authorize a lawsuit, plaintiffs who never lived in Florida, and plaintiffs who did not respond to the Court Questionnaire ("**Frivolous Actions**"). Many of these Frivolous Actions also violated Rule 11 for the same reasons that the 588 Actions did.[42] Nonetheless, because the parties voluntarily dismissed those actions involving Non-Smoker Plaintiffs, plaintiffs who never lived in Florida, and plaintiffs who did not want to pursue a lawsuit**,** <u>monetary</u> sanctions are inapplicable under Rule 11(c)(5)(B).[43] And while Counsel did not voluntarily dismiss the cases in which the plaintiff never responded to the Court Questionnaire, instead vigorously opposing their dismissal, the Court chooses to address these cases in Part IV (regarding sanctions under 28 U.S.C. § 1927) and Part V (regarding sanctions under the Court's inherent authority). However, Counsel's pursuit of these cases on behalf of plaintiffs who never returned a questionnaire also constituted Rule 11 violations.

---

[42] That is, the complaints (1) were objectively frivolous; (2) Counsel advocated them in federal court (by, for instance, filing a case management proposal in March 2008 asserting that all the plaintiffs were members of the <u>Engle</u> class, Case No. 3:07-cv-760-J-25HTS, Doc. 35-2 at 1, 17, insisting on the same position three years later on the <u>Engle</u> master docket, Doc. 25 at 4, 6, and insisting that Counsel would certify that the complaints satisfied Rule 11); and (3) Counsel knew or acted with reckless indifference as to whether the Frivolous Actions had legal and factual merit.

[43] These were hardly true voluntary dismissals. Plaintiffs' counsel "voluntarily" dismissed these other cases only <u>after</u> the Court Questionnaire process—which they had firmly opposed— began to uncover problems. Before then, Counsel obviously were not forthcoming about unviable cases.

"But [Rule 11(c)(5)(B)'s] restriction is explicitly limited to monetary sanctions. The Court is empowered to issue a number of other sanctions against malfeasant parties, including censure, educational requirements, or referral to disciplinary authorities." Goldenberg v. Indel, Inc., No. CIV. 09-5202 JBS AMD, 2011 WL 1134454, at *1 (D.N.J. Mar. 25, 2011). In Part VI, the Court will address the appropriate type of monetary and non-monetary sanctions, both for the 588 Actions and the Frivolous Actions.

## PART IV

**A.    § 1927**

Title 28, United States Code, §1927 provides that:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. This statutory language imposes three requirements for the imposition of sanctions:

> First, the attorney must engage in "unreasonable and vexatious" conduct. Second, that "unreasonable and vexatious" conduct must be conduct that "multiplies the proceedings." Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, i.e., the sanction may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Amlong, 500 F.3d at 1239 (quoting Peterson v. BMI Refractories, 124 F.3d 1386, 1396 (11th Cir. 1997)).

Section 1927 only applies to unreasonable conduct after the lawsuit has begun. Macort v. Prem, Inc., 208 F. App'x 781, 786 (11th Cir. 2006). "[Section] 1927 covers only the multiplication of 'the proceedings in any case' . . . . This unambiguous statutory language necessarily excludes the complaint that gives birth to the proceedings, as it is not possible to multiply proceedings until after those proceedings have begun." Steinert v. Winn Group, Inc., 440 F.3d 1214, 1224–25 (10th Cir. 2006) (emphasis in original). Thus, the focus of § 1927 is on post-filing conduct that "multiplies the proceedings . . . unreasonably and vexatiously."

The Eleventh Circuit has "consistently held that an attorney multiplies proceedings 'unreasonably and vexatiously' within the meaning of [§ 1927] only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'" Amlong, 500 F.3d at 1239 (quoting Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991)). Importantly, however, "bad faith" for purposes of § 1927 does not mean subjective bad faith. It is not necessary that the attorney engaged in deliberate misconduct. Id. at 1239. Rather:

> it is clear from the statutory language and the case law that for purposes of § 1927, bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct. The term "unreasonably" necessarily connotes that the district court must compare the attorney's conduct against the conduct of a "reasonable" attorney and make a judgment about whether the conduct was acceptable according to some objective standard. The term "vexatiously" similarly requires an evaluation of the attorney's objective conduct.

Id. at 1239–40 (citations omitted). The Amlong court noted that "other circuits, too, have found that the phrase 'unreasonably and vexatiously' demands an objective analysis and that § 1927 does not require a malicious intent or a bad purpose." Id. at 1240 (citing Cruz

v. Savage, 896 F.2d 626 (1st Cir. 1990); Jones v. Continental Corp., 789 F.2d 1225 (6th Cir. 1986); Knorr Brake Corp. v. Harbil, Inc., 738 F.2d 223 (7th Cir. 1984); Braley v. Campbell, 832 F.2d 1504 (10th Cir. 1987)). Moreover, "[o]ther courts also have determined that 'reckless' conduct is sufficient to justify sanctions under § 1927." Id. (citations omitted).

As such, "sanctions under § 1927 are measured against objective standards of conduct," and "objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently." Id. at 1241; see also Schwartz v. Millon Air, Inc., 341 F.3d 1220, 1225 (11th Cir. 2003) (§ 1927 sanctions are permissible "where an attorney knowingly or recklessly pursues a frivolous claim.") (emphasis added); Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1544 (11th Cir. 1993) (an attorney's conduct was "tantamount to bad faith" where he "either carelessly or deliberately" concealed evidence).

> In short, a district court may impose sanctions for egregious conduct by an attorney even if the attorney acted without the specific purpose or intent to multiply the proceedings. That is not to say the attorney's purpose or intent is irrelevant. Although the attorney's objective conduct is the focus of the analysis, the attorney's subjective state of mind is frequently an important piece of the calculus, because a given act is more likely to fall outside the bounds of acceptable conduct and therefore be "unreasonabl[e] and vexatious[ ]" if it is done with a malicious purpose or intent.

Amlong, 500 F.3d at 1241.

In determining whether an attorney acted in bad faith, a court may rely on the totality of the circumstances. In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 278 F.3d 175, 189-90 (3d Cir. 2002). Even if discrete instances of an attorney's conduct would

not have been sanctionable, a court may nevertheless find bad faith based on the attorney's conduct "considered as a whole." Id.

"[Section] 1927 reaches further than Rule 11 in the kinds of conduct that may be punished. For example, a basic requirement of Rule 11 is that there be a writing, but § 1927 does not require a writing and instead reaches any misconduct that results in a proliferation of proceedings." Georgene M. Vairo, RULE 11 SANCTIONS: CASE LAW, PERSPECTIVES, AND PREVENTIVE MEASURES, § 12.03[a][3] (Richard G. Johnson, eds., 3d ed., ABA Publishing 2004). "Unlike Rule 11, which is aimed primarily at pleadings, under section 1927 attorneys are obligated to avoid dilatory tactics throughout the entire litigation." Byrne v. Nezhat, 261 F.3d 1075, 1106 (11th Cir. 2001), abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008). Thus, for instance, oral statements during a hearing may be "subject to sanctions under 28 U.S.C. § 1927 as evidence of 'dilatory tactics.'" HD Brous & Co., Inc. v. Mrzyglocki, Case No. 03 Civ. 8385 (CSH), 2004 WL 376555, at *15 (S.D.N.Y. Feb. 26, 2004) (citing United States v. Int'l Brotherhood of Teamsters, 948 F.2d 1338, 1345 (2d Cir. 1991)). Moreover, unlike Rule 11, which requires some sort of affirmative conduct, inaction in bad faith can also be the subject of § 1927 sanctions. Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3d Cir. 1987) ("Although Rule 11 sanctions do not apply to a mere failure to act, an attorney's inaction in bad faith may implicate penalties under 28 U.S.C. § 1927.").

Although the Eleventh Circuit does not appear to have addressed the burden of proof for imposing § 1927 sanctions, the Fifth Circuit has held that § 1927 "require[s] clear and convincing evidence that sanctions are justified." Lawyers Title Ins. Corp. v. Doubletree

<u>Partners, L.P.</u>, 739 F.3d 848, 872 (5th Cir. 2014). Without deciding the matter, the Court assumes that the clear and convincing standard applies.

## B. Application

In the cases discussed below, the Court determines that Counsel multiplied the proceedings unreasonably and vexatiously by maintaining frivolous complaints in bad faith. Between 2011 and 2013, the Court learned that Counsel had filed dozens of Frivolous Actions (in addition to the 588 Actions). Counsel brought these Frivolous Actions without authorization or on behalf of non-smokers, people who never lived in Florida, and plaintiffs with previously adjudicated claims. The fatal defects in these actions surfaced not through voluntary disclosures from Counsel, but through alerts from Defendants, the hard work of the Temporary Special Master, and from the returned Court Questionnaires. Before the Court Questionnaire process, Counsel vigorously opposed any suggestion that someone should interview or question the plaintiffs. Counsel's intransigence forced the Court to order Wilner to mail the Court Questionnaires to 2,661 plaintiffs and to have the Temporary Special Master review the results. The questionnaire process was time-consuming but necessary. It accomplished what Counsel would not: the identification of hundreds of frivolous cases, and the segregation of viable from non-viable claims.

In some of these cases, Counsel knew or must have known that a fundamental defect existed. As to others, Counsel acted with reckless indifference. Counsel insisted on maintaining cases without having bothered to obtain the plaintiff's authorization, without having any basis for asserting that the plaintiff was even a smoker, and without knowing whether the alleged smoker ever lived in Florida (as required by <u>Engle III</u>). Moreover,

Counsel's resistance to the questionnaires and false assurances appeared calculated to prevent the discovery of such frivolous cases. At the very least, counsel's behavior "grossly deviate[d] from reasonable conduct." <u>Amlong</u>, 500 F.3d at 1240.

Counsel's actions demonstrated a pattern of obfuscation and deception, which frustrated the Court's efforts to rid the <u>Engle</u> Docket of frivolous cases and to promptly and fairly resolve the cases that had merit. Counsel's maintenance of frivolous suits forced the Court to expend valuable resources—in terms of time, money, and manpower—to cope with the swollen <u>Engle</u> Docket. It also delayed the resolution of meritorious claims. As a result, sanctions are appropriate for the "excess costs" and "expenses . . . incurred because of [counsel's] conduct." 28 U.S.C. § 1927.

## 1. The 588 Actions

In Part III, the Court explained why Counsel's advocacy of the 588 Actions was objectively in bad faith, in violation of Rule 11. As an alternative to Rule 11, the Court determines that Counsel's insistence on maintaining those cases "multiplie[d] the proceedings . . . unreasonably and vexatiously," in violation of 28 U.S.C. § 1927.

## 2. Previously Adjudicated Cases

As discussed more fully in Part I, the Court discovered in March 2011—thanks only to the Defendants—that Counsel had filed 30 complaints that were previously adjudicated. Counsel never notified the Court or the Defendants of this fact, even though the Court ordered Counsel in December 2010 to identify cases that should be dismissed for any reason (particularly cases that had "already been tried in state court."). (Doc. 42 at 7–8). <u>Wilner himself was the plaintiff's counsel in 11 of the 30 previously-adjudicated actions (having</u>

tried one of them to verdict), and the Defendants sent Wilner actual notice in February 2011 about the existence of the previously-adjudicated claims (see Doc. 128-4).[44] Nevertheless, Counsel's 2011 Response to the December 2010 Order omitted any mention of these cases. (See Doc. 114).[45]

The Special Master "did not find any information for any of the 30 Plaintiffs indicating that Wilner inquired as to whether prior litigation existed that would bar a later action (nor any analysis of whether prior litigation in which Mr. Wilner represented a Plaintiff would bar a later action)." (2016 R&R at 171). If Wilner had only searched his own internal records, he would have had notice that 10 of these cases had been previously resolved. (Id.).

Although Counsel concede that their filing of frivolous cases was "regrettable" (Objections at 49), they contend that the Court should not sanction them under § 1927 because they did not oppose dismissal. (Objections at 49–50). The Court disagrees.

As Wilner and Farah acknowledge, § 1927 can apply where a lawyer fails to take action in bad faith. (Id. at 97) (citing Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3d Cir. 1987)). Indeed, there are examples of courts holding that a lawyer's failure to act warranted

---

[44] "Specifically, Wilner represented: Wilda Antal (3:09-cv-14046); Juanell Davis (3:09-cv-11454); Gilbert Goldstein (3:09-cv-13946); Lois Goldstein (3:09-cv-13947); Matthew Mark Heekin (Estate of Aurelia P. Viguers) (3:09-cv-11888); Matthew Mark Heekin (Estate of Darlene Thorington) (3:09-cv-11865); Matthew Mark Heekin (Estate of Virginia Tuoni) (3:09-cv-11878); Joan Karbiwnyk (3:09-cv-13026); Stephen Lande (Estate of Maxine Lande) (3:09-cv-13729); Robert Mason (3:09-cv-12789); Richard McCauley (3:09-cv-12818); and Nancy Salmons (3:09-cv-12332) in their prior actions. In the case of Joan Karbiwnyk, the action had been tried to verdict by Wilner." (2016 R&R at 170).

[45] Counsel's 2011 response did seek to dismiss two of the previously adjudicated cases, but only because they were related consortium cases. (2016 R&R at 170 n.55).

sanctions under § 1927. <u>E.g.</u>, <u>Trulis v. Barton</u>, 107 F.3d 685, 688–91, 691-96 (9th Cir. 1995) (reversing district court's decision not to award sanctions, where plaintiffs' lawyer failed to dismiss plaintiffs from lawsuit after they asked him to do so); <u>Fifth Third Bank v. Boswell</u>, 126 F.R.D. 460, 463–64 (S.D. Ohio 1989) (imposing § 1927 sanctions on bank for failing to disclose that they had already mitigated a significant portion of its claimed damages).

Williams v. Family Dollar Services, Inc., 327 F. Supp. 2d 582 (E.D. Va. 2004), may be most similar to the circumstances here. In that case, a plaintiff's lawyer received actual notice that his client's claim was part of a pre-existing class action in another district court. After the defendant notified the plaintiff's lawyer of this fact, the plaintiff's lawyer went several weeks without filing a stipulation of dismissal. <u>Id.</u> at 583–84. The lawyer's inaction forced the district court to grant the defendant's motion to dismiss (to which the plaintiff's lawyer never responded). <u>Id.</u> at 584. The district court held that the lawyer's "failure to immediately file a stipulation of dismissal once given actual notice of his client's pre-existing civil action was unreasonable and vexatious." <u>Id.</u> at 585.

Likewise, Wilner had actual notice as of mid-February 2011 that 30 of his cases had been previously adjudicated. (<u>See</u> 2016 R&R at 169–70 & n.54; Doc. 128-4). Nevertheless, Wilner did not agree at that time to dismiss 28 of those cases; instead, he omitted them from Counsel's 2011 Response. Although Wilner later did not oppose the Defendants' recommendation that the Court dismiss the previously-adjudicated cases, he forced the Court to sift through and reconcile his and the Defendants' inconsistent proposals about which cases to cull from the <u>Engle</u> Docket (<u>compare</u> Doc. 113-1 <u>with</u> Docs. 114-1, 114-2,

114-3, 114-4), something the Court likened to "two ships passing in the night" (Doc. 145 at 1 n.1). "The Court's purpose in directing the parties to confer prior to filing their proposed dismissals was to avoid exactly such a disjointed result." (Id.). Thus, Wilner is not relieved from § 1927 liability merely because he ultimately did not oppose the Defendants' recommendation to dismiss the other 28 previously adjudicated cases. Counsel's failure to dismiss 28 of the 30 previously adjudicated cases was egregious enough to amount to objective bad faith for purposes of § 1927.

### 3. Cases Dually Filed in State and Federal Court

The Special Master investigated "[t]he filing and maintenance of Federal Engle cases that . . . were being [ ] adjudicated in another forum at the time they were filed in this Court." (Doc. 2108 at 4; 2016 R&R at 171–75). The Special Master notes that it is permissible to file an action in both state court and federal court. (2016 R&R at 173) (citing Colorado River, 424 U.S. at 817). The Special Master's position appears correct, and the Court will not impose sanctions with respect to cases concurrently filed in state and federal court.

### 4. The Larramore Case, 3:09-cv-13139 (The Denton Juror)

The Court instructed the Special Master to investigate "[t]he filing and maintenance of Larramore v. R.J. Reynolds Tobacco Company, et al., 3:09-cv-13138-J-34HTS and 3:09-cv-13139-J-32HTS[.]" (Doc. 2108 at 4). During the trial in Denton v. R.J. Reynolds Tobacco Co., Case No. 3:09-cv-10036, the Defendants alerted the Court that a juror— Shirley Larramore—was an Engle plaintiff. Ms. Larramore had no idea she was an Engle plaintiff, since neither she nor her husband ever authorized a lawsuit. (See Case No. 3:09-cv-10036, Doc. 189 at 92–93, Doc. 190 at 27–30, Doc. 200 at 157–59). Much to Ms.

Larramore's dismay, Wilner had filed complaints in her and her husband's name, despite their refusal to answer Wilner's letters or phone calls. Her response upon learning that the Court would dismiss the lawsuit: "Thank you Lord." (See id. at Doc. 190 at 28). This incident was a tangible example of something the Court suspected happened on a much wider scale: that Wilner and Farah filed cases en masse without permission from the plaintiffs. Such behavior diminishes and undermines the confidence of the public in the administration of justice.

According to Wilner's records, Ms. Larramore or her husband contacted the firm sometime before 1999 about representing them in a tobacco lawsuit. (2016 R&R at 154). Wilner had records of Ms. Larramore's date of birth, social security number, contact information, and a smoking-related diagnosis, but he did not have a questionnaire or a client agreement for her. (Id.). After the Florida Supreme Court decided Engle III in 2006, Wilner sent Ms. Larramore a letter asking if she wanted to pursue an individual damages action, but Wilner had no record of receiving a response. (Id.). Despite the lack of a response, Wilner filed a lawsuit on Ms. Larramore's behalf, just as he did in hundreds of other cases.

Wilner contacted Ms. Larramore in June 2008 about pursuing a claim from the Engle Trust Fund, but Wilner's own notes show that Ms. Larramore told Wilner she did not want to pursue a claim. (Id.). Nevertheless, Counsel "neither dismissed Ms. Larramore's lawsuit nor otherwise informed the Court of this information." (Id.). It did not come to light that Ms. Larramore had not authorized a lawsuit until defense counsel brought it to the Court's attention over four years later, on July 24, 2012, in the middle of the Denton trial, after she had been selected as a juror in a different Engle case. The Special Master concluded that

89

"Wilner unreasonably multiplied the litigation and deliberately disregarded his client's wishes" not to pursue a lawsuit. (2016 R&R at 157).[46] The Court agrees.

### 5. The Olds Cases, Case Nos. 3:09-cv-12059 and 3:09-cv-12060

The Court also instructed the Special Master to investigate "[t]he filing and maintenance of Olds v. R.J. Reynolds Tobacco Company, et al., 3:09-cv-12059-J-34HTS and 3:09-cv-12060-J-34HTS[.]" (Doc. 2108 at 4). The first case, 3:09-cv-12059, was a personal injury action in the name of one "Oscar Olds." The second case, 3:09-cv-12060 was a related loss-of-consortium action in the name of one "Douglas Olds."

In March 2012, the Court received a letter from a "Douglas Olds" ("**Olds Correspondence**") stating in pertinent part:

> The last part of last year was the first of my knowledge of knowing that this case was put into this court, U.S. District Court, Middle District of Florida, Jacksonville, Florida after receiving a letter from Kenneth Byrd telling me that I needed to fill out a questionnaire and sent it back to him. I did and ask him how did they get my case and who put it in the above court. He told me that they were helping out the law firm of Wilner that is mention in the order and that I needed to call and ask them. I did call them and ask them how did they get my case. She said that she did not know, that anyone could have given it

---

[46] Counsel objects to the legal conclusion that they, but not Lieff Cabraser, should be held responsible for the "waste of public resources and diminution in the reputation of the justice system." (Id. at 61–62). Counsel's objections are unpersuasive. Counsel were the ones who initiated a lawsuit in January 2008 on behalf of a plaintiff who did not authorize it. They actually knew as of June 2008—years before Lieff Cabraser appeared—that Ms. Larramore did not want to pursue a lawsuit, yet they did nothing to dismiss the case. Then, Counsel insisted in May and June 2011 that the remaining 2,900 cases (including Larramore's) were viable. (See Doc. 158 at 14–15; Doc. 171 at 6–9, 16–18, 28–29). Although Lieff Cabraser was working on the cases by 2011, they were never in the same position as Counsel to know the circumstances of how these cases were investigated (or not investigated) and filed. Additionally, Lieff Cabraser reached out to Ms. Larramore in 2011, and upon learning that she did not want to pursue a claim, took measures to dismiss the case. (2016 R&R at 159). Accordingly, the Court agrees that Lieff Cabraser does not bear the same responsibility as do Counsel.

to them. I also told her that Kenneth Byrd told me that they were helping them and that I never received anything about this case being in this court until now and never told anyone to handle it nor gave my authorization or fill out any legal forms; therefore, how did anyone filed this case in this court [sic].

(Doc. 574 at 1-2) (emphasis added).

The author of the Olds Correspondence, Oscar Douglas Olds, Jr., (a.k.a. "Douglas Olds"), was the loss-of-consortium plaintiff in Case Number 3:09-cv-12060. His brother was the personal injury plaintiff in Case Number 3:09-cv-12059, Oscar Gregory Olds. (Objections at 55, 58–59). The Olds brothers also had a father named Oscar Douglas Olds, Sr., who died in 1995 and had a separate tobacco action pending in state court. (Id.). Oscar Gregory Olds died in 1998 (id. at 59), which was a decade before Wilner filed the personal injury complaint in his name. Neither Wilner, Farah, nor any of the other plaintiffs' lawyers knew that Oscar Gregory Olds had died, possibly because Wilner's files only listed their client as "Oscar Olds," without distinguishing between Oscar Gregory Olds, Oscar Douglas Olds, Jr., and Oscar Douglas Olds, Sr.  (See id. at 55). Wilner admits he did not always capture middle names at intake, and over time, he lost track of which "Oscar Olds" was his client. (Id.). Wilner also admits that he chose to file a personal injury claim on behalf of Oscar Gregory Olds, as well as a loss-of-consortium claim on behalf of Oscar Douglas Olds, Jr., because he was unable to contact either one in the year leading up to the Engle filing deadline. (Id.).[47]

---

[47] The Court ultimately dismissed Oscar Gregory Olds's case as one of the 588 predeceased plaintiffs' cases.  The Court dismissed Oscar Douglas Olds, Jr.'s case because it was a related loss-of-consortium claim.  (See Doc. 925-1 at 17).

According to the Special Master, Wilner claims he established an attorney-client relationship with a Mr. Olds—presumably referring to Oscar Gregory Olds—on August 26, 1997. (2016 R&R at 159). However, Wilner could not produce a representation agreement or a statement of client's rights relating to Mr. Olds. (Id. at 160). Nor did Wilner have any copies of correspondence from Mr. Olds to the law firm, such as a completed questionnaire or a letter. (Id. at 160–61).

> Wilner did not produce any documents evidencing communication with Mr. Olds or his representative between 1997, when Wilner claims the attorney-client relationship was formed, and November of 2011, which is the date of Lieff Cabraser's letter to Mr. Olds regarding the questionnaire and the first documented evidence of attempted communication with Mr. Olds.

(Id. at 163).

The Special Master found that Wilner's own internal database concerning the Olds cases was inaccurate. Wilner's database indicated that Wilner had contact with a Mr. Olds between November 3, 2010 and June 29, 2011. But that could not have happened, regardless of which "Oscar Olds" Wilner thought he was referring to. Oscar Gregory Olds had been dead since 1998; Oscar Douglas Olds, Sr. had been dead since 1995; and Oscar Douglas Olds, Jr. wrote that he knew nothing about the case until the end of 2011. Between the presence of unreliable records (like Wilner's database) and the absence of other records (such as an attorney-client agreement), the Special Master wrote that the Olds cases "call[ ] into question much of the data Wilner provided concerning his 'attorney-client relationships,' the authorization to file lawsuits on behalf of 'clients,' his communication with 'clients,' and his professional and ethical obligations to the Court." (Id. at 162–63). The Special Master concluded:

The circumstances surrounding <u>Olds</u>—where the plaintiff was not a client of Wilner's, despite Wilner's representation stating otherwise; where the plaintiff was not informed of the filing of a complaint on his behalf, despite Wilner's representation stating otherwise; where the plaintiff was deceased, despite Wilner's representation in the personal injury complaint stating otherwise—lead the Special Master to believe that, as it relates to <u>Olds</u>, Wilner is in violation of his duty of candor to the Court and his ethical and professional responsibilities.

(<u>Id.</u> at 164).

Counsel insist that they <u>did</u> form an attorney-client relationship in 1997 with Oscar Gregory Olds, but over the next several years they simply lost "awareness" of who their client was. (Objections at 55). That supposedly explains why Oscar Douglas Olds, Jr. wrote the Court a letter stating that he never authorized a lawsuit. (<u>Id.</u>). According to Counsel, "Douglas Olds did not know of Wilner's representation, because Douglas Olds <u>was not the original client</u>. The original client was Douglas Olds's brother, Oscar Gregory Olds." (<u>Id.</u>) (emphasis in original).

That does not explain the fact that Counsel <u>also</u> filed a loss-of-consortium claim on behalf of Oscar Douglas Olds, Jr. himself. Even if Oscar Gregory Olds ever qualified as Wilner's "client" (albeit before he died in 1998, which seems dubious), the same cannot be said for Oscar Douglas Olds, Jr. As his 2012 letter reveals, he did not authorize Counsel to file a complaint in his name. Despite the lack of authorization, Counsel insisted in 2011 that Oscar Douglas Olds, Jr.'s case, along with hundreds of other frivolous cases, was viable and involved a willing plaintiff.

### 6. **Eugene Johnson**, Case No. 3:09-cv-12989

Although the Court's Order appointing the Special Master "did not ask [him] to specifically address the filing and maintenance of <u>Johnson</u>, the Special Master, through his investigation, found the circumstances surrounding the filing and maintenance of <u>Johnson</u> to be as troubling as those that existed in <u>Olds</u>." (2016 R&R at 167). In January 2008, Counsel filed a personal injury action on behalf of Eugene M. Johnson, Sr. On June 24, 2009, Wilner sent a letter advising Mr. Johnson that, as a client "from the early 1990's tobacco litigation," he had filed a complaint on his behalf. On June 29, 2009, Eugene Johnson's personal representative, Katheryn F. Johnson, sent Wilner a letter stating she had never been a client of Wilner's, and she did not wish to be. (<u>Id.</u> at 166). Unbeknownst to Wilner, Eugene M. Johnson died in 2003. (<u>See</u> Objections at 63). The Special Master concludes, based on Katheryn Johnson's letter, that Counsel filed the complaint in <u>Johnson</u> without authorization.

Counsel respond that Katheryn Johnson was correct when she asserted that she was never a client; her husband, Eugene Johnson, was their client. Counsel contend that "[b]ased on communications with Wilner in 1996, the named plaintiff—Mr. Johnson—was a client of Wilner's, and Wilner had a duty to protect his client's interests." (Objections at 63). However, Wilner could not produce a representation agreement or a statement of client's rights for Mr. Johnson. (2016 R&R at 165–66). Nor did Wilner have any evidence of communications with Mr. Johnson between 1996 and 2009. (<u>Id.</u> at 168). Discrepancies in Wilner's own data also call his assertions into question. For one, Wilner's data shows that he notified Mr. Johnson or his personal representative in 2007 that he had filed a complaint.

(Id. at 167). But that cannot be true because Wilner did not file the complaint until January 2008. Second, Wilner's data says that he entered into a fee contract with Mr. Johnson on July 29, 2009. (Id. at 168). That also cannot be true because: (1) Mr. Johnson was dead by then; and (2) only a month earlier, on June 29, 2009, Ms. Johnson had told Wilner that she had never been a client and did not want to be one. (Id.).

Counsel suggest that Ms. Johnson changed her mind because in November 2011 she requested a federal Engle questionnaire. (Objections at 64–65). Counsel also assert that in 2012, one of Eugene Johnson's sons approved pursuing the lawsuit. (Id. at 65). Even if both of these assertions are true, however, it does not change the fact that Counsel initially filed this suit in 2008 without authorization. Wilner evidently had no contact with Mr. Johnson between 1996 and 2009. Had Wilner kept up any contact, or conducted any type of pre-suit investigation, he would have known that Mr. Johnson died in 2003. Nevertheless, Wilner insisted in May and June 2011 that Mr. Johnson's case, along with 587 others like it involving Pre-Deceased Plaintiffs, were viable and involved a living, willing plaintiff. At the least, Wilner filed Johnson, and maintained the case for several years, with reckless disregard to whether the personal injury complaint involved a living plaintiff.

### 7. Cases Where Plaintiffs Did Not Wish to Pursue a Claim

The Special Master investigated "[t]he filing and maintenance of [other] Federal Engle cases where the plaintiff . . . did not wish to pursue the case." (Doc. 2108 at 4; 2016 R&R at 175–77, 214–21). The Special Master analyzed cases dismissed under various Orders in 2012 and 2013, following the results of the Court Questionnaire process. The Special Master found over 50 cases that the Court dismissed because the plaintiff did not

95

want to pursue the claim. (2016 R&R at 175–77, 214–21, 242, 245–50, 252–68). In most of these cases, the plaintiff wanted to pursue a claim at some point, but simply changed his or her mind. The Special Master does not recommend sanctions as to those cases, and the Court agrees.

However, the Special Master identified over a dozen cases where the plaintiff never authorized Counsel to file a claim. The Special Master examined detailed logs developed by Lieff Cabraser in 2011 and 2012, when the firm conducted phone interviews with hundreds of Engle plaintiffs in connection with the Court Questionnaire process. (See 2016 R&R, Ex. 79, 82). The notes from the phone interviews reflect that some of the plaintiffs or their survivors told Lieff Cabraser that they never authorized a lawsuit. These include, but are not limited to, the cases of Charles Carew (Case No. 3:09-cv-10765), Clifford Clark (3:09-cv-10846), Willie Mae Copeland (3:09-cv-11356), Harriet Dauman (3:09-cv-11443), Wayne Evans (3:09-cv-13772), Joe Harris (3:09-cv-11200), Calvin Lewis (3:09-cv-13746), Louis Perez (3:09-cv-12136), Thomas Criswell (3:09-cv-11407), Carrie Griffin (3:09-cv-12660), and Sharon Swidler (spelled "Swindler" in the 2016 R&R) (3:09-cv-13302). (2016 R&R at 214–21).

Wilner admits that there were two cases that he should not have filed because the plaintiff never authorized a lawsuit. Those were the cases of Shirley Larramore (3:09-cv-13138), which the Court discussed earlier, and Jean Evans (3:09-cv-13771). (See Objections at 53, 209–10). Otherwise, Counsel object to the Special Master's findings that they maintained lawsuits that a plaintiff did not want to pursue.

Counsel explain that the reason why some people claimed they never authorized a lawsuit is that Lieff Cabraser simply contacted the wrong person—someone with a similar name to the plaintiff—which explains why the contacted person denied permitting a lawsuit. (See Objections at 53, App'x I at 206–11). For example, in the case of Willie Mae Copeland, Wilner's client was a "W.M. Copeland age 65, Jacksonville, FL," but Lieff Cabraser contacted a "WM Copeland, age 72, Columbus, Ohio." (Id. at 210). That, of course, would explain why WM Copeland of Columbus, Ohio told Lieff Cabraser that he never authorized a lawsuit. Likewise, Counsel assert that Lieff Cabraser contacted the wrong person in the cases of Clifford Clark, Harriet Dauman, and Louis Perez. (Id.). Wilner offers a similar explanation for the cases of Charles Carew and Joe Harris: Lieff Cabraser spoke to the plaintiff's relative, rather than the plaintiff himself, and the relative did not wish to pursue the claim. (Id. at 209). Thus, the actual plaintiffs did not necessarily deny having authorized a lawsuit. Therefore, while the Court is skeptical of Counsel's explanation, because the Court cannot find that Counsel violated § 1927 absent clear and convincing evidence, the Court does not impose sanctions for these cases.

Wilner's explanations for maintaining the cases of Carrie Griffin, Sharon Swidler, and Wayne Evans are problematic. Wilner says that in the case of Carrie Griffin (3:09-cv-12660), the client died and the survivors declined to pursue a case. (Objections at 209). Carrie Griffin died in 2006, and in 2008 Wilner contacted the survivors, who stated they did not want to proceed. (Objections at 209; Doc. 2165-14 at 64–65). By 2009, Wilner no longer had contact with the survivors. (See Objections at 209). As early as 2008, then, Counsel actually knew that the client was dead and the survivors did not want to pursue a

claim. Nevertheless, four years dragged on without Wilner doing anything to withdraw the complaint, instead telling the Court in 2011 that all the plaintiffs were alive, willing, and present.

With respect to Sharon Swidler (3:09-cv-13302), Wilner claims that Lieff Cabraser spoke to the wrong person. (Id. at 210). However, Wilner's notes state: "Client indicated in 2009 she did not want to pursue." (Id.). Though Wilner claims that the firm passed the case off to Lieff Cabraser for withdrawal (see id.), that would not have happened until 2011 when Lieff Cabraser first appeared in these actions. Thus, Wilner's own notes show that his firm actually knew that Swidler did not want to pursue a claim, yet they failed to do anything about it for at least two years.

Similarly, in the case of Wayne Evans (3:09-cv-13772), Wilner claims that Lieff Cabraser spoke to the wrong Wayne Evans. (Id.). However, Wilner's notes state that the client changed his mind in March 2010 and told the firm not to pursue the claim. (Id.). Wilner's notes do not suggest that Lieff Cabraser contacted the wrong person, but that Evans himself told the firm not to pursue an action.

Despite being flagged by the Special Master, Wilner's objections do not explain seven other cases where the plaintiff did not authorize a lawsuit. The Special Master reported that five plaintiffs—Donald Blajda (3:09-cv-14174), James Carter (3:09-cv-10787), Brent Collinson (3:09-cv-10888), Martin Coulton (3:09-cv-11046), and Beverly Siddens (3:09-cv-12408) —neither authorized a lawsuit nor had they ever lived in Florida. (2016 R&R at 199–200; see also 2016 R&R, Ex. 79 at 14, 56, 68–69, 104–05, 231). A Non-Smoker Plaintiff—Elaine Minnis (3:09-cv-11658)—also did not authorize a cause of action.

Although she advised Wilner of this fact in 2010 (2016 R&R at 228; 2016 R&R, Ex. 79 at 190; Doc. 2165-14 at 30–31), Wilner did not dismiss the case.

Additionally, Counsel's Objections do not address the case of Gerald Druley (3:09-cv-11607), who never wanted to pursue an individual damages action. (2016 R&R at 249; 2016 R&R, Ex. 82 at 85–86). Counsel's Objections, including Appendices I, J, and K (which purport to explain the circumstances of plaintiffs who did not wish to pursue a claim, who were not smokers, or who were not Florida residents, respectively), do not explain these defects.

Counsel's explanations for three more unauthorized cases, even if assumed to be true, are unsatisfactory. Those are the cases of Calvin Lewis (3:09-cv-13746), Thomas Criswell (3:09-cv-11407), and Steven Cahen (3:09-cv-13017). Calvin Lewis's personal representative, Annette Hamilton, stated that she received paperwork from Farah, but that she never returned it and did not authorize them to file a lawsuit. (2016 R&R at 215; 2016 R&R, Ex. 79 at 121). Ms. Hamilton was angered to learn that Counsel had filed a lawsuit anyway. (2016 R&R, Ex. 79 at 121). Wilner's only response is to say that Calvin Lewis "hired another attorney" (Objections at 211), which fails to explain why Counsel filed an unauthorized claim and maintained it for years.

Another of Counsel's "clients"—Mr. Criswell was also upset to discover that Wilner and Farah had filed a lawsuit in his name. (2016 R&R at 215). Again, Wilner's only response is to say that Mr. Criswell "hired another attorney." (Objections at 211). Steven Cahen states that he did not authorize a lawsuit either. (2016 R&R at 260; 2016 R&R, Ex. 82 at 40–41). Counsel do not contend that Lieff Cabraser spoke to the wrong Steven Cahen;

instead, they suggest that Cahen is mistaken, and that he did authorize a lawsuit. (See Objections at 210; Doc. 2165-14 at 78-79). As between Counsel and Mr. Cahen himself, Mr. Cahen is a more credible source of information about whether he authorized a lawsuit.

Accordingly, as to the following 15 individuals—Shirley Larramore (which the Court has already accounted for), Jean Evans, Carrie Griffin, Sharon Swidler, Wayne Evans, Donald Blajda, James Carter, Brent Collinson, Martin Coulton, Beverly Siddens, Elaine Minnis, Gerald Druley, Calvin Lewis, Thomas Criswell, and Steven Cahen—there is clear and convincing evidence that Counsel filed and maintained Federal Engle Actions that were unauthorized, or continued to maintain a suit after the plaintiff told Wilner that they no longer wanted to pursue it.[48]

### 8. Non-Smoker Plaintiffs

In 2012, following the Court Questionnaire process and four years of litigation, the plaintiffs' lawyers admitted that some of the Engle personal injury plaintiffs or decedents were not smokers at all. (See, e.g., Doc. 718-1).[49] This admission was stunning. Florida's courts defined the Engle class as "[a]ll Florida citizens and residents" "and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." Engle I, 672 So. 2d at 40, 42

---

[48] The Court suspects that Wilner and Farah filed many more complaints without the plaintiff's permission. Nevertheless, considering the clear and convincing evidence requirement, the Court imposes sanctions only with respect to those cases identified in this Order.

[49] Counsel did not admit this willingly. Their admission only came after the Court Questionnaire process began to reveal critical defects in hundreds of cases. Moreover, the Court had to press the plaintiffs' counsel for the reasons why they suddenly moved in January 2012 to dismiss 189 cases without any explanation. (See Doc. 452; Doc. 452-1; Doc. 664 at 2).

(emphasis added). Thus, Florida's definition of the Engle class required a personal injury plaintiff (or the decedent) to have been a smoker. A non-smoking plaintiff, or the survivors of a non-smoking decedent, therefore could not possibly have had a viable Engle claim. Moreover, each of the personal injury and wrongful death complaints alleged that the plaintiff or the decedent "purchased, smoked, and [was] addicted to cigarette products manufactured and sold by Defendants which were the subject of Engle." (See, e.g., Lewis v. R.J. Reynolds Tobacco Co., Case No. 3:08-cv-158-J-32HTS, at Doc. 2, ¶¶ 1.6–1.10). Thus, the revelation that a plaintiff or a decedent was not a smoker meant that the allegations in the pertinent complaints were untrue. It also meant Wilner deceived the Court in his March 2008 case management proposal, which he "[s]ubmitted on behalf of approximately 4000 claimaints," when he represented that "[a]ll plaintiffs come with[in] the Engle class definition specified by the Florida Supreme Court and thus share the Engle I verdict." (Case No. 3:07-cv-760-J-25HTS, Doc. 35-2 at 1, 17). And it meant Wilner was still misleading the Court three years later, when he filed a case management proposal on the Engle master docket stating that his position had not changed since March 2008 (Doc. 25 at 6), and maintaining that all of the Engle "damage claims were vested with a liability verdict from [Engle III]," (id. at 4). Accordingly, the Court directed the Special Master to investigate "[t]he filing and maintenance of Federal Engle cases where the plaintiff was not a smoker." (Doc. 2108 at 4).

The Special Master identified 43 individuals whose cases the Court dismissed because the plaintiff or the decedent was not a smoker. (2016 R&R at 222–30, 246, 257–

58, 274).[50]  In identifying some of these cases, the Special Master also relied on extensive logs assembled in 2011 and 2012 by Lieff Cabraser, when the firm telephonically interviewed hundreds of Engle plaintiffs.  (See 2016 R&R, Exs. 79 & 82). The Special Master considered the non-smoker cases to be among the "most egregious of all." (2016 R&R at 222).

Wilner and Farah respond by providing details about the circumstances surrounding 42 of the "non-smoker" cases. (See Objections at 211–15, App'x J; see also Doc. 2165-14). After carefully considering each category of objections in Appendix J, the Court finds that Counsel have an explanation for maintaining 25 of the non-smoker's cases that makes sanctions inappropriate. These are the cases described in Categories A, B, C, and D.[51] However, Counsel's explanations for the 17 Non-Smoker Plaintiffs' cases listed in Categories H, K, L, M, and N are more troubling. According to Counsel, five of the complaints were supposed to be filed in a different class action concerning flight attendants exposed only to second-hand smoke ("Category H"); two cases involved confirmed nonsmokers ("Category K"); six cases involved "inconsistent, inconclusive, or missing

_____

[50] To be precise, the Special Master found 44 cases, but two were in the name of Raymond Harris, Case Nos. 3:09-cv-11205 and 3:09-cv-11204. (2016 R&R at 258). Thus, the Court counts 43.

[51] "Category A" lists five cases where a different court approved the plaintiff to receive a disbursement from the Engle Trust Fund, suggesting there was a reasonable basis for those plaintiffs' causes of action.  Additionally, the plaintiff or survivor in each of the Category A cases gave a sworn statement affirming that they or the decedent smoked cigarettes at one point. (Doc. 2165-14 at 2–7). "Category B" lists five cases where the firm had information suggesting proof of smoking, such as an interview, questionnaire, or medical record indicating that the plaintiff once smoked. (See also id. at 7–12). "Category C" lists four cases that were simply duplicate actions. "Category D" lists 11 cases where Lieff Cabraser interviewed the wrong person, which explains why that person insisted they were not a smoker.

smoking information" ("Category L"); three cases involved plaintiffs whose smoking history was unknown to Counsel even as of 2011, and with whom Counsel had lost contact ("Category M"); and one case involved a known non-smoker whose case was somehow mismarked ("Category N"). (See Objections, Appendix J at 211–15). At best, these explanations underscore how Counsel filed Engle-progeny complaints with reckless abandon, without knowing something as basic as whether the plaintiff even smoked. At worst, some of these explanations show that Wilner actually knew some of the plaintiffs were not smokers. For example, Eric Kusher, 3:09-cv-13107, stated that he has never smoked and never registered with the Engle Trust Fund, and that his wife was very upset that people kept calling his house about a lawsuit. (2016 R&R, Ex. 79 at 161). Carl Bell, 3:09-cv-14234, whose wife, Lois Luke, died of second-hand smoke, had evidently told the plaintiffs' lawyers repeatedly that his wife never smoked. (Id. at 7). Mr. Bell complained that he did not "understand why [Counsel] keep calling and why [they] can't get it that she never smoked." (Id.).

Additionally, there was one Non-Smoker Plaintiff's case that Counsel's objections did not address, although the Special Master flagged it in his Report. Marjorie Manushaw (3:09-cv-12760), told Lieff Cabraser in an interview on October 16, 2012 that she did not want to participate in mediation, that she did not smoke, and that she was only exposed to second-hand smoke. (2016 R&R at 246; id. at Ex. 82 at 234). Counsel filed a complaint anyway alleging that she "purchased, smoked, and [was] addicted to cigarette products manufactured and sold by Defendants which were the subject of Engle." (Lewis, et al. v. R.J. Reynolds Tobacco Co., et al., Case No. 3:08-cv-158-J-32HTS, Doc. 2 at ¶ 1.6).

With respect to Marjorie Manushaw's case and the 17 cases contained in Categories H, K, L, M, and N of Appendix J to Counsel's Objections (see Objections, App'x J at 211–15), the Court determines that Counsel maintained complaints involving Non-Smoking Plaintiffs or decedents that had no colorable basis. Counsel maintained these cases for over four years before they finally dismissed them in 2012 and 2013—albeit only after the Court Questionnaire process. Before the Court Questionnaire process, Wilner insisted that such an inquiry was unnecessary, that the Court could trust Counsel to identify any non-viable cases because they had complete files on every plaintiff, and that the remaining cases were viable. This simply was not true.

### 9. Non-Florida Resident Plaintiffs

At the same time the Court discovered the Non-Smoker Plaintiffs, it also began to learn that some of the plaintiffs did not satisfy Engle's requirement of Florida residency ("**Non-Resident Plaintiffs**"). (See Doc. 718-1). Yet, Counsel alleged in each complaint that the plaintiffs or decedents "were at times material residents of the State of Florida, suffering from a tobacco related illness within the time frames defined by Engle." (See, e.g., Jay Zeidel, et al. v. R.J. Reynolds Tobacco Co., Case No. 3:08-cv-165-J-25HTS, Doc. 2 at ¶ 1.3). Thus, cases with smokers who lacked Florida residency were necessarily unviable and involved factually untrue allegations.

The Court directed the Special Master to investigate "[t]he filing and maintenance of Federal Engle cases where the plaintiff . . . did not meet the Engle requirements," such as Florida residency. (Doc. 2108 at 4). The Special Master identified approximately 70 cases that the Court dismissed because of Non-Resident Plaintiffs or decedents. (See 2016 R&R

at 196–208, 242, 245–50, 258–60). In some of these cases, the Special Master found that Counsel made an understandable mistake, such as where the smoker reportedly lived in Florida at some point but not during the relevant Engle class period. (Id. at 177–78). However, with the aid of Lieff Cabraser's interview logs (see 2016 R&R, Exs. 79 & 82), the Special Master determined that 61 of these cases involved a smoker who never lived in Florida. (See 2016 R&R at 199-208, 258–60). For these 61 "never-resident" cases, the Special Master found that Counsel's residency mistake was not understandable, and that § 1927 sanctions are warranted.

In Appendix K to their Objections, Counsel respond with details purporting to explain the circumstances of the Non-Resident Plaintiffs. (See Objections, App'x K at 215–20). Upon carefully considering the Objections, the Court determines that 22 cases with Non-Resident Plaintiffs do not evince clear and convincing evidence of bad faith or recklessness.[52]

The evidence is stronger with respect to other Non-Resident Plaintiff cases. The case of Marcus Walker[53], 3:09-cv-12486, stands out as one of the most egregious examples. Marcus Walker's daughter told Farah that her father, a smoker, never lived in Florida. (2016 R&R at 200; id. at Ex. 79 at 258). Nevertheless, someone from "Farah & Farah told her to

---

[52] In 10 cases, for example, the plaintiffs were adjudicated as Engle class members for purposes of the Engle Trust Fund, suggesting there was some basis for believing the plaintiffs or decedents were Florida residents ("Category A"). In 10 other cases, the plaintiffs had significant connections to Florida, such as working or receiving medical treatment in the state, which could have suggested that the plaintiff had Florida residency ("Category C"). In two more cases, Lieff Cabraser interviewed the wrong person, which explains why the "plaintiff" said they did not live in Florida ("Category E"). The Court considers these explanations colorable.

[53] Counsel filed this case under the misspelling "Waller." (2016 R&R, Ex. 79 at 258).

just list her county in [Florida] and still go ahead and fill out [the] paperwork." (Id. at Ex. 79 at 258). It therefore appears that someone from the Farah firm instructed Marcus Walker's daughter to falsely provide a Florida county of residence for her father. Such conduct reflects not reckless indifference, but intentional disregard for the candor owed to this Court concerning the Engle residency requirement.

Remarkably, Counsel listed Walker, 3:09-cv-12486, under "Category B" of their Objections, meaning they claim to have had information, such as a questionnaire, indicating that the smoker was a Florida resident. Of course, Counsel have documentary evidence that Marcus Walker was a Florida resident only because the Farah firm told the smoker's daughter to falsely list a Florida county of residence in the questionnaire.[54]

---

[54] Wilner argues that Walker's daughter was a Florida resident, and "[a] Florida residence for a survivor is an arguable and possible extension of the class definition." (Doc. 2165-14 at 132). Wilner baldly asserts: "We would not hesitate to submit cases wherein the survivor lived in Florida as meeting the spirit of residence requirements, for a judicial determination." (Id.).

This is an untenable interpretation of the Engle residency requirement. First, it is contrary to the plain language of the Engle class definition, which defines the class as "[a]ll Florida citizens and residents" "and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." Engle I, 672 So. 2d at 40, 42 (emphasis added). Thus, it is the person who suffered from an addiction to cigarettes who must be a Florida citizen or resident, not the survivor. Under Wilner's nonsensical interpretation of the residency requirement, if a smoker and lifelong resident of San Francisco, California died, leaving behind a survivor who happened to live in Jacksonville, Florida, the survivor could join the Engle litigation and recover from the cigarette companies—in Florida court and under Florida tort law—for conduct that occurred entirely in California.

The second problem with Wilner's interpretation of the residency requirement is that the very wrongful death complaints he filed in 2008 belie it. Wilner made a point of alleging in the wrongful death complaints that the decedents were Florida residents, not the survivors. (See, e.g., Jay Zeidel, et al. v. R.J. Reynolds Tobacco Co., Case No. 3:08-cv-165-J-25HTS, Doc. 2, ¶ 1.3). Thus, Wilner's own complaints reflect that he understood the residency requirement as applying to the decedents, not their survivors. Wilner's novel contention that a survivor's Florida residence could satisfy Engle's residency requirement is frivolous and perhaps sanctionable itself.

Similarly, Wilner has no excuse for filing and maintaining four of the five cases in "Category D"—the cases of Frank Tuohey (3:09-cv-13391), John Dubravetz (3:09-cv-11545), Kenneth Cortesi (3:09-cv-11369), and Beverly Siddens (3:09-cv-12408)—because none of them ever lived in Florida. (See 2016 R&R at 202–03, 206–07; Objections at 218-19).[55] Wilner's excuse is that the lack of Florida residency was not fatal to their cases because they had valid "non-Engle" claims, and "non-Engle" claims do not require residency. (See Objections at 216, 218-19). The glaring problem is that Wilner did not assert "non-Engle" claims on behalf of these plaintiffs. In these and every other Engle Complaint, Wilner alleged only an *Engle* claim, trying to take advantage of the preclusive effect of the Engle findings. (See, e.g., Clay Smith, et al., v. R.J. Reynolds Tobacco Co., et al., Case No. 3:08-cv-160-J-34HTS, Doc. 2, ¶¶ 1.1–1.2). Each complaint began by stating: "This is a complaint seeking compensatory and punitive damages in accordance with the Florida Supreme Court's class action decision and mandate in [Engle III]." (Id. at ¶ 1.1). The very next paragraph of each complaint set forth the Engle Findings, followed by the statement that the "specified liability and general causation findings by the Engle jury [do] not need to be proved again as they shall be given res judicata effect." (Id. ¶ 1.2). Regardless of whether Tuohey, Dubravetz, Cortesi, and Siddens had valid "non-Engle" claims, Wilner did not allege such claims.

---

[55] The Special Master found that one of the cases in Category D, James Skinner (3:09-cv-12430), involved an excusable mistake because he did live in Florida at one point, just not during the Engle residency period. (2016 R&R at 199, 206).

Additionally, Counsel's objections do not reasonably explain the filing and maintenance of the 31 Non-Resident Plaintiffs' cases listed in Categories F, G, H, and I of Appendix K. (Objections, App'x K at 216, 219-20). In fourteen Non-Resident Plaintiff cases, Wilner was unable to locate the plaintiff or obtain information about their residence until the Court Questionnaire process ("**Category F**"). In three cases Wilner knew of a residence defect and passed it off to Lieff Cabraser for dismissal ("**Category G**"). In seven cases there was some sort of "error in intake" ("**Category H**"). And in seven cases there was a known defect in residence, but the case was not dismissed due to "clerical error" ("**Category I**").

One of the most egregious examples of these cases was that of Thomas Sillers, 3:09-cv-12415. In Sillers, the Plaintiff "said every time they asked him when he lived in [Florida], he would tell them that he never lived in [Florida] so why do they keep asking him, and then one guy told him that it didn't matter that he never lived in [Florida]." (2016 R&R at 206; id. at Ex. 79 at 233). Thus, someone from the Wilner or Farah firms apparently believed it wasn't important whether the smoker met Engle's residency requirement. Wilner admits that Counsel should have marked the case for withdrawal, noting that Thomas Sillers did not provide information indicating a Florida residence. (Doc. 2165-14 at 183). The filing and maintenance of this case reflects not just reckless indifference to whether the claim satisfied Engle's residency requirement, but intentional disregard.

Counsel are responsible, under § 1927, for filing and maintaining 36 Engle-progeny complaints on behalf of Non-Resident Plaintiffs. These consist of the 31 cases described in

Categories F, G, H, and I of Appendix K to the Objections; four of the five cases described in Category D; and the Marcus Walker case (3:09-cv-12486).

### 10. Cases Where the Plaintiff Did Not Suffer from an __Engle__ Disease

The Special Master also investigated cases where the plaintiff or decedent did not suffer from an "__Engle__ disease."[56] The Special Master identified approximately 35 such cases. (2016 R&R at 230–32, 255–57, 272–73). The Special Master recommends sanctions for cases where the plaintiff never claimed to suffer from an __Engle__ disease, but not for cases where the plaintiff initially claimed to suffer from such a disease and could not prove it. (Id. at 178). However, the Report did not specify which cases fell into which category. Thus, the Court does not have enough information to determine, by clear and convincing evidence, whether Counsel maintained any such cases in bad faith. Accordingly, the Court will not impose sanctions with respect to this category of cases.

### 11. Cases Barred by the Statute of Limitations

The Special Master investigated cases that were barred by the statute of limitations. The Special Master identified at least 90 such cases. (2016 R&R at 208–14, 238). The Special Master notes, however, that Wilner believed the __Engle__ findings tolled the statute of limitations. While the Eleventh Circuit ultimately rejected this contention, the Special Master finds that Wilner's argument was not frivolous; therefore the maintenance of these cases does not warrant sanctions. (Id. at 179) (citing Taylor v. R.J. Reynolds Tobacco Co.,

---

[56] An "__Engle__ disease" is one of the 16 diseases or medical conditions that the __Engle__ Phase I jury determined were generally caused by smoking cigarettes (such as cerebrovascular disease, cardiovascular disease, lung cancer, and chronic obstructive pulmonary disorder). See Engle III, 945 So. 2d at 1276–77.

441 F. App'x 664 (11th Cir. 2011)). The Court agrees with the Special Master's recommendation.

### 12. Cases Involuntarily Dismissed for Lack of a Federal <u>Engle</u> Questionnaire

Finally, the Court addresses the disturbing number of cases where, despite several months of intensive, Court-mandated efforts to make contact with the plaintiffs, the plaintiff never returned a Court-ordered <u>Engle</u> questionnaire. As recounted in Part I, the Court directed Counsel in August 2011 – over their objections – to send questionnaires to all of the remaining plaintiffs because it had lost faith in Wilner's representations about his "clients'" willingness or ability to prosecute the lawsuits. These simple three-page, 14-question forms were designed to elicit basic information about these plaintiffs, including whether they wished to participate in the <u>Engle</u> litigation. (<u>See</u> Doc. 218-1). Wilner and Farah "mailed questionnaires to 2,661 unique addresses, [but] by the November 2011 deadline, they had submitted only 1,724 to the [Temporary] Special Master." <u>In re Engle Cases</u>, 767 F.3d at 1096.[57] When all was said and done, nearly a third of the 2,661 plaintiffs never responded.[58] As a result, the Court dismissed hundreds of cases for failure to prosecute. (<u>E.g.</u>, Doc. 787, Doc. 1102). Plaintiffs' counsel opposed the dismissals, insisting that the dismissals would come as a surprise to their so-called "clients." But the Court was

---

[57] The Court later accepted 72 additional questionnaires for good cause.

[58] The questionnaires that <u>were</u> returned revealed the existence of the 588 predeceased personal injury plaintiffs discussed earlier. The Special Master's investigation of other questionnaires (and some cases involving unreturned questionnaires) revealed the existence of more defective cases discussed elsewhere: i.e., cases involving plaintiffs who never wanted to pursue a claim, never smoked, or never lived in Florida, etc.

"concerned that the real surprise for many of these plaintiffs was the fact that a lawsuit had been filed on their behalf in the first place." (Doc. 787 at 6 n.6).

Of the approximately 900 plaintiffs who did not respond to the Court Questionnaire, many are already accounted for elsewhere in this Order. Those not yet accounted for consist of 557 dismissed cases in which the plaintiff never returned a questionnaire for unknown reasons (see 2016 R&R at 232, 253-55), and 15 dismissed cases in which Wilner did not even send a questionnaire because he did not have the plaintiff's mailing address (indeed, Wilner did not even know the first names of two of those plaintiffs). (Id. at 232-34). Except for the 15 plaintiffs to whom Wilner did not even mail a questionnaire, these plaintiffs failed or refused to return the form despite extensive efforts to make contact:

> According to Plaintiffs' counsel, these efforts consisted of the following: (1) sending questionnaires by first class mail to 2,661 addresses; (2) sending questionnaires to verified e-mail addresses; (3) posting a downloadable copy of the questionnaire on the website: www.floridatobaccocase.com; (4) employing nine full-time and three part-time paralegals to answer calls from plaintiffs, as well as place follow up calls to plaintiffs who did not submit a questionnaire in response to the mailing; (5) the creation of a separate e-mail address for communication between the paralegals and plaintiffs; (6) establishing precise protocols to be used by the legal team throughout the questionnaire process (Doc. 427, Ex. A); (7) investigation by the firm's Research Department to locate contact information for questionnaires returned by the U.S. Postal Service due to an incorrect address, including but not limited to database searches on ACCURINT and Lexis-Nexis; (8) utilization of a cell phone tracking service to obtain cell phone numbers; (9) attempts by Plaintiffs' counsel to contact plaintiff's next of kin and/or potential relatives at the numbers located; (10) sending a new questionnaire to new addresses or e-mail addresses obtained through follow up efforts; and ultimately (11) the initiation of an "on the ground" follow up to locate clients in Duval County, Florida.

(Doc. 787 at 5). Thus, Counsel tried to contact the plaintiffs (whose contact information was known) no less than five ways: (1) by post mail, (2) by e-mail, (3) by phone, (4) by next-of-

kin, and finally (5) in person. Nevertheless, these plaintiffs still did not return questionnaires – even after the issuance of a show cause order (Doc. 379) and the passage of a year.[59]

The large number of individuals who never responded was concerning because Wilner assured the Court on June 6, 2011 that he had been in recent contact with all but 332 of the roughly 2,900 remaining plaintiffs. (Doc. 171 at 8-9). Indeed, it was the plaintiffs' counsel themselves who assured the Court that three months would be plenty of time to send and retrieve questionnaires from all of the plaintiffs. (Id. at 27). Yet, even as much as a year later, Counsel still were unable to obtain questionnaires from hundreds of plaintiffs on whose behalf they had filed an Engle lawsuit and with whom they claimed to have been in contact.

The filing and maintenance of these 572 cases is emblematic of the larger problems in the federal Engle litigation. Wilner and Farah filed lawsuits on behalf of plaintiffs who did not authorize them, continued to maintain suits even after plaintiffs manifested their desire not to pursue a lawsuit, failed to keep in touch with their so-called "clients" or keep themselves apprised of their "clients'" status, and made misleading statements to the Court regarding the level of contact they had with their clients. Indeed, when the Court pressed

---

[59] Although the questionnaire process began in August 2011, the Court did not dismiss the first group of cases for failure to respond until September 20, 2012 – a little over a year later. (Doc. 787). Even as of then, hundreds of plaintiffs had yet to submit a questionnaire form.

Wilner at the December 13, 2016 hearing about whether he had signed authorizations to file the complaints, he ultimately admitted: "Probably not." (Doc. 2174 at 135).[60]

Between the 557 plaintiffs who did not return a questionnaire, the 15 plaintiffs for whom Wilner did not even have the basic contact information to mail a questionnaire, and Wilner's admission that he probably lacked signed authorizations to file complaints on behalf of the plaintiffs, the Court is left with the definite and firm conviction that these 572 plaintiffs did not authorize Wilner and Farah to file or maintain lawsuits. The failure of the 557 to return the questionnaire – when considered in the context of everything the Court has discussed – is tantamount to these individuals denying that they had authorized a lawsuit in the first place. With respect to the 15 plaintiffs to whom Wilner did not even send a questionnaire (and especially the two plaintiffs whose first names Wilner did not even know), it is inconceivable that Wilner had any sort of attorney-client relationship if he did not possess such rudimentary contact information. With respect to all 572 of these cases, moreover, Wilner could not have been in recent contact with these plaintiffs nor could he have known that they wished to maintain these actions, as Wilner represented at the June 6, 2011 hearing.[61]

---

[60] This accords with the Special Master's report that he could locate only 45 attorney-client agreements, authorizing litigation, with respect to the timeframe before the filing of the complaints. (2016 R&R at 183).

[61] This also comports with the Special Master's report that he could only find records confirming that Counsel had contact with 1,320 of the 2,900 remaining plaintiffs during the six-month period preceding the June 6, 2011 hearing. (2016 R&R at 191-94).

Accordingly, the Court finds that Wilner and Farah vexatiously and unreasonably multiplied the proceedings by filing and maintaining these 572 lawsuits for years before the Court finally dismissed them over Counsel's objections. Although the Special Master did not explicitly recommend sanctions with respect to these cases, the Special Master's investigation and discussion supports the finding by clear and convincing evidence that these cases were unauthorized, that they involved plaintiffs who did not want to pursue a claim, and that Counsel had no current contact with these "clients." Therefore, the Court has determined that Wilner and Farah ought to be sanctioned pursuant to 28 U.S.C. § 1927 for maintaining these cases in bad faith.

## PART V

### A. The Court's Inherent Authority to Sanction

A court may sanction an attorney pursuant to its "inherent power" to police behavior that undermines the judiciary's ability to achieve the just, orderly, and expeditious disposition of cases. Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." Id. at 44 (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980)). "The inherent power 'is both broader and narrower than other means of imposing sanctions.'" Peer v. Lewis, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoting Chambers, 501 U.S. at 46). It is broader in the sense that, "[w]hile other sanction mechanisms only reach certain individuals or conduct, 'the inherent power extends to a full range of litigation abuses' and 'must continue to exist to fill in the interstices.'" Id. (quoting Chambers, 501 U.S. at 46). "Indeed, the inherent

power of a court can be invoked even if procedural rules exist which sanction the same conduct, for these rules are not substitutes for the inherent power." Id. (quoting In re Mroz, 65 F.3d 1567, 1575 (11th Cir. 1995)) (internal quotation marks omitted). At the same time, the inherent power is narrower in the sense that a finding of bad faith is required to impose such sanctions. Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998).

Ordinarily, a court should not impose sanctions pursuant to its inherent authority if Rule 11 would suffice. Fed. R. Civ. P. 11, Adv. Cmt. Note, 1993 amend. "But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power" to sanction misconduct. Chambers, 501 U.S. at 50.

"The key to unlocking a court's inherent power is a finding of bad faith." Barnes, 158 F.3d at 1214. In this context, "'[a] finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order.'" Id. (quoting Primus Auto. Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 649 (9th Cir. 1997)). The Eleventh Circuit recently held that "the inherent powers standard is a subjective bad-faith standard." Purchasing Power, LLC v. Bluestem Brands, Inc., 851 F.3d 1218, 1223 (11th Cir. 2017). Importantly however, the court clarified that absent direct evidence of subjective bad faith, this standard can also be met if an attorney's conduct is "tantamount to bad faith," meaning the "attorney's conduct is so egregious that it could only be committed in bad faith." Id. at 1224-25 (citing Roadway Exp., 447 U.S. at 767). An attorney's conduct is "tantamount to bad faith" if he "recklessly raises a frivolous argument." Id. at 1225 (quoting Barnes, 158

F.3d at 1214). "Recklessness alone does not satisfy the inherent powers standard," but "recklessness plus a frivolous argument suffice." Id.

The Eleventh Circuit offered additional guidance to lower courts considering whether to invoke their inherent power to impose sanctions:

> If a district court is unsure whether to sanction a party under its inherent powers, it should look to the guidance of the Supreme Court in Chambers. The purpose of the inherent power is both to vindicate judicial authority without resorting to contempt of court sanctions and to make the non-violating party whole. See Chambers, 501 U.S. at 45–46, 111 S. Ct. at 2133. The inherent power must be exercised with restraint and discretion. This power is not a remedy for protracted litigation; it is for rectifying disobedience, regardless of whether such disobedience interfered with the conduct of the trial. See id. at 44, 111 S. Ct. at 2132. Courts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority.

Id.

## B. Applicability of Inherent Authority Sanctions to Cases Discussed in Parts III and IV

Although the Court concludes Rule 11 and 28 U.S.C. § 1927 are adequate to address the misconduct described in Parts III and IV, sanctions under the Court's inherent authority are warranted in the alternative. Wilner's and Farah's conduct with respect to the cases discussed in Parts III and IV can be traced to violations of the Florida Rules of Professional Conduct ("FRPC"), and by extension, this Court's Local Rules.[62] A court has the inherent authority to sanction lawyers when they violate a court's local rules or the rules regulating the bar. See Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1322-23 (11th Cir. 2002)

---

[62] This Court's Local Rules incorporate the rules regulating members of the Florida Bar. Rule 2.04(d), Local Rules, United States District Court for the Middle District of Florida.

(applying the inherent authority analysis to a district court's decision to sanction a lawyer for violating the Georgia Code of Professional Responsibility).

Florida Rule of Professional Conduct 4–3.1 provides that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law." FRPC 4–3.1. "[T]o some extent, the definition of 'frivolous' is incapable of precise determination." De Vaux v. Westwood Baptist Church, 953 So. 2d 677, 683 (Fla. 1st DCA 2007) (quoting Wendy's of N.E. Fla., Inc. v. Vandergriff, 865 So. 2d 520, 524 (Fla. 1st DCA 2003)). Nonetheless, "[a] frivolous position is one that a lawyer of ordinary competence would recognize as so lacking in merit that there is no substantial possibility that the tribunal would accept it." Id. (quoting Restatement (Third) of Law Governing Lawyers § 110, cmt. d. (2000)). Florida law provides

> established guidelines for determining when an action is frivolous. These include where a case is found: (a) to be completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law; (b) to be contradicted by overwhelming evidence; (c) as having been undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or [(d)] as asserting material factual statements that are false.

Wendy's, 865 So. 2d at 524 (quoting Visoly v. Security Pac. Credit Corp., 768 So. 2d 482, 491 (Fla. 3d DCA 2000)). "Under the ethics rules, '[w]hat is required of lawyers ... is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions.'" De Vaux, 953 So. 2d at 683-84 (quoting FRPC 4–3.1, comment).

Wilner and Farah violated their obligations by failing to inform themselves about the facts of their "clients'" cases. Had they done so, they would not have advanced hundreds of complaints involving dead plaintiffs, people who never smoked, people who never lived in Florida, people who did not authorize a lawsuit, and people whose claims had been previously adjudicated. These complaints were without merit in law or fact, and they contained material assertions that were false. Overwhelming evidence would have contradicted these allegations as well, but for the fact that Wilner and Farah chose not to conduct any meaningful investigation before recklessly filing thousands of complaints. And there is evidence that Wilner and Farah actually knew that some of the personal injury plaintiffs were dead, that several plaintiffs or survivors did not want to pursue a claim, and that some of the plaintiffs or decedents did not smoke, did not live in Florida, or already had their claims adjudicated. As such, Wilner and Farah recklessly or knowingly violated Rule 4–3.1 by filing hundreds of frivolous complaints. At the least, Wilner's and Farah's behavior was reckless in the sense that it "grossly deviate[d] from reasonable conduct." Amlong, 500 F.3d at 1240 (citations omitted).[63]

One of the purposes of inherent authority sanctions is also "to vindicate judicial authority" and to "rectify[ ] disobedience." Purchasing Power, 851 F.3d at 1225. Underlying

---

[63] The Court does not rely on recklessness alone to find that inherent authority sanctions are appropriate. Rather, the Court finds that the underlying complaints referenced herein were frivolous; that Wilner's and Farah's insistence on maintaining those complaints was itself frivolous; and that Counsel behaved recklessly (and sometimes knowingly) in attempting to preserve or advance those frivolous complaints. See Purchasing Power, 851 F.3d at 1225 ("Recklessness alone does not satisfy the inherent powers standard," but "recklessness plus a frivolous argument suffice."). In that sense, Counsel's behavior was "tantamount to bad faith."

the frivolous cases described in Parts III and IV is that Wilner and Farah defied the Court's Order to "determine which of [the Engle] cases is presently due to be dismissed." (Doc. 42 at 7). Every time Counsel insisted that each remaining case had merit, and that each case had a living, willing plaintiff, they transgressed "their continuing obligation throughout th[e] litigation to inform . . . the Court when any of the remaining cases is due to be dismissed for any reason." (Id. at 8). Therefore, inherent authority sanctions are a fitting alternative to Rule 11 and § 1927 to vindicate the Court's authority and to address Counsel's disobedience regarding the conduct described in Parts III and IV.

## C. Material Misrepresentations

The Court also instructed the Special Master to examine whether Wilner made any material misrepresentations to the Court, either during Court hearings such as the June 6, 2011 status conference (Doc. 171), or in Court filings, such as his April 6, 2012 Declaration (Doc. 589-1). (Doc. 2108 at 5-6). A court "possesses the inherent authority to fashion a sanction for attorneys violating the duty of candor in a manner it finds appropriate." United States v. Shaffer Equip. Co., 158 F.R.D. 80, 87 (S.D. W. Va. 1994) (citing Chambers, 501 U.S. at 44-45). Moreover, FRPC 4–3.3(a)(1) forbids a lawyer from knowingly "mak[ing] a false statement of fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer." The Court determines that Wilner

knowingly, or at least with reckless disregard for the truth, made material misrepresentations for the purpose of preserving meritless cases.[64]

### 1. Misrepresentations During the June 6, 2011 Hearing

The Special Master analyzed various statements Wilner made during the June 6, 2011 status conference, and concluded that Wilner made two material misrepresentations during the proceeding. (2016 R&R at 188-95).

The first was Wilner's assertion that, except for 332 people, he had been in contact with the rest of the 2,900 remaining plaintiffs during the six-month period preceding the conference. The relevant exchange:

> JUDGE HOWARD: When you say you're in contact with them, as of how recently have you actually had -- I mean, if I'm saying, if you've heard from them three years ago, that doesn't really count to me.
>
> MR. WILNER: No, that doesn't. It's not nothing, but that's not what I mean in contact. I mean within the past group of months, depending on how wide of a net we are talking about and how quickly we can go through it. We can't contact everybody at once; but we are in touch with them in recent history, meaning X number of months; and they indicated to us, through writings or personal interviews or telephone calls, they were alive, present, willing, and all that.
>
> …
>
> JUDGE HOWARD: <u>And what you are saying is that within the last six months, all but the 332 that are identified in that motion have expressed that</u>

---

[64] The specific misrepresentations discussed below are by no means the only ones Wilner made. For instance, Wilner's statement in a March 2008 case management brief that all 4,000-or-so federal <u>Engle</u> plaintiffs fit within the <u>Engle</u> class definition was also a blatant misrepresentation. (<u>See</u> Case No. 3:07-cv-760-J-25HTS, Doc. 35-2 at 17). Wilner continued that misrepresentation in November 2010, despite having over two years to reconsider, when he asserted that all 3,800 <u>Engle</u> "damage claims vested with a liability verdict from [<u>Engle III</u>]," (Doc. 25 at 4), and he stated that his "position ha[d] not changed since filing" that initial March 2008 case management brief (<u>id.</u> at 6).

> they are willing and able to proceed with these claims? Is that your representation to the Court?
>
> MR. WILNER: Yes, absolutely. The defense has gotten the idea that they are not. I don't know, but we are in constant contact with them. . . .

(Doc. 171 at 8-9) (emphasis added).

Wilner now admits that he was not in touch with the other 2,600 plaintiffs in the six-months before the hearing. During the Special Master's investigation, Wilner himself "indicated that he could not precisely answer the question of whether he was in contact with his 'clients' during the six-month period between December 6, 2010 and June 6, 2011 (the date of the hearing)." (2016 R&R at 190). That is because "for most clients, [Wilner] did not record individual dates of contact." (Id. at 191). According to a review of his data, Wilner now claims to have been in contact with 2,231 clients during the six-month period preceding the hearing. (Id.). The Special Master doubts that assertion, however, based on inaccuracies elsewhere in Wilner's data and his methodology for calculating that number. (Id. at 191-93). The Special Master found correspondence that confirmed contact with only 1,320 individuals during the pertinent six-month time frame. (Id. at 193-94).

Wilner responds that when he stated he had been in contact with all of the remaining plaintiffs, he really meant during the preceding eight to nine months, not the preceding six months. (Objections at 108). That explanation is unpersuasive, because the question the Court asked Wilner was whether he was in contact with all of the plaintiffs in the preceding six months, and Wilner unequivocally answered "yes." (Doc. 171 at 8-9). Besides, even if the Court accepted the premise that Wilner was referring to an eight-to-nine-month timeframe, it would not render his representation any more truthful. As the Court now

knows, 588 of the personal injury plaintiffs had been dead since before 2008. Therefore, Wilner could not have been in contact with those plaintiffs even during the eight to nine months preceding the June 2011 hearing.

Wilner's statement that he was in contact with all of the remaining plaintiffs was made with reckless disregard to its veracity, if it was not knowingly false.[65] Wilner now admits he could not precisely answer the Court's inquiry because he did not record dates of contact. Thus, when the Court asked Wilner whether he had been in contact with all of the remaining plaintiffs, Wilner should have responded "No," or if he was unsure, then "I don't know." Instead, Wilner answered "[y]es, absolutely." The reason why: almost certainly because he did not want the Court to know that he was unaware of the current status of the plaintiffs and their claims. Wilner did not want to draw attention to the fact that he had filed hundreds of complaints on behalf of people with whom he had lost contact, and whose last contact with him might have been a decade or more old. Wilner gave the answer in bad faith – at least in the sense that he gave it with reckless indifference to its veracity. Wilner answered "[y]es, absolutely" to preserve the cases, not because he had a mistaken-but-earnest belief that he had been in recent contact with the remaining plaintiffs.

The second misrepresentation the Special Master found was Wilner's statement that the remaining 2,900 plaintiffs were "ready and able" to proceed. Below are relevant excerpts:

---

[65] Wilner and Farah object that they should not be sanctioned because any misrepresentations were not made knowingly. (Objection at 106). This objection overlooks the fact that sanctions under a court's inherent authority may be imposed for recklessly making frivolous arguments.

MR. WILNER:  Well, what we did after the [Temporary] Special Master's Report is went beyond that. In other words, we went and re-examined the entire mix of people and sent new questionnaires to everybody and compiled a new report.

So that is what we are just about to be able to present on behalf of everybody. So we took the [Temporary] Special Master's questions to heart, so to speak, but went beyond those questions, and we have data that extends to the entire group.

The answer is, are all 2800 ready and able?  Well, as far as we know today, they are. I hasten to say –

(Doc. 171 at 18).

JUDGE CORRIGAN:  Let me ask it this way, and I don't care if Mr. Wilner answers it or you answer it.

If you had to sign a Rule 11 complaint today, under Rule 11, because we know we haven't really talked about Rule 11, but if you had to sign a Rule 11 complaint today on behalf of each one of these smokers who has a case that you can certify under Rule 11, how many people would that be?

MR. WILNER:  Twenty-eight hundred and whatever the last two digits are. That's our data.

(Id. at 29).

As the Court-ordered questionnaire process revealed later on, nearly a third of the plaintiffs were unresponsive, 588 personal injury cases involved predeceased plaintiffs, over a dozen involved plaintiffs who did not want to pursue a claim, and dozens more involved plaintiffs who did not meet basic Engle requirements, like Florida residency. Such cases obviously were not "ready and able" to proceed. As such, the Special Master concluded that this representation was false. (2016 R&R at 194-95).

Wilner's assertion was also in bad faith. Wilner actually knew, or must have known, that that representation was untrue. Nearly 600 of Wilner's personal injury "clients" were

dead by then, and they had been dead for at least three and a half years. It is not plausible that Wilner merely overlooked that fact in good faith. In addition, a number of living plaintiffs or survivors had affirmatively told Wilner that they did not want to pursue a claim. For example, between 2008 and 2010, Sharon Swidler (3:09-cv-13302), Wayne Evans (3:09-cv-13772), the survivors of Carrie Griffin (3:09-cv-12660), and the personal representative of Eugene M. Johnson (3:09-cv-12989) all instructed Wilner not to pursue a cause of action. Thomas Sillers (3:09-cv-12415) told the lawyers over and over that he never resided in Florida, until eventually someone from Wilner or Farah told him "that it didn't matter that he never lived in [Florida]." (2016 R&R at 206; Ex. 79 to 2016 R&R at 233). In cases like these, Wilner had actual notice that the lawsuits were unauthorized or fundamentally defective. Wilner nevertheless told the Court that all of the remaining plaintiffs were "ready and able" to go forward.

Accordingly, there is clear and convincing evidence that Wilner recklessly or knowingly made misrepresentations at the June 6, 2011 hearing regarding his level of contact with the plaintiffs and the viability of the 2,900 remaining cases. Wilner's conduct obstructed the Court from eliminating hundreds of frivolous filings from the Engle docket. Wilner forced the Court to order the dissemination of over 2,600 federal Engle questionnaires, and left it to the Temporary Special Master to unearth the frivolous cases. Wilner's obstruction delayed the adjudication of meritorious cases as well. Accordingly, Wilner's misrepresentations at the June 6, 2011 hearing were in bad faith and are appropriate for sanctions under the Court's inherent authority.

### 2. April 6, 2012 Declaration (Doc. 589-1)

The Special Master also examined Wilner's April 6, 2012 Declaration (Doc. 589-1), which accompanied Wilner's response (Doc. 589) to the defendants' motion to dismiss personal injury complaints involving predeceased individuals.

First, the Special Master analyzed Wilner's contention that: "[b]y 1998, I represented over 3,000 Florida smokers or their families. These clients were signed into contractual agreements giving the firm latitude as to the appropriate method to preserve and advance their claim against the cigarette companies." (Doc. 589-1 at ¶4). The Special Master concludes that this statement misrepresented the number of smokers or their families who had signed contracts with Wilner by 1998. (2016 R&R at 182-83). "Based on Wilner's own data, there were only 45 clients who entered into contracts in the 1990's. The vast majority of the fee contracts weren't entered into until 2008, after the complaints had already been filed." (Id. at 183).

The Eleventh Circuit recognized the same discrepancy with Wilner's April 6, 2012 Declaration:

> [T]he record remains incomplete or conflicting on nearly every relevant point.
>
> First, Mr. Wilner's sworn declaration states, "By 1998, I represented over 3,000 Florida smokers or their families. These clients were signed into contractual agreements giving the firm latitude as to the appropriate method to preserve and advance their claim[s] against the cigarette companies." Doc. 589–1, at 1 (emphasis added). His Verified Response states, though, that his representation began when his firm received "information sufficient for us to believe that such client wanted us to act on their behalf should circumstances deem it advisable." Doc. 822, at 4. It explains further: "requiring clients, who were at the time Engle class members and formally represented by class counsel, to sign agreements in the mid 1990s was not consistent with class action practices nor with our intent to monitor their potential claims and act

125

only if necessary." Id. at 18. "[R]egardless of the presence of a written agreement, our firm was duty bound to presume it represented each client who made contact seeking legal advice, and to act accordingly." Id. So while Mr. Wilner originally told the court he had signed agreements from all 3,000–or–so of his "clients," if the Verified Response is to be believed, it would seem that he considered anyone who contacted his firm to be a client and that none of them executed a written representation agreement.

In re Engle Cases, 767 F.3d at 1111–12 (emphases in original).

Wilner now does not dispute that as of 1998, he had fee contracts with only a tiny percentage of his "clients." (Objections at 111). Instead, Wilner argues that "[t]o the extent one might infer that Wilner had 3,000 contractual agreements by 1998, that was not what he intended to communicate." (Id.). To understand what he allegedly meant, Wilner insists that the Court must read the last two sentences of paragraph 4 of the Declaration granularly and discretely. What Wilner really meant to say was that: (1) by 1998, he represented over 3,000 smokers or their families, and (2) that each smoker was signed into a contractual agreement as of the date of the Declaration – April 6, 2012. (Id.).

Wilner's interpretation is frivolous. The plain and natural meaning of Wilner's Declaration is that he purportedly had 3,000 plaintiffs signed into contractual agreements by 1998, not by the date of the Declaration. Nothing in paragraph 4 states that Wilner was referring to the state of affairs as of April 6, 2012. To the contrary, Wilner said that "[b]y 1998, I represented over 3,000 Florida smokers or their families." (Doc. 589-1 at ¶4). In the very next sentence, Wilner said, using the past tense, that the plaintiffs "were signed into contractual agreements," obviously alluding to 1998. (Id.) (emphasis added). Wilner never

said that the plaintiffs "are signed into contractual agreements as of today."[66] Then, in the sentence after that, Wilner stated: "As the Engle class action was at that same time period progressing through the courts, I elected, for the large majority of the claims, not to file individual claims at that time but to consider the claims as potential Engle class members." (Id. at ¶ 5) (emphasis added). Since the Engle class action was "progressing through the courts" from 1994 to 2006, Wilner could not have meant to say that 3,000 plaintiffs were signed into contractual agreements as of April 6, 2012. Accordingly, the Court rejects Wilner's revisionist interpretation of the Declaration. Wilner meant to say exactly what the Declaration says: that Wilner represented over 3,000 smokers or their families by 1998, and that by 1998 they had all signed contractual agreements. That representation was false.

Wilner's misrepresentation could not have been an innocent mistake either. Only 45 plaintiffs signed contracts in the 1990's, and the vast majority of those who did sign contracts did not do so until after Wilner had already filed the complaints in 2008. (2016 R&R at 183). It is not plausible that Wilner was earnestly mistaken about whether 3,000 people or 45 people had signed contracts by 1998. Wilner made the misrepresentation to overstate his authority to file the lawsuits at hand – particularly the 500+ personal injury

---

[66] Wilner's untenable interpretation of the Declaration is not logical either, because it conflicts with the Declaration's purpose. Wilner filed the Declaration to try to explain why he filed over 500 personal injury complaints on behalf of deceased individuals in 2008. He did so by asserting that the contractual agreements gave "the firm latitude as to the appropriate method to preserve and advance their claim against the cigarette companies." Wilner was relying on the "latitude" the contractual agreements supposedly afforded him to justify filing 500+ personal injury cases in 2008 on behalf of dead "clients." It would make no sense if Wilner meant that all 3,000 clients were signed into contractual agreements by April 6, 2012, when he was relying on those contractual agreements to justify filing the cases the way he did in January 2008.

cases with predeceased plaintiffs, whose dismissal Wilner was trying to prevent. As such, the Court finds that Wilner made this false representation in bad faith.

Next, the Special Master analyzed Wilner's representation that "[his] firm had successfully remained in contact with most but not all of these clients during the decade long period between their initial contact with the firm and the [Florida] Supreme Court's decision." (Doc. 589-1 at ¶7). The Special Master determined this statement to be a misrepresentation as well. (2016 R&R at 183). The Special Master found that Wilner initially made contact with the plaintiffs between 1995 and 1997, that Wilner had little or no contact with those individuals over the next decade, and that Wilner only began re-contacting his "clients" beginning in late 2006, which is consistent with the lack of records of client communications from the 1995-2006 time frame. (Id. at 183-84). The Special Master adds that paragraph 8 of the Declaration seems to contradict paragraph 7. (See Doc. 589-1 at ¶¶7-8). In paragraph 8, Wilner stated that the status of the original claimants was unknown as of the Engle filing deadline. The Special Master advises that not knowing the status of the original claimants is inconsistent with having maintained contact with the plaintiffs leading up to the January 2008 deadline. (2016 R&R at 184).

The Eleventh Circuit recognized similar contradictions in Wilner's statements about the level of contact he maintained with the plaintiffs:

> Next, in his sworn declaration, Mr. Wilner stated, "my firm had successfully remained in contact with most but not all of these clients during the decade long period between their initial contact with the firm and the Supreme Court's [Engle III] decision." Doc. 589–1, at 2. In his Verified Response, Mr. Wilner tells us the opposite: that "[t]here is normally no need to monitor individual class members," and that the Florida Supreme Court's decertification of the class imposed "a unique and exigent circumstance" on his firm "whose last

contacts with these class members could well be decades old." Doc. 822, at 4–5. The summary data he attached to his Verified Response confirms that his last contact with most of the predeceased plaintiffs was in the mid- to late-'90s. We are not given data for the rest of Mr. Wilner's "clients." In light of Mr. Wilner's confessed belief that he was "duty bound to presume [he] represented each client who made contact," id. at 18, <u>we are left with the inevitable conclusion that he filed lawsuits in 2008 for many individuals whose last, and perhaps only, contact with his firm was nearly a decade earlier, who never authorized him to file suit, and who, in all likelihood, had no earthly idea that Mr. Wilner considered himself to be their lawyer.</u>

In re Engle Cases, 767 F.3d at 1112 (emphasis added).

Given the inconsistencies with paragraph 7 of Wilner's April 6, 2012 Declaration, the Court agrees with the Special Master that Wilner once again misrepresented the level of contact he maintained with his "clients." Wilner knew, or must have known, that he had lost contact with hundreds of plaintiffs a decade earlier (some of whom had been dead for that long). Wilner made the representation to obscure that he had lost contact with most – if not all – of the plaintiffs on whose behalf he filed complaints. The misrepresentation was made in bad faith. As such, sanctions are appropriate pursuant to the Court's inherent authority for Wilner's false assertions in the Declaration regarding the level of contact he maintained with the plaintiffs.

**PART VI**

**A. Monetary Sanctions**

The Court has determined that Wilner and Farah violated Rule 11 by advocating 588 personal injury complaints involving dead plaintiffs and 572 cases where the plaintiff never responded to the Court Questionnaire. The Court has also determined that Wilner and Farah violated 28 U.S.C. § 1927 by maintaining these cases, as well as 15 cases that were

unauthorized; 18 cases where the plaintiff or decedent was not a smoker; 36 cases where the plaintiff or decedent never lived in Florida; and 28 cases that were previously adjudicated. Alternatively, the Court has the inherent authority to sanction Wilner and Farah for filing and maintaining these cases, as doing so violated the Florida Rules of Professional Conduct and their responsibilities as officers of this Court. Moreover, the Court has the inherent authority to sanction Wilner for misrepresentations made during the June 6, 2011 hearing (Doc. 171) and in his April 6, 2012 Declaration (Doc. 589-1). Due to some overlap between categories of frivolous cases, the total number of sanctionable cases is 1,250.[67] This figure represents about a third of the 3,765 <u>Engle</u>-progeny complaints originally filed.[68]

The Court further determines that monetary sanctions are necessary to impress upon Wilner and Farah, and all others who litigate in this Court, that the Court cannot tolerate the type of conduct they have displayed in these cases. Non-monetary sanctions alone, such as a reprimand, will not suffice. Although the cold transcripts do not reflect it, Wilner's attitude throughout the proceedings has never reflected contrition. During the June 2011 status conference, for instance, Wilner's attitude was one of defiant indignation that the Court would suggest he was unaware of the status of the plaintiffs, as well as condescending assurance that the Court had no reason to worry about the viability of the remaining 2,900 cases. At the December 13, 2016 sanctions hearing, Wilner still did not seem to appreciate how seriously his conduct deviated from professional norms. Nor did Wilner seem to grasp

[67] For ease of reference, the Court will file a separate Appendix to Opinion and Order (Doc. 2182) listing the cases found sanctionable and for what reason.

[68] The number of frivolous filings is likely higher, but the Court has limited itself to these.

the incredible strains his cavalier approach to filing Engle complaints imposed on the justice system – strains that were magnified by the fact that, at the time, the Middle District of Florida had the ninth heaviest weighted caseload in the country (out of 94 district courts).[69] Counsel's actions also delayed, perhaps by years, plaintiffs with meritorious cases from having their claims heard.

Under Rule 11, a sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). The sanction may include "an order to pay a penalty into court" if the Court is acting sua sponte, as it is here. Fed. R. Civ. P. 11(c)(4). The Court must also consider the following factors in fashioning the appropriate sanction:

> (1) "[w]hether the improper conduct was willful, or negligent"; (2) "whether it was part of a pattern of activity, or an isolated event"; (3) "whether it infected the entire pleading, or only one particular count or defense"; (4) "whether the person has engaged in similar conduct in other litigation"; (5) "whether it was intended to injure"; (6) "what effect it had on the litigation process in time or expense"; (7) "whether the responsible person is trained in the law"; (8) "what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case"; and (9) "what amount is needed to deter similar activity by other litigants."

Thomas v. Early Cty., Ga., 518 F. App'x 645, 646 (11th Cir. 2013) (quoting Fed. R. Civ. P. 11(b), Adv. Cmt. Notes to 1993 Amend.).

Applying these factors, the Special Master recommends that: (1) Wilner's and Farah's conduct was "willful and reckless"; (2) Counsel's conduct was part of a pattern that began with the filing of frivolous complaints and continued until the Court dismissed the

---

[69]http://www.uscourts.gov/sites/default/files/statistics_import_dir/District_FCMS_June_2011.pdf

last frivolous case; (3) Counsel's conduct infected the entire <u>Engle</u> litigation; (4) there is no evidence of similar previous misconduct by Wilner or Farah; (5) it is not clear that Wilner and Farah intended to injure, but they acted with conscious disregard to how their conduct would affect the Court, the defendants, and other litigants who were waiting to have their cases adjudicated; (6) in terms of time and expense, Wilner's and Farah's conduct burdened the Court for years, and required both the Court and the defendants to expend significant additional resources; (7) Wilner and Farah were attorneys trained in the law; (8) deterring repetition in the same case is not a factor now that the <u>Engle</u> litigation is over; and (9) total disgorgement of attorney's fees and costs is the only sanction sufficient to deter other lawyers from engaging in similar misconduct. (Doc. 2170, Response at 44-46). With respect to the ninth factor, the Special Master reasons:

> By imposing a modest fine on a per cases basis, unscrupulous attorneys of like mind would not be deterred from engaging in such conduct. Rather, it would just require a calculus to determine whether the fees collected in the successful cases would be in excess of the sanctions imposed for the frivolous cases. Only by removing any possibility of profit can the Court be satisfied in the deterrent effect of the sanction.

(<u>Id.</u> at 46). "By preventing Farah and Wilner from profiting from their willful and reckless conduct, the Special Master believes [the sanction of complete disgorgement of fees] is the most appropriate means of deterring repetition of the conduct or comparable conduct by others similarly situated." (2016 R&R at 285).

The Court agrees with the Special Master's assessment of the first eight factors, but stops short of deciding that disgorgement of all attorneys' fees and costs is the proper sanction. To be sure, Wilner's and Farah's conduct was so egregious that disgorgement

could be justified as necessary to deter similar abuses in future mass tort litigation. But the Court is mindful that the process employed is civil in nature and accordingly, the sanction must not be punitive. Moreover, a sanction of total disgorgement would deprive Wilner and Farah even of the fees they earned from prosecuting or settling legitimate causes of action, and would ignore the benefits attained for willing plaintiffs who had meritorious claims. The Court is unaware of any precedent where an attorney's sanction for litigating certain frivolous lawsuits consisted of losing the fees and costs earned from prosecuting other lawsuits with valid claims. As such, the Court declines the Special Master's recommendation to disgorge Wilner and Farah of all attorney's fees and costs. Instead, the Court seeks to find a lesser monetary sanction, but one that still serves as an adequate deterrent, and which reflects the seriousness of Wilner's and Farah's behavior.

The formulation for determining the appropriate sanction varies somewhat depending on which authority the Court invokes to impose sanctions. However, some common themes govern the calculation of monetary sanctions, regardless of whether they are imposed under Rule 11 <u>sua</u> <u>sponte</u>, § 1927, or the Court's inherent power. First, a district court has broad discretion under all three authorities to determine the type and amount of a sanction. <u>Peer</u>, 606 F.3d at 1316 (under their inherent authority "district courts have broad discretion to determine whether to impose sanctions and the nature or amount of those sanctions."); <u>Amlong</u>, 500 F.3d at 1237-38 (abuse of discretion standard applies to a court's decision about sanctions under § 1927 and its inherent authority, which "recognizes the range of possible conclusions the trial judge may reach.")); <u>Riccard</u>, 307 F.3d at 1295 ("Although the sanctions most commonly imposed [under Rule 11] are costs and attorney's

fees, the selection of the type of sanction to be imposed lies with the district court's sound exercise of discretion.").

Second, where, as here, the sanction is not to compensate the opposing party but the Court itself, the Court may, in its discretion, design a monetary sanction so that it compensates the public for the waste of judicial resources caused by an attorney's misconduct. E.g., Eisenberg v. Univ. of New Mexico, 936 F.2d 1131, 1136-37 (10th Cir. 1991) (affirming district court's imposition of $250 Rule 11 sanction related "to excess court time expended in deciding the [frivolous] issue."); Magnus Electronics, Inc. v. Masco Corp. of Indiana, 871 F.2d 626, 634 (7th Cir. 1989) ("A district judge, once the grounds for sanctions [under Rule 11] have been established, may impose various costs and expenses upon the attorney. The district judge is free to fine an attorney for the court's time, but that fine must be based on court costs and paid to the clerk's office.") (citing with approval Robinson v. Moses, 644 F. Supp. 975, 982 (N.D. Ind. 1986) (imposing $3,600 sanction on litigant, representing the value of six hours of the judge's time at $600 per hour, to account "for the waste of judicial resources this suit has caused."), and Nixon v. Rose, 631 F. Supp. 794, 797 (N.D. Ind. 1985) (imposing $2,000 sanction, payable to the court, to account for the "significant expenditure of judicial resources in order to deal with the absolutely groundless and frivolous claims asserted in this case.")). With respect to 28 U.S.C. § 1927, "the dollar amount of the sanction must bear a financial nexus to the excess proceedings, i.e., the sanction may not exceed the 'costs, expenses, and attorneys' fees reasonably incurred because of such conduct.'" Amlong, 500 F.3d at 1239 (quoting Peterson, 124 F.3d at 1396). And in imposing sanctions under the Court's inherent power, "a district court is

well within its discretion to 'fashion[ ] a sanction which is a direct response to the harm that the bad faith conduct of the attorney causes.'" Peer v. Lewis (Peer II), 571 F. App'x 840, 845 (11th Cir. 2014), cert. denied, 135 S. Ct. 1176, 191 L. Ed. 2d 133 (2015) (quoting Barnes, 158 F.3d at 1215). Therefore, a sanction that reimburses the public for the diversion of judicial resources caused by frivolous, bad faith litigation falls within the scope of the three applicable authorities – Rule 11, § 1927, and the judiciary's inherent power.

Third, if a court seeks to impose a sanction that is compensatory rather than punitive, there must be a causal link between the amount of the sanction and the litigant's misbehavior. Goodyear Tire & Rubber Co. v. Haeger, 137 S. Ct. 1178, 1186 (2017) (causal link required for compensatory sanction under a court's inherent authority); id. at 1186 n.5 (noting the need for a causal link for sanctions under Rule 11 and 28 U.S.C. § 1927). "That kind of causal connection . . . is appropriately framed as a but-for test": the sanction must be based on the costs that would not have been incurred but for the misconduct. Id. at 1187 (citing Fox v. Vice, 563 U.S. 826, 836 (2011); Paroline v. United States, 134 S. Ct. 1710, 1722 (2014)). "This but-for causation standard generally demands that a district court assess and allocate specific litigation expenses," but it does not require district courts to "'become green-eyeshade accountants.'" Id. (quoting Fox, 563 U.S. at 838). "The essential goal" in fashioning a compensatory sanction is "to do rough justice, not to achieve auditing perfection." Fox, 563 U.S. at 838. Therefore, a district court "may take into account [its] overall sense of a suit, and may use estimates in calculating and allocating" costs. Goodyear, 137 S. Ct. at 1187. In "exceptional cases," the but-for standard even allows a court to shift all of the costs "from either the start or some midpoint of a suit, in one fell swoop." Id.

> Chambers v. NASCO offers one illustration. There, we approved such an award because literally everything the defendant did—"his entire course of conduct" throughout, and indeed preceding, the litigation—was "part of a sordid scheme" to defeat a valid claim. 501 U.S., at 51, 57, 111 S.Ct. 2123 (brackets omitted). Thus, the district court could reasonably conclude that all legal expenses in the suit "were caused ... solely by [his] fraudulent and brazenly unethical efforts." Id., at 58, 111 S.Ct. 2123. Or to flip the example: If a plaintiff initiates a case in complete bad faith, so that every cost of defense is attributable only to sanctioned behavior, the court may again make a blanket award.

Id. at 1187-88 (emphasis added). Thus, under the "but-for" test, the Court can impose the entire cost of a lawsuit if the suit was a sham from the beginning.

There are good reasons for tying the monetary sanction to the costs that an attorney or litigant imposes on the Court. "The judicial system of dispute resolution is not cost free and those who abuse it through misconduct impose direct costs on the law abiding taxpayers who support it." Specialized Plating, Inc. v. Federal Envtl. Serv., Inc., 975 F. Supp. 397, 398 (D. Mass. 1997) (basing $5,250 sanction on the waste of three hours of the court's time). "[T]he crowded dockets of the federal courts cannot tolerate the burden posed by factually baseless suits that drain judicial resources. This court will sanction those cases, like this one, that are so meritless they can only waste the court's resources." Robinson, 644 F. Supp. at 983. Indeed, one of the purposes of Rule 11 sanctions is to "discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses." Fed. R. Civ. P. 11, Adv. Cmt. Note, 1983 Amend. Frivolous litigation diverts the time and attention of judges and their chambers away from meritorious lawsuits, leaving the public and other litigants to pay for misbehaving lawyers' malfeasance, mainly in the form of longer delays. And, as the familiar maxim goes, "justice delayed is justice denied." Of

course, the Court cannot restore lost time to those parties whose cases were delayed while the Court sorted through the mess of Wilner's and Farah's creation. But the Court can restore the public fisc and deter similar abuses of the court system by requiring Wilner and Farah to reimburse the taxpayer for the waste of judicial resources.

"It is possible to place a . . . monetary cost to the taxpayer on this process of adjudication — the core 'product,' if you will, of the judicial branch of government." Specialized Plating, Inc., 975 F. Supp. at 399. In 1982, the Rand Institute for Civil Justice published a study that concluded that each personal injury case in federal court costs taxpayers, on average, $2,785. J. Kayalik & A. Robyn, COSTS OF THE CIVIL JUSTICE SYSTEM: COURT EXPENDITURES FOR PROCESSING TORT CASES at 49 (Rand Institute for Civil Justice, 1982) ("Rand Study").[70] Since its publication, a number of courts and academics have looked to this study as authoritative on the public cost of litigation, e.g., J. Resnik, Managerial Judges, 96 Harv. L. Rev. 374, 423 n.188 (1982); A. Levin & D. Colliers, Containing the Cost of Litigation, 37 Rutgers L. Rev. 219, 219-22 (1985),

---

[70] The study identified two different average costs for suits falling under the "[o]ther personal injury" category – one figure based on data from a 1970 study ($2,785 per case) and the other figure based on data from a 1979 study ($1,750 per case). The Court selected the figure from the 1970 study because that information was based on a more detailed and extensive data set (83,573 usable hours of data) than the 1979 study (31,578 usable hours of data). Id. at 22, 24. And while the 1979 study "pointed to certain deficiencies" in the 1970 study, the deficiency in the 1970 study was that it "underestimated the average time required to process a case," id. at 23, which if anything would have led to an underestimate of the average cost. In any event, the Rand Study corrected for those deficiencies. Id. at 23-24. Moreover, the author of the 1970 study opined that any changes in courts and court culture between 1970 and 1979 did not diminish the relevance of the 1970 data. Id. at 23. As such, the Court is persuaded that the average cost per case based on the 1970 data is superior. Moreover, the Court is convinced that the higher figure better reflects the drain on the Court's resources, given that managing the Engle cases was far more complex than the "average" case.

including in the context of imposing sanctions, <u>Nogess v. Poydras Center, LLC</u>, Civil Action No. 16–15227, 2017 WL 396307, at *14 (E.D. La. Jan. 30, 2017) (collecting cases using figures from the Rand Study to calculate sanctions). Adjusting for inflation in 2017 dollars, this amounts to an average cost to the public of $6,983.42 for each tobacco lawsuit.[71] This data provides a basis for assessing the value of judicial resources wasted by frivolous litigation.

The Court has determined that Wilner and Farah were responsible for filing and maintaining at least 1,250 frivolous suits. With each frivolous lawsuit costing the judiciary, on average, $6,983.42, the value of Court resources wasted by Wilner's and Farah's conduct amounts to $8,729,275. Because these cases were frivolous from their inception, and because Wilner's and Farah's "'entire course of conduct' throughout, and indeed preceding, the litigation" was part of a pattern of advancing invalid claims, the Court can identify the entire cost of these frivolous suits as directly resulting from Counsel's behavior. <u>Goodyear</u>, 137 S. Ct. at 1187-88 (citing <u>Chambers</u>, 501 U.S. at 51, 57, 58). Yet, even this figure inadequately captures the enormity and complexity of the challenges Wilner's and Farah's behavior put before the Court.[72] For nearly two and a half years, from early 2011 to mid-

---

[71] [https://data.bls.gov/cgibin/cpicalc.pl?cost1=565&year1=1982&year2=2017](https://data.bls.gov/cgibin/cpicalc.pl?cost1=565&year1=1982&year2=2017). The Court takes judicial notice of the Bureau of Labor Statistics' inflation-adjustment calculator, a widely-accepted instrument for measuring the present-value of a dollar figure. Other courts have also used this calculator to obtain the present value of the dollar figures presented in the Rand Study. <u>Nogess</u>, 2017 WL 396307 at *15.

[72] The $6,983.42 number represents the "average" personal injury action, which likely underestimates the financial drain on the Court's resources because the <u>Engle</u> cases were not "average," but were complex and necessitated substantial Court time and effort. Ironically, the sanction likely would have been greater had the Court acted immediately on the tobacco companies' motion for Rule 11 sanctions, which was later withdrawn pursuant to the settlement agreement.

2013, the judges of this Court devoted an incalculable amount of time to parsing through thousands of cases to sort out legitimate cases from illegitimate ones. The Court's efforts, mostly opposed by Wilner, included holding multi-judge panel hearings in June 2011 and June 2012 to address the bloated <u>Engle</u> docket, finding and appointing a Temporary Special Master to assist the Court in coping with case management, ordering Wilner to send questionnaires to the plaintiffs, reviewing the Temporary Special Master's reports and analyses, disposing of the frivolous lawsuits (often over Counsel's opposition, as with the hundreds of cases involving Pre-Deceased Plaintiffs and those where the plaintiff never returned a questionnaire), and various other in-chambers tasks. Other litigants suffered as a result – both within and outside the <u>Engle</u> litigation – because the time and resources the Court had to devote to these tasks could have been spent resolving other cases. <u>Ironically, even Wilner himself once acknowledged – albeit in the context of pushing for his own case management plan – that (1) the large volume of Engle claims imposed a significant burden on judicial resources, and (2) delay would harm plaintiffs and the public interest.</u> (Doc. 25 at 8-11).

The cost to the public of Wilner's and Farah's misbehavior does not end there, however. Because "[t]he detection and punishment of a violation . . . is part of the court's

---

(footnote 72 cont'd) However, the Court did not act immediately on the Rule 11 motion because the Court did not want the issue of sanctions to sidetrack it from the primary goal of identifying and resolving viable pending <u>Engle</u> cases (many of which involved plaintiffs in declining health). Because the Court put the sanctions issue on the backburner so as not to cause further delays, the plaintiffs' lawyers had time to reach a global settlement, part of which entailed the withdrawal of the Rule 11 motion. Thus, Wilner and Farah are potentially facing a far less costly sanction than what they would be responsible for had the Court not postponed consideration of the defendants' Rule 11 motion in the interest of focusing on viable cases – something they never did.

responsibility for securing the system's effective operation," Fed. R. Civ. P. 11, Adv. Cmt. Note, 1983 Amend., the Court had a duty to take action once it became apparent that Wilner and Farah had potentially violated their ethical duties and committed sanctionable conduct. To fulfill this duty while retaining the ability to act as a neutral arbiter, the Court appointed the United States Attorney for the Middle District of Florida to act as Special Master to investigate possible misconduct by the plaintiffs' counsel. (Doc. 2108).[73] Yet such an investigation is not cost-free to the public. The United States Attorney is responsible for investigating and prosecuting a range of criminal and civil actions against those who violate federal law. The substantial time and resources that the United States Attorney spent investigating Wilner's and Farah's misconduct could have been used to prosecute other violations of the law. To compensate the public, the Court has determined that the sanction must encompass the cost of the Special Master's labor in carrying out this extensive investigation.[74] According to the Special Master, the value of its labor during the course of

---

[73] The United States Attorney's Office also had the resources to undertake the massive investigation required to unearth and document Wilner's and Farah's misconduct.

[74] The Court has the authority to include the costs, expenses, and attorney's fees incurred in prosecuting the sanctions proceedings. E.g., Norelus v. Denny's, Inc., 628 F.3d 1270, 1297-1302 (11th Cir. 2010) (affirming district court's inclusion of the costs of the sanctions proceedings in an award under 28 U.S.C. § 1927); In re Tutu Wells Contamination Litig., 120 F.3d 368, 387 n.21, 387-88 (3d Cir. 1997) (affirming inclusion of the costs arising from sanctions proceedings under either an inherent authority or rules-based analysis), overruled on other grounds by Cunningham v. Hamilton Cnty., Ohio, 527 U.S. 198 (1999); Silva v. Witschen, 19 F.3d 725, 733 n.15 (1st Cir. 1994) (rejecting "claim that attorney fees reasonably incurred in the sanctions phase may not be made the subject of a Rule 11 sanction").

the sanctions investigation was $435,129.12 (Doc. 2180). Thus, this sum will be included in the sanction.[75]

In total, therefore, Wilner's and Farah's conduct cost **$9,164,404.12** in judicial and other public resources during the course of the federal <u>Engle</u> litigation. The Court considers this figure to be a fitting monetary sanction in view of all the circumstances, including the nine factors enumerated in Rule 11's commentary. <u>See</u> Fed. R. Civ. P. 11, Adv. Cmt. Notes, 1993 Amend. A sanction in this amount is also sufficient, but not greater than necessary, to deter other lawyers from engaging in similarly egregious misconduct. The true cost of vexatious litigation is the diversion of judicial attention away from other cases and the loss of integrity that should underlie the system of civil justice – in addition to the incalculable cost of undermining public trust. This sanction teaches that frivolous litigation imposes real costs, which should be borne by the wrongdoers.

The Court must assure itself that the sanctioned party has the ability to pay. <u>Baker</u>, 158 F.3d at 528-29. The Court is so assured because it is holding in escrow approximately $45 million in attorneys' fees and costs from the global settlement of the remaining federal <u>Engle</u> cases. Although there is a pending state court dispute about the division of those fees among Lieff Cabraser Heimann & Bernstein, Motley Rice, LLC, and the Wilner and Farah firms, it appears based upon the state court pleadings that the Wilner and Farah firms would

---

[75] The Court also considered whether the fees of the Temporary Special Master should be included, because the Court's employment of the Temporary Special Master was necessitated by Wilner's intransigence. However, the Court determined not to do so.

likely be entitled to more than the amount of the sanction.[76] As such, Wilner and Farah have the ability to pay the sanction from readily available funds.

The Court recognizes that a strong case can be made that Wilner and Farah should be disgorged of all fees from the federal Engle litigation; the Court already has said why it is not ordering disgorgement. Nevertheless, the Court is also aware that the monetary sanction it imposes is significant, and perhaps unprecedented. But "[a]s has been observed before, nearly everything about the Engle progeny litigation is sui generis." (Doc. 925 at 12) (citing Waggoner v. R.J. Reynolds Tobacco Co., 835 F. Supp. 2d 1244, 1277 (M.D. Fla. 2011)). Equally unprecedented is a lawyer filing 1,250 frivolous lawsuits, followed by years of maintaining those cases through obfuscation and recalcitrance. It must also be remembered that this sanction is not imposed for a single case. It is instead $6,983.42 – a modest sum given the egregiousness of Counsel's conduct and its adverse consequences on

---

[76] The Court takes judicial notice of the state court pleadings in Howard & Associates v. The Wilner Firm, P.A., et al., Case No. 16-2015-CA-003930 (Fla. 4th Jud. Cir.). According to Wilner's and Farah's Answer, Affirmative Defenses, and Crossclaim, a fee-sharing agreement between Lieff Cabraser and the Wilner and Farah firms calls for Wilner and Farah to receive no less than 40% of any attorney's fees derived from a settlement, Lieff Cabraser to receive no less than 30% of attorney's fees derived from a settlement, and "[t]he remaining 30% of such fees [to] be shared upon further mutual agreement, or, in the absence of such agreement, pursuant to mediation or binding arbitration." (Case No. 16-2015-CA-003930, Docket Entry No. 18 at 9, ¶ 13).

As the Court noted, it has approximately $45 million worth of attorney's fees and costs in the Federal Engle Settlement Fund, which was derived from the settlement of the remaining federal Engle cases. Of that amount, approximately $39 million represents attorney's fees. Assuming Wilner and Farah's share of attorney's fees were not to exceed 40% of the $39 million, their share would still be $15,600,000 – or more than enough to cover the sanction. While Lieff Cabraser contends in the state court action that the fee-sharing agreement is invalid, its claim has yet to be proven, and the Court has no reason to believe at this time that Wilner and Farah ultimately will receive less than the amount of the sanctions. Indeed, during the December 13, 2016 hearing, counsel for Wilner and Farah stated that the Court need not await resolution of the state court litigation before ruling on the sanctions issue (Doc. 2174 at 38-39), and counsel for Lieff Cabraser agreed (id. at 49-50).

the Court's docket – imposed for each of the 1,250 frivolous lawsuits that Counsel advanced in bad faith (plus the cost of the Special Master's labor).[77] While $9,164,404.12 is a large number, it is that large only because of the breathtaking scale of Wilner's and Farah's wrongdoing. To impose a lesser sanction only because the end figure seems too high perversely would give Counsel a break precisely <u>because</u> they advocated such a vast number of frivolous lawsuits. That cannot be. Such a monetary sanction is necessary to compensate the public and to deter other lawyers from engaging in similarly outrageous conduct in the future.

## B. Apportionment of Fault

The Wilner and Farah law firms were responsible for investigating and filing each of the <u>Engle</u>-progeny lawsuits, and it was Wilner and Farah themselves who signed each of the complaints. It was Wilner who filed case management briefs representing that all of the roughly 4,000 plaintiffs were <u>Engle</u> class members. (Doc. 25; <u>see also</u> <u>Nestor Amoros, et al. v. R.J. Reynolds Tobacco Co., et al.</u>, Case No. 3:07-cv-760-J-25HTS, Doc. 35-2). Wilner and Farah also signed court filings where they insisted that the remaining cases were viable, and that questioning or interviewing the plaintiffs was unnecessary because there was no significant number of cases ripe for dismissal. (<u>See</u> Doc. 61, Doc. 158). Wilner played the leading role in deciding to file, maintain, and advocate 1,250 lawsuits he knew or should have known were frivolous. Moreover, it was Wilner who stood before the Court in June

---

[77] While the Court has done its best to anchor its sanction to the estimated cost of each frivolous lawsuit, the Court also seeks "'to do rough justice, not to achieve auditing perfection.'" Goodyear, 137 S. Ct. at 1187 (quoting Fox, 563 U.S. at 838).

2011 and insisted that he had been in recent contact with all of the remaining plaintiffs, and that he could certify that all of the remaining complaints satisfied Rule 11. It was also Wilner who made the misleading representations about his authority to represent the plaintiffs in his April 2012 declaration. (See Doc. 589-1). Accordingly, the Court concludes that Wilner and Farah should be sanctioned.

The Court agrees with the Special Master that the law firms of Lieff Cabraser and Motley Rice should not be sanctioned. Lieff Cabraser and Motley Rice joined the Engle effort in 2011 and 2012, respectively, when Wilner, feeling the weight of the Court's inquiries, belatedly sought them out. Lieff Cabraser and Motley Rice were not responsible for creating the mess. Nor were those firms in the same position as Wilner and Farah to know how haphazardly the cases were investigated and filed – they just weren't around at the time. Overall, Lieff Cabraser and Motley Rice acted reasonably once they became involved in the litigation. Even if they made some mistakes, their conduct never rose to the level of bad faith or recklessness that is necessary for the imposition of sanctions. As such, the Court determines that neither Lieff Cabraser nor Motley Rice should be sanctioned.[78]

---

[78] While the Court believes Wilner is substantially more responsible for what happened in the federal Engle litigation, the Court finds no need to apportion fault between Wilner and Farah. As cosigners on each complaint, each firm had a "nondelegable responsibility to the court" not to submit or later advocate a frivolous pleading. Fed. R. Civ. P. 11, Adv. Cmt. Note, 1993 Amend. Moreover, the need to apportion fault is lessened by the fact that the Court need not collect any money from Counsel; the money to pay the sanction is already in the Court's possession from the Federal Engle Settlement Fund.

## C. Non-Monetary Sanctions

Finally, the Court has the discretion under Rule 11 and its inherent authority to impose a variety of non-monetary sanctions. Fed. R. Civ. P. 11(c)(4) ("The sanction may include nonmonetary directives . . . ."); In re Tutu Wells Contamination Litig., 120 F.3d at 383 (listing options for non-monetary sanctions) (citation omitted). Rule 11's commentary provides a number of examples of possible nonmonetary sanctions, including "issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; [and] … referring the matter to disciplinary authorities." Fed. R. Civ. P. 11, Adv. Cmt. Note, 1993 Amend., subdivisions (b) and (c).

The Special Master recommends that the Court refer the matter to the Florida Bar for an investigation into whether Wilner and Farah violated the Florida Rules of Professional Conduct. (2016 R&R at 288-89, ¶¶ 9-12). The Court agrees.[79] In the Court's opinion, a Bar investigation is warranted with respect to (1) whether Wilner and Farah violated Florida Rule of Professional Conduct ("FRPC") 4–3.1 by pursuing lawsuits lacking any factual basis, and (2) whether Wilner and Farah violated FRPC 4–3.3(a)(1) by knowingly "mak[ing] a false statement of fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer." (There may also be other ethical provisions implicated by Counsel's conduct). The Court is aware that the Florida Bar previously investigated Wilner and, on a limited record, found no probable cause to discipline him. However, in light of the complete record now compiled by the

---

[79] The Court's referral is limited to Norwood Wilner and Charlie Farah, individually, and does not extend to the other lawyers in the respective firms.

Special Master and the Court's findings in this Order, the Court recommends that a further investigation by the Florida Bar is appropriate.

Additionally, the Court determines that a public reprimand is appropriate. As this Order will be published, the Order itself accomplishes that purpose.

## CONCLUSION

Imposing sanctions on members of the Bar of this Court is an unpleasant task. Fatigued from managing the federal <u>Engle</u> docket since 2008, it would have been easier for the undersigned – once the global settlement was announced and the defendants' Rule 11 motion withdrawn – to let this matter go. However, we all agreed that would be inconsistent with our duty to ensure that lawyers who practice before the Court do so ethically and responsibly. If we did not cite Wilner and Farah for unprofessional conduct committed on such a grand scale, how could we continue to insist upon professionalism in our other cases? If this egregious conduct went unchecked, what deterrent would there be for other lawyers in future cases from taking the same approach? As the Honorable William W. Schwarzer of the United States District Court for the Northern District of California aptly stated:

> Of all the duties of a judge, imposing sanctions on lawyers is perhaps the most unpleasant. A desire to avoid doing so is understandable. But if judges turn from Rule 11 and let it fall into disuse, the message to those inclined to abuse or misuse the litigation process will be clear. Misconduct, once tolerated, will breed more misconduct and those who might seek relief against abuse will instead resort to it in self-defense.

<u>Sanctions Under the New Rule 11 – A Closer Look</u>, 104 F.R.D. 181, 205 (1985).

Wilner's and Farah's maintenance of 1,250 frivolous complaints and their refusal to aid the Court in purging these cases from the <u>Engle</u> docket substantially prolonged this

litigation. Wilner and Farah forced the Court, over Wilner's objections, to expend significant time and resources merely identifying and eliminating baseless claims – something a court should not have to do. Wilner's and Farah's conduct evinced disdain for the Court, and reckless disregard for their profession's ethical duties to the Court and to other litigants. As a result of their actions, other litigants faced increased delays as the Court had to divert its attention to cleaning up the mess that was the <u>Engle</u> docket. It is hard to overstate the strains Wilner and Farah placed on the Court's already-stretched resources. We impose these sanctions reluctantly but with the conviction that it is the right thing to do.

Accordingly, it is hereby **ORDERED:**

1. The Court sanctions The Wilner Firm, P.A., and Farah & Farah, P.A. **$9,164,404.12** as described herein.

2. The Court refers the matters discussed herein to The Florida Bar for an investigation into:

   a. Whether Norwood Wilner and Charlie Farah violated FRPC 4–3.1 by filing and maintaining frivolous and factually baseless lawsuits;

   b. Whether Norwood Wilner and Charlie Farah violated FPRC 4–3.3(a)(1) by making a false statement of fact or law to this Court or failing to correct a false statement of material fact or law previously made to the Court.

   c. Any other violations of the Florida Rules of Professional Conduct.

   d. The Clerk is directed to transmit this Opinion and Order as well as the entire record of the sanctions proceedings to the Florida Bar.

3. The Court continues the appointment of the Special Master through the completion of any appeal of this Order.

4. The Court will issue such orders as necessary to transfer the sanctions amount from the Federal Engle Settlement Fund to the Court's registry. The Court will maintain those funds in the Court's registry until any appeal of this Order is completed. Lieff Cabraser is directed, no later than **November 1, 2017**, to submit a proposed Order which will withdraw the sanctions amount of $9,164,404.12 from the Federal Engle Settlement Fund and deposit it into the Court's registry.

5. Cognizant of the pending state court litigation regarding the division of fees, the Court directs all counsel for the tobacco plaintiffs to submit a joint proposal, no later than **December 19, 2017**, as to how the Court should disburse the remaining money in the Federal Engle Settlement Fund following the subtraction of the sanctions amount. If the parties cannot agree on a joint proposal, or if the matter is still in litigation, the lawyers should advise the Court as to how it should proceed.

**DONE AND ORDERED** this 18th day of October, 2017.


WILLIAM G. YOUNG
United States District Judge


TIMOTHY J. CORRIGAN
United States District Judge


MARCIA MORALES HOWARD
United States District Judge


ROY B. DALTON JR.
United States District Judge